**2022-2090**

# United States Court of Appeals for the Federal Circuit

KOSS CORPORATION,

*Appellant,*

— v. —

BOSE CORPORATION,

*Appellee.*

*On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2021-00297*

## BRIEF FOR APPELLANT

MARK G. KNEDEISEN
CHRISTOPHER M. VERDINI
MICHELLE WEAVER
RAGAE GHABRIAL
BRIAN P. BOZZO
LAURÉN S. MURRAY
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222
(412) 355-6500
mark.knedeisen@klgates.com
christopher.verdini@klgates.com
michelle.weaver@klgates.com
ragae.ghabrial@klgates.com
brian.bozzo@klgates.com
lauren.murray@klgates.com

*Counsel for Appellant*

NOVEMBER 14, 2022

## U.S. Patent 10,368,155 – Claims 1-14

1. A wireless headphone assembly comprising:

first and second earphones, wherein each of the first and second earphones

    comprises an acoustic transducer;

an antenna for receiving wireless signals;

a wireless communication circuit connected to the antenna, wherein the wireless

    communication circuit is for receiving and transmitting wireless signals to and

    from the wireless headphone assembly;

a processor in communication with the wireless communication circuit; and

a rechargeable battery for powering the wireless headphone assembly,

wherein the headphone assembly is configured, with the processor, to transition

    automatically from playing digital audio content received wirelessly by the

    headphone assembly via a first wireless network to playing digital audio content

    received wirelessly by the headphone assembly via a second wireless network.


2. The wireless headphone assembly of claim 1, wherein the processor is further

configured to, upon activation of a user-control of the headphone assembly, initiate

transmission of a request to a remote network server.


3. The wireless headphone assembly of claim 2, wherein:

the headphone assembly further comprises a microphone; and

the processor is further configured to:

> process audible utterances by a user of the headphone assembly picked up
>
> > by the microphone in response to activation of the microphone by the
> >
> > user; and
>
> transmit a communication based on the audible utterances via the first or
>
> > second wireless networks.

4. The wireless headphone assembly of claim 1, wherein: the first earphone comprises a first earbud; and the second earphone comprises a second earbud.

5. The wireless headphone assembly of claim 4, wherein each of the first and second earphones comprises:

an antenna;

a wireless communication circuit connected to the at least the antenna;

a processor in communication with the wireless communication circuit; and

a rechargeable battery for powering the wireless headphone assembly.

6. The wireless headphone assembly of claim 1, further comprising a headband connected between the first and second earphones.

7. The wireless headphone assembly of claim 6, wherein the first and second earphones comprise speaker elements housed in on-ear headphones.

8. The wireless headphone assembly of claim 6, wherein the first and second earphones comprise speaker elements housed in over-ear headphones.

9. The wireless headphone assembly of claim 1, wherein each of the first and second earphones comprises:

a hanger bar that sits upon an upper external curvature of a user's ear; and

a body connected to the hanger bar, wherein the acoustic transducer is connected to the body.

10. The wireless headphone assembly of claim 1, further comprising a docking station to charge the rechargeable battery when the first and second earphones are connected to the docking station.

11. The wireless headphone assembly of claim 1, wherein the processor is configured to transition automatically from playing digital audio content received wirelessly by the headphone assembly via the first wireless network to playing

digital audio content received wirelessly by the headphone assembly via the second wireless network based on a signal strength level for the second wireless network.

12. The wireless headphone assembly of claim 11, wherein the processor is configured to transition automatically from playing digital audio content received wirelessly by the headphone assembly via the first wireless network to playing digital audio content received wirelessly by the headphone assembly via the second wireless network based on whether the signal strength level for the second wireless network is above a threshold level.

13. The wireless headphone assembly of claim 1, wherein the processor is further configured to receive firmware updates from a remote computer device.

14. The wireless headphone assembly of claim 1, further comprising a memory unit that stores network identifiers for the first and second wireless networks.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---:|:---|
| **Case Number** | 2022-2090 |
| **Short Case Caption** | Koss Corp. v. Bose Corp. |
| **Filing Party/Entity** | Koss Corp. |

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: Nov. 14, 2022

Signature:    /s/ Mark G. Knedeisen

Name:    Mark G. Knedeisen

| 1. Represented Entities.<br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☒ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☒ None/Not Applicable |
| Koss Corp. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐     None/Not Applicable     ☐     Additional pages attached

| | | |
|---|---|---|
| K&L Gates LLP | Mark G. Knedeisen | Christopher M. Verdini |
| Laurén Murray | Brian P. Bozzo | Michelle Weaver |
| Ragae M. Ghabrial | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐     None/Not Applicable     ☐     Additional pages attached

*Koss Corp. v. Bose Corp.*, No. 1:20-cv-12193-RGS (D. Mass.)

*Koss Corp. v. PEAG LLC*, No. 3:21-cv-01177-CAB-JLB (S.D. Cal.)

*Koss Corp. v. Plantronics, Inc.*, No. 4:21-cv-03854-JST (N.D. Cal)

*Koss Corp. v. Skullcandy, Inc.*, Nos. 2:21-cv-00203-DBB  (D. Utah)

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☒     None/Not Applicable     ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ............................................................... i

TABLE OF AUTHORITIES ................................................................. vi

STATEMENT OF RELATED CASES .................................................... 1

JURISDICTIONAL STATEMENT ........................................................ 2

STATEMENT OF THE ISSUES............................................................ 3

STATEMENT OF THE CASE............................................................... 4

    I.      THE '155 PATENT ............................................................ 4

    II.     DISTRICT COURT PROCEEDINGS................................. 7

    III.    *INTER PARTES* REVIEW ................................................ 9

SUMMARY OF ARGUMENT ............................................................ 20

ARGUMENT ....................................................................................... 22

    I.      STANDARD OF REVIEW ............................................... 22

    II.     THE BOARD ERRED BY CONCLUDING THAT
              REZVANI INCLUDES PRINTING OR DRAFTING
              ERRORS ........................................................................... 23

          A.    No Reasonable Mind Would Accept That Rezvani
                  Includes Obvious Printing or Drafting Errors........................... 24

          B.    The Board's Determination That Rezvani Includes
                  Obvious Errors Was Not Harmless........................................... 29

                1.    Rezvani Does Not Satisfy Limitation 1.g When
                        Rezvani is Not Assumed to Include Printing or
                        Drafting Errors ................................................................. 29

                      a.    The Board Erred Legally in Its Construction
                              of "Transition Automatically"............................... 31

b. Rezvani Does Not Teach or Suggest Limitation 1.g Under the Proper Legal Construction for "Transition Automatically" .......................................34

2. The Board's Alternative Theory Is Flawed Factually and Legally .......................................38

a. A Reasonable Mind Would Not Accept As Adequate Williams's Testimony That Rezvani Includes "Unambiguous" Disclosures of the Headset Executing an Automatic Transition .......................................39

b. The Board Applied an Improper Obviousness Analysis for Its Alternative Theory .......................................42

3. The Board Should Not Have Considered Williams's Testimony That (i) Rezvani Includes Errors and (ii) Other Portions of Rezvani "Unambiguously" Disclose Rezvani's Headset Executing the Seamless Handoff .......................................44

III. THE BOARD ERRED BY RELYING ON THE PORTIONS OF REZVANI THAT THE BOARD DETERMINED ARE ERRONEOUS .......................................50

A. The Board Erred by Relying on Portions of Rezvani That the Board Determined Include Errors .......................................50

B. Bose's Invalidity Theories for Ground 2A Collapse Without Rezvani's ¶¶ [0041] and [0050] .......................................53

IV. CONCLUSION .......................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*3Shape A/S v. Align Tech., Inc.*, IPR2019-00151, Paper 42, 45,
2020 WL 4031552 (PTAB July 16, 2020)...........................................................48

*Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*,
841 F.3d 1334 (Fed. Cir. 2016)..........................................................................54

*Apple Inc. v. Andrea Elecs. Corp.*,
949 F.3d 697 (Fed. Cir. 2020).............................................................................49

*Chamberlain Grp., Inc. v. One World Techs., Inc.*,
944 F.3d 919 (Fed. Cir. 2019)...................................................................... 23, 49

*ClearOne, Inc. v. Shure Acquisition Holdings, Inc.*,
35 F.4th 1345 ......................................................................................................50

*Cuozzo Speed Techs., LLC v. Lee*,
579 U.S. 261 (2016).............................................................................................45

*Ericsson Inc. v. Intellectual Ventures I LLC*,
901 F.3d 1374 (Fed. Cir. 2018)...........................................................................49

*Ex Parte Barthelemy*,
Appeal No. 2003-2023, 2004 WL 4979042 (B.P.A.I. Jan. 21, 2004) .................51

*Ex Parte Burger*,
Appeal No. 2009-004196, 2009 WL 3497070 (B.P.A.I. Oct. 27, 2009).............51

*Graham v. John Deere Co.*,
383 U.S. 1 (1966) ................................................................................................28

*Hamilton Beach Brands, Inc. v. f'real Foods, LLC*,
908 F.3d 1328 (Fed. Cir. 2018)................................................................... 23, 30

*In re NuVasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016)...........................................................................22

*In re Yale*,
434 F.2d 666 (C.C.P.A. 1970) .................................................................... 21, 51

*Insite Vision Inc. Sandoz, Inc.*,
783 F.3d 853 (Fed. Cir. 2015)................................................................42

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016)......................................................... 23, 48

*Key Pharms. v. Hercon Labs. Corp.*,
161 F.3d 709 (Fed. Cir. 1998).................................................................30

*KSR Int'l Co. v. Telefex*,
550 U.S. 398 (2007).................................................................................28

*LG Elecs. Inc. v. Immervision, Inc.*,
39 F.4th 1364 (Fed. Cir. 2022) ....................................... 21, 22, 50, 51

*Marmo v. Tyson Fresh Meats, Inc.*,
457 F.3d 748 (8th Cir. 2006) ..................................................................47

*Mintz v. Dietz & Watson, Inc.*,
679 F.3d 1372 (Fed. Cir. 2012).............................................................42

*Palo Alto Networks, Inc. v. Finjan, Inc.*,
836 Fed. Appx. 916 (Fed. Cir. 2020)....................................................31

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005).......................................... 31, 32, 33

*Power Integrations, Inc. v. Lee*,
797 F.3d 1318 (Fed. Cir. 2015)..............................................................22

*Pride Mobility Prods. Corp. v. Permobil, Inc.*,
818 F.3d 1307 (Fed. Cir. 2016)..............................................................22

*Qualcomm Inc. v. Apple Inc.*,
24 F.4th 1367 (Fed. Cir. 2022) .............................................................52

*SuperGuide Corp. v. DirecTV Enters., Inc.*,
358 F.3d 870 (Fed. Cir. 2004).................................................................35

*Ultratec, Inc. v. CaptionCall, LLC*,
872 F.3d 1267 (Fed. Cir. 2017)..............................................................23

*United States v. Pulsifer*,
39 F.4th 1018 (8th Cir. 2022) .................................................................35

*Univ. of Strathclyde v. Clear-Vu Lighting LLC,*
    17 F.4th 155 (Fed. Cir. 2021) ...............................................................22

*Yorkey v. Diab,*
    605 F.3d 1297 (Fed. Cir. 2010) ............................................................30

**Statutes and Other Authorities:**

5 U.S.C. § 706 .......................................................................................22

5 U.S.C. § 706(2)(A) ..............................................................................22

5 U.S.C. § 706(2)(E) ...............................................................................22

28 U.S.C. § 1295(a)(4)(A) .........................................................................2

35 U.S.C. § 103 ................................................................................. 3, 22

35 U.S.C. § 141–144 ..................................................................................2

35 U.S.C. §§ 311–315 ................................................................................2

35 U.S.C. § 311(b) ............................................................................ 21, 52

35 U.S.C. § 312(a)(3) ...............................................................................45

35 U.S.C. § 319 ..........................................................................................2

37 C.F.R. § 42.100(b) ..............................................................................31

## STATEMENT OF RELATED CASES

This appeal arises from a final written decision in IPR2021-00297 concerning U.S. Patent 10,368,155 B2 ("the '155 Patent"), assigned to Koss Corporation, which is the appellant here. The IPR petitioner and appellee is Bose Corporation.

This appeal may affect the litigation between Koss Corporation and Bose Corporation in *Koss Corp. v. Bose Corp.*, No. 1:20-cv-12193-RGS (D. Mass.), which case is presently stayed pending final adjudication of *inter partes* review proceedings for the three patents asserted by Koss Corporation, one of which is the '155 Patent.

This appeal may also affect the following litigations involving the '155 Patent, all of which are presently stayed: *Koss Corp. v. PEAG LLC*, No. 3:21-cv-01177-CAB-JLB (S.D. Cal.); *Koss Corp. v. Plantronics, Inc.*, No. 4:21-cv-03854-JST (N.D. Cal); and *Koss Corp. v. Skullcandy, Inc.*, Nos. 2:21-cv-00203-DBB (consolidated with Case No. 2:21-cv-00557-DBB) (D. Utah).

## JURISDICTIONAL STATEMENT

The Board had jurisdiction under 35 U.S.C. §§ 311–315, and issued its Final Written Decision on May 31, 2022.  Appx1–62.  Koss Corporation filed a timely Notice of Appeal on August 1, 2022.  Appx753–757.  This Court has jurisdiction under 35 U.S.C. §§ 141–144, 319 and 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

1.      Whether there is substantial evidence supporting the Board's determination that portions of the primary reference, Rezvani, for Grounds 2A–2E, include errors and, if there is not such substantial evidence, whether the Board's erroneous determination that Rezvani includes errors was harmless.

2.      If the Board's determination that Rezvani includes errors was correct, whether the Board abused its discretion by relying on the portions of Rezvani that include errors to conclude that claims 1–14 of the '155 Patent are unpatentable under 35 U.S.C. § 103 and, if the Board erred by relying on the erroneous portions of Rezvani, whether that error was harmless.

# STATEMENT OF THE CASE

## I.  THE '155 PATENT

The '155 Patent is assigned to Koss Corporation ("Koss").  John C. Koss, the founder of Koss, invented the world's first high-quality stereophonic headphone, the SP/3 stereophone.  Appx3657–3658, ¶¶ 12–13.  Koss's commitment to, and storied history of, headphone development has continued to the present.  Appx3658–3667, ¶¶ 14–42.  Relevant to the '155 Patent, in the early 2000s, Koss began its internally named "Striva" project, born out of Koss's recognition that wireless headphones were going to be an integral part of people's audio consumption.  Appx3664–3667, ¶¶31–41.

The '155 Patent is a result of the Striva project.  The '155 Patent is directed to a wireless headphone assembly that comprises, among other things, two ("first and second") earphones and a processor.  As stated in claim 1, the "headphone assembly is configured, with the processor, to transition automatically from playing digital audio content received wirelessly by the headphone assembly via a first wireless network to playing digital audio content received wirelessly by the headphone assembly via a second wireless network."  Appx162, 18:14–19; *see also* Appx7.  This limitation in claim 1 of the '155 Patent was referred to as limitation "1.g" in the petition (Appx191), the Institution Decision (Appx414) and the Final Written Decision ("FWD") (Appx7).  For consistency, it is referred to

herein as limitation "1.g" as well.

In operation, if the headphone assembly is receiving digital audio content via a first wireless network, and the headphone assembly loses its connection to that first wireless network or the headphone assembly goes out of range of the first network, the headphone assembly transitions automatically to receiving digital audio content via a second wireless network.  Appx154, 1:67–2:6; Appx156, 5:9–15.

The '155 Patent describes two general types of wireless network: "ad hoc" and "infrastructure" wireless networks.  According to the '155 Patent, an ad hoc wireless network is "a network where two (or more) wireless-capable devices … communicate directly and wirelessly, without using an access point."  Appx155, 3:3–6.  Bluetooth is an example of an ad hoc wireless link.  *Id.*, 4:56–61.  An infrastructure wireless network, on the other hand, "is a wireless network that uses one or more access points to allow a wireless-capable device, such as the wireless earphone, to connect to a computer network, such as a LAN or WAN (including the Internet)."  *Id.*, 3:7–11.  Figure 6 of the '155 Patent (shown below) is a flowchart depicting how the wireless earphones could, for example, transition from streaming audio via an ad hoc wireless network to streaming audio via an infrastructure wireless network.  *See* Appx158–159, 10:49–11:56.



FIG. 6

The '155 Patent includes fourteen claims, of which claim 1 is the sole independent claim. The '155 Patent claims priority via several continuation applications to a PCT application, PCT/US2009/039754, filed April 7, 2009 ("PCT Application," Appx1754–1798), and to a provisional application, Serial No.

61/123,265, filed April 7, 2008 ("Provisional Application," Appx8627–8652).

Appx135–136, field codes (60) and (63).

## II. DISTRICT COURT PROCEEDINGS

On July 22, 2020, Koss filed a patent infringement suit in the District Court for the Western District of Texas against Bose Corporation ("Bose") alleging that Bose infringed three Koss patents: the '155 Patent; U.S. Patent No. 10,206,025 ("'025 Patent"); and U.S. Patent No. 10,469,934 ("'934 Patent").  Appx3655.  The '155, '025 and '934 Patents all claim priority to the abovementioned PCT Application and Provisional Application.

Koss also filed four additional infringement actions on the same day against four other entities.  Koss asserted infringement of the '155 Patent in three of those four other cases: *Koss Corp. v. PEAG LLC*, Case No. 6:20-cv-00662 (W.D. Tex.) (*see* Appx796:204); *Koss Corp. v. Plantronics, Inc.*, Case No. 6:20-cv-00663 (W.D. Tex.) (*see* Appx7909); and *Koss Corp. v. Skullcandy, Inc.*. Case No. 6:20-cv-00664 (W.D. Tex.) (*see* Appx7936).  In the fourth case, *Koss Corp. v. Apple Inc.*, Case No. 6:20-cv-00665 (W.D. Tex.), Koss did not assert infringement of the '155 Patent, although it asserted infringement of the '025 and '934 Patents (as well as other Koss patents).

Bose filed one *inter partes* review ("IPR") request for each of the three patents that Koss asserted against Bose, including for the '155 Patent.  Appx167–

278, Appx4–5 (listing related IPRs).  Apple filed multiple IPRs for the patents asserted by Koss against Apple, including for the '025 and '934 Patents.  Appx4–5.

On December 10, 2020, Bose filed a declaratory judgment action in the District Court for the District of Massachusetts seeking a declaration of noninfringement of the three Koss patents (including the '155 Patent) that Koss asserted against Bose in the Western District of Texas.  *Koss Corp. v. Bose Corp.*, Case No. 1:20-cv-12193, Dkt. No. 1 (D. Mass. Dec. 10, 2020).  The case was stayed pending the Western District of Texas's ruling on Bose's improper venue motion.  *Koss Corp. v. Bose Corp.*, Case No. 1:20-cv-12193, Dkt. No. 8 (D. Mass. Feb. 5, 2021).

In June 2021, the District Court for the Western District of Texas dismissed Koss's complaint against Bose for improper venue.  *Koss Corp. v. Bose Corp.*, Case No. 6:20-cv-00661, Dkt. No. 55 (W.D. Tex. June 23, 2021).  Upon dismissal, Koss filed a counterclaim against Bose in the District Court for the District of Massachusetts asserting infringement of the same three Koss patents, including the '155 Patent.  *Koss Corp. v. Bose Corp.*, Case No. 1:20-cv-12193, Dkt. No. 14 (D. Mass. July 29, 2021).[1]

---

[1] The Massachusetts district court realigned the parties to have Koss listed as the plaintiff in view of the earlier filed Western District of Texas case.  *Id.*, Dkt. No.

In September 2021, the Massachusetts district court stayed the case pending the institution decisions for the Bose and Apple IPRs (*id.*, Dkt. No. 30 (D. Mass. Sept. 3, 2021)), and continued the stay until completion of the IPRs after some of the IPRs, including Bose's three IPRs, were instituted. *Id.*, Dkt. No. 33 (D. Mass. Oct. 15, 2021). The Massachusetts case remains stayed pending Bose's IPRs of the Koss patents, including this appeal, although Koss recently moved to lift the stay because some claims of the '025 and '934 Patents survived IPR without amendment. *Id.*, Dkt. No. 56 (D. Mass. Oct. 27, 2022).

The other three cases involving the '155 Patent are presently stayed after being refiled or transferred, as the case may be. *Koss Corp. v. PEAG LLC*, Case No. 3:21-cv-01177, Dkt. No. 40 (S.D. Cal. Oct. 5, 2021); *Koss Corp. v. Skullcandy, Inc.*, Case No. 2:21-cv-00203, Dkt. No. 43 (D. Utah July 21, 2021); *Koss Corp. v. Plantronics, Inc.*, Case No. 4:21-cv-03854, Dkt. No. 79 (N.D. Cal. Oct. 18, 2021). Koss recently moved to lift the stay in the *PEAG* case. *Koss Corp. v. PEAG LLC*, Case No. 3:21-cv-01177, Dkt. No. 45 (S.D. Cal. Oct. 13, 2022).

## III.    *INTER PARTES* REVIEW

Bose petitioned for IPR of claims 1–14 of the '155 Patent on December 7, 2020. Appx167–278. The petition asserted ten grounds as follows:

---

18 (D. Mass. July 30, 2021).

| Ground | Claims | 35 U.S.C. § | Reference(s) |
|:---:|:---:|:---:|:---|
| 1 | 1–14 | 102 | Pelland |
| 2A | 1–4, 6–8, 14 | 103 | Rezvani, Skulley |
| 2B | 11–12 | 103 | Rezvani, Skulley, Feder |
| 2C | 13 | 103 | Rezvani, Skulley, Hind |
| 2D | 5, 9 | 103 | Rezvani, Skulley, Rosener |
| 2E | 10 | 103 | Rezvani, Skulley, Wilson |
| 3A | 1–3, 6–8, 10, 14 | 103 | Nakagawa, Wilson |
| 3B | 1, 4–5, 9 | 103 | Nakagawa, Rosener |
| 3C | 13 | 103 | Nakagawa, Wilson, Hind |
| 3D | 13 | 103 | Nakagawa, Rosener, Hind |

Appx8–9; Appx188; Appx415.

The petition included two expert declarations: one from Dr. Tim Williams (Appx1270–1471) and one from Dr. John Casali (Appx1494–1581). Williams, who has a Ph.D. in electrical engineering and expertise in wireless communications, opined that the challenged claims are invalid under the asserted grounds. Appx1279–1281, Appx1325–1464. Casali, on the other hand, who has a Ph.D. in industrial engineering, limited his opinions to "an overview of the state of the art of the non-wireless communication aspects of wireless headphone assembly design …." Appx1498, ¶ 4, Appx1513, ¶ 36.

10

The Board instituted on all grounds, although it found that Bose had not shown preliminarily that claims 1–14 were anticipated by Pelland (Ground 1). Appx452–458.  Pelland is the published PCT Application to which the '155 Patent claims priority.  The issue of anticipation turned on whether the claims of the '155 Patent are entitled to the filing date of the PCT Application.  Appx51; Appx452–453.  In both the Institution Decision and the FWD, the Board found that the claims of the '155 Patent were entitled to the filing date of the PCT Application. Appx55–60 (FWD); Appx458 (Institution Decision).  Thus, the FWD, which was issued on May 31, 2022, concluded that, for Ground 1, "Petitioner has not shown by a preponderance of the evidence that claims 1–14 are anticipated by Pelland." Appx60.

The FWD, however, decided in Bose's favor for Grounds 2A–2E and 3A–3D.  Appx61.  This appeal focuses exclusively on the Board's decision for Grounds 2A–2E, for which the primary reference is Rezvani, U.S. Pub. No. 2007/0165875 (Appx2470–2487).  Rezvani discloses a wireless headset with multiple wireless systems, such as GPS, radio, cellular phone standards, Wi-Fi and Bluetooth.  Appx2481, ¶ [0019].  The headset may have, for example, a "low-rate wireless connection to [a] handset …" (Appx2484, ¶ [0039]), which could be a cell phone.  Appx2481, ¶ [0004].  The petition relied primarily on Figure 8 of Rezvani and its corresponding description in ¶¶ [0041] and [0050] as disclosing limitation

1.g because, according to the petition, Rezvani teaches a "seamless" handoff between two wireless networks.  Appx219–220.  However, the relied-upon disclosures in Rezvani, ¶¶ [0041] and [0050], each state that the **handset**—not the headset—supports the seamless handoff, and each state that the **handset**—not the headset—switches a VoIP call for the headset between two wireless networks:

> **[0041]**  FIG. 8 illustrates simultaneous operation over a cellular system and a Wifi system according to some embodiments.  In these embodiments, a headset 805 having a plurality of antennas 810-1, 810-2, 810-3, and 810-4 is able to connect to a wi-fi access point 820 via its one or more antennas 830, 835 and to a cellular base station 840 via one or more base station antennas 850, 855. A voice over IP call handoff between a wi-fi and cellular connection may advantageously be implemented. Another mechanism to support this simultaneous multifrequency operation is time division.  In addition to simultaneous operation, the **handset can support seamless handoff** between two systems. For example, the **handset could switch a VoIP call** from a wide-area wireless network such as Wimax or 3G to a local area network such as Wifi.  FIG. 8 also illustrates the seamless handoff of a VoIP call between a cellular and Wifi system.

\*    \*    \*

**[0050]**  Another  mechanism  to  support  this  simultaneous

multifrequency  operation  is  time  division.    In  addition  to

simultaneous  operation,  the  ***handset  can  support  seamless***

***handoff*** between  two  systems.    For  example,  the  ***handset  could***

***switch  a  VoIP  call*** from  a  wide-area  wireless  network  such  as

Wimax  or  3G  to  a  local  area  network  such  as  Wifi.    FIG.  8  also

illustrates  the  seamless  handoff  of  a  VoIP  call  between  a  cellular

and  Wifi  system.

Appx2484–2485, ¶¶ [0041], [0050] (emphasis added).  Thus, collectively, four

times these two paragraphs specify that the handset—not the headset—executes

the seamless handoff between wireless networks.  No other portion in Rezvani

states that the headset performs the seamless handoff, as that capability is

exclusively reserved to the handset.  Rezvani only shows that the headset supports

VoIP and, in Figure 8, that the headset could benefit from the seamless handoff.

Appx2481, ¶ [0019]; Appx2478.

Despite Rezvani's repeated teachings that the handset supports the seamless

handoff, neither the petition nor its accompanying expert declarations explained

why the seamless handoff supported by Rezvani's handset could be imputed to the

headset.  Instead, without explanation, the petition and Williams's opening

13

declaration assumed (albeit inconsistently, as described below) that Rezvani's ¶¶ [0041] and [0050] state that the **headset** supports the seamless handoff, even though these paragraphs state four different times that the **handset**—not the headset—supports the seamless handoff.  Williams even quoted from Rezvani's ¶ [0041] in his opening declaration, but omitted the word "handset" from the quote, instead using the word "headset" outside of the quotations as shown at Appx8980. *See also* Appx1374, ¶ 136.  The petition relied on Williams's opinion to assert that Rezvani disclosed limitation 1g.  Appx219 (citing ¶ 136 of Williams Opening Dec.).  Neither the petition nor Williams's opening declaration asserted that Rezvani includes an error.  In fact, in other places, both the petition and Williams emphasized inconsistently, in bold and italics, that in Rezvani's ¶ [0041] the **handset** performs the seamless handoff.  *See* Appx220 (petition); Appx1376, ¶ 139 (Williams Opening Dec.).

In its Patent Owner Preliminary Response ("POPR"), Koss explained that Bose's petition misrepresented the literal wording of Rezvani.  Appx345–346.  In a pre-institution preliminary reply to the POPR, Bose "allege[d] for the first time … that 'handset' in paragraph 41 of Rezvani is 'a clear typographical error ….'" Appx445 (quoting Preliminary Reply at Appx384).  Yet, in its preliminary reply, Bose failed to provide any evidence that a person skilled in the art would interpret Rezvani as having a typographical error.  Appx384.  In the Institution Decision, the

14

Board stated that whether Rezvani discloses limitation 1.g. is "clouded" by the alleged typographical error, but concluded that Bose "provided evidence rising to the level of a reasonable likelihood that limitation 1.g is taught by Rezvani." Appx446–447.

In Koss's post-institution Patent Owner Response, Koss demonstrated that Rezvani explicitly and repeatedly allocates the "seamless handoff" functionality to the handset rather than to the headset and that, because claim 1 reserves the automatic transitioning task to the processor of the headphone assembly (i.e., a headset), Bose had failed to prove that Rezvani satisfies limitation 1.g. Appx510–514. Koss submitted evidence, in the form of expert testimony from Mr. Joseph C. McAlexander III, that "automatically" transitioning networks as in limitation 1.g is not satisfied by Rezvani's "seamless handoff." McAlexander testified that "automatic" means by itself, without external intervention, such as from a human operator or another device, and that Rezvani's seamless handoff was not "automatic" because it was supported by the handset, which is external to the headset. Appx514–515 (citing Appx8787–8788).

With its Reply, Bose filed a reply declaration by Williams in which he concluded that a person skilled in the art would understand that Rezvani's ¶¶ [0041] and [0050] contain errors. Appx7795–7802 (Williams Reply Dec.), ¶¶15-28. Williams, however:

- concluded that Rezvani contains the alleged error only after reading the '155 Patent.  Appx8926;

- conducted essentially no investigation into the source of the alleged typos, including failing to consult with anyone, such as the inventors of Rezvani, the attorney(s) that prosecuted Rezvani, and the patent examiner, regarding the source of the alleged errors.  Appx8923–8924;

- confirmed that, under his theory, the author of Rezvani made the exact same typing mistake multiple times.  Appx8923;

- confirmed that Rezvani's sentences that include the alleged typographical errors are technically accurate as written.  As published, Rezvani's ¶ [0041] states that "the handset can support seamless handoff between two systems."  Appx2484.  Williams testified that a person skilled in the art in 2008 would have understood that a handset, such as a cellular phone, could hand off between networks. Appx8930–8935; and

- admitted that at the time his opening declaration was prepared, he had reached the conclusion that Rezvani includes the alleged errors and claimed that was the reason why he did not include "headset" in the quotations in ¶ 136 of his opening declaration.  Appx8958–8960.

The Board's rules prohibited Koss from submitting an expert declaration refuting Williams's new "typo" theory testimony. PTAB Consolidated Trial Practice Guide (Nov. 2019) ("CTPG")[2] at 73 ("sur-reply may not be accompanied by new evidence other than deposition transcripts of the cross-examination of any reply witness").

At the oral hearing, the Board asked Bose's counsel to address the "handset-headset issue in the petition." Bose's counsel stated that they "didn't notice it." Appx699. He elaborated that, "We, ourselves, like Dr. Williams, simply interpreted that or read that or saw that − maybe it's dyslexia, I don't know, it's a very small change – we saw it as the headset." *Id*.

The Board accepted this admission as "candid and credible" in the FWD. Appx42. In accepting this explanation from Bose's counsel, the Board overlooked that, in other places, both the petition (*see* Appx220) and Williams's opening declaration (*see* Appx1374, ¶ 136; Appx1376, ¶ 139) also said that the handset, not the headset, supported the seamless handoff. *See also* Appx700 (Bose's counsel admitting at oral hearing that the petition bolded and italicized the word "handset" in one place). Thus, neither Bose's counsel nor Williams consistently "saw it as

---

[2] A copy of the November 2019 Consolidated Trial Practice Guide is available at www.uspto.gov/sites/default/files/documents/tpgnov.pdf?MURL=.

the headset." The statement from Bose's counsel also conflicts with Williams's testimony that he had reached the conclusion that Rezvani contained the alleged errors at the time his opening declaration was prepared. Appx8958–8960. Williams did not just "s[ee] it as the headset."

In the FWD, the Board concluded that "handset" in Rezvani's ¶¶ [0041] and [0050] "was a mistake and 'headset' was intended." Appx42. The Board also concluded that "transition automatically" in claim 1 "includes Rezvani's 'seamless handoff.'" Appx45. The Board stated that it was "not persuaded that a 'seamless handoff' is any different from 'transition automatically'" and that "a 'seamless handoff' is encompassed within the meaning of 'transition automatically,'" even though the Board declined to expressly construe "transition automatically." Appx13. The Board also postulated an alternative theory that even if Rezvani reserved the seamless handoff to the handset, a person of ordinary skill in the art would not have been prevented from understanding "that the claimed 'headset' would have been modified to perform the handoff." Appx44. For this alternative theory, the Board relied on Williams's reply declaration testimony to conclude that there were "unambiguous disclosures" in Rezvani of the headset executing the automatic transition between two wireless networks. *Id.* (citing Appx7792, ¶ 8).

The Board also concluded that Bose was not required to present its "typo" theory earlier (i.e., with the petition) because Koss "has not alleged prejudice from

18

any delay" and that Koss "had notice and opportunity to respond."  Appx43.

The Board also found claims 1–10 and 13–14 unpatentable under Grounds 3A–3D.  Appx14–39.

## SUMMARY OF ARGUMENT

The Board erred in invalidating claims 1–14 of the '155 Patent under Grounds 2A–2E of the petition.  Because (i) the Board also invalidated claims 1–10 and 13–14 under Grounds 3A–3D and (ii) Koss is not appealing that determination by the Board, this Court should reverse the Board's determination that claims 11 and 12 (which were not challenged under Grounds 3A–3D) are unpatentable.  The Board should reverse the determination that claims 11 and 12 are unpatentable, for the following reasons.

I.      No substantial evidence supports the Board's finding that Rezvani includes obvious printing or drafting errors.  The Board's rationales for concluding that Rezvani includes the alleged obvious errors are misplaced or wrong on their face.  Moreover, the Board's determination is not credible.  For the Board's finding to hold, one would have to believe that Rezvani made the exact same typing mistake in four different places—twice in ¶ [0041] and twice in ¶ [0050]—and each mistake coincidentally resulted in sentences that are technically accurate and grammatically correct.  The more likely explanation in light of the evidence, and the conclusion that any reasonable mind would draw, is that Rezvani meant to say what it literally said multiple times.  The Board's conclusion that Rezvani includes obvious errors also was not harmless because: (i) when Rezvani is not assumed to include errors, Rezvani does not satisfy limitation 1.g., particularly when the

proper construction for "transition automatically" is applied, which claim term the Board erroneously construed; (ii) there is not substantial evidence to conclude that claim 1 would have been obvious under the alternative obviousness theory expressed by the Board in FWD; and (iii) the Board should not have considered Bose's theories and evidence that claim 1 would have been obvious in light of what Rezvani literally states because Bose failed to provide such theories and evidence with its petition, which prevented Koss from having an opportunity to present testimony from its expert to the contrary.

II.    If the Board is correct that Rezvani's ¶¶ [0041] and [0050] include obvious printing or drafting errors, then the Board abused its discretion by subsequently concluding that Rezvani taught limitation 1.g based on ¶¶ [0041] and [0050].  This Court's precedent required the Board to ignore Rezvani's ¶¶ [0041] and [0050].  *See LG Elecs. Inc. v. Immervision, Inc.*, 39 F.4th 1364 (Fed. Cir. 2022); *In re Yale*, 434 F.2d 666 (C.C.P.A. 1970); *see also* 35 U.S.C. § 311(b) (IPR petition may rely only on "prior art consisting of patents or printed publications").  When ¶¶ [0041] and [0050] are ignored, Rezvani fails to disclose or suggest limitation 1.g.  This error was not harmless because no other portion of Rezvani satisfies limitation 1.g.

# ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews the Board's determinations under the standard provided in the Administrative Procedure Act, 5 U.S.C. § 706. *Pride Mobility Prods. Corp. v. Permobil, Inc.*, 818 F.3d 1307, 1313 (Fed. Cir. 2016); *Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1323 (Fed. Cir. 2015). "Under 5 U.S.C. § 706(2)(A), (E), the Board's actions … are to be set aside if 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or 'unsupported by substantial evidence.'" *Pride Mobility*, 818 F.3d at 1313.

Here, the Board found claims 1–14 unpatentable under Bose's asserted Grounds 2A–2E because, according to the Board, claims 1–14 would have been obvious pursuant to 35 U.S.C. § 103. Appx39–51. Obviousness is a legal question based on underlying findings of fact. *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 160 (Fed. Cir. 2021). This Court reviews the Board's ultimate obviousness determination *de novo* and underlying factual findings for substantial evidence. *LG Elecs. Inc. v. Immervision, Inc.*, 39 F.4th 1364, 1371 (Fed. Cir. 2022). "Substantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence," meaning that "[i]t is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re NuVasive, Inc.*, 842 F.3d 1376, 1379–80 (Fed. Cir. 2016) (internal quotation

marks omitted).

Claim interpretation by the Board during IPR is a question reviewed *de novo* by this Court.  *See Hamilton Beach Brands, Inc. v. f'real Foods, LLC*, 908 F.3d 1328, 1339 (Fed. Cir. 2018).

This Court reviews the Board's application of its procedural rules for abuse of discretion.  *See Chamberlain Grp., Inc. v. One World Techs., Inc.*, 944 F.3d 919, 924 (Fed. Cir. 2019); *Ultratec, Inc. v. CaptionCall, LLC*, 872 F.3d 1267, 1271 (Fed. Cir. 2017).  "An abuse of discretion is found if the decision: (1) is clearly unreasonable, arbitrary, or fanciful; (2) is based on an erroneous conclusion of law; (3) rests on clearly erroneous fact finding; or (4) involves a record that contains no evidence on which the Board could rationally base its decision."  *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd*., 821 F.3d 1359, 1367 (Fed. Cir. 2016).

## II.   THE BOARD ERRED BY CONCLUDING THAT REZVANI INCLUDES PRINTING OR DRAFTING ERRORS

It is undisputed that the only paragraphs in Rezvani's description that describe the "seamless handoff" are ¶¶ [0041] and [0050].  It also is undisputed that these paragraphs state multiple times that the handset performs the seamless handoff.  Appx2484, ¶ [0041]; Appx2485, ¶ [0050].  Indeed, both paragraphs state that the "handset could ***switch*** a VoIP call" between two wireless networks.  *Id.* (emphasis added).  It is also undisputed that those paragraphs do not describe that

the headset performs the seamless handoff and that no other portion of Rezvani describes the headset as executing the seamless handoff.  Bose's counsel and one of its expert witnesses, Williams, however, allegedly "saw" ¶¶ [0041] and [0050] of Rezvani as stating that the headset supports the seamless handoff.  Appx699.  Consequently, Bose and Williams argued in the petition, without acknowledging any alleged error in Rezvani, that ¶¶ [0041] and [0050] disclose that the headset performs the seamless handoff.  Appx219 (petition); Appx1374 (Williams Opening Dec.), ¶ 136.  After Koss filed its POPR, however, Bose and Williams asserted that Rezvani's ¶¶ [0041] and [0050] include allegedly obvious errors.  Appx384; Appx568–573; Appx7795–7797, ¶¶15–20.

The Board accepted that Rezvani includes obvious printing or drafting errors.  It found "that an error in printing or drafting led to the appearance of 'handset' in Rezvani."  Appx41.  No substantial evidence supports this determination by the Board.  Further, the Board's erroneous determination that Rezvani includes the allegedly obvious errors is not harmless because if Rezvani is taken for what it actually states, the evidence is insufficient to show that claim 1 would have been obvious under Ground 2A.

### A.    No Reasonable Mind Would Accept That Rezvani Includes Obvious Printing or Drafting Errors

The Board found that Rezvani includes the allegedly obvious printing or drafting errors because (i) Rezvani's Figure 8, which is described in Rezvani's

¶¶ [0041] and [0050], shows a headset instead of a handset, (ii) Rezvani's ¶ [0041] refers to the headset before referring to the handset, and (iii) the remaining description in Rezvani "universally" refers to "headset" such that "handset" is never referenced outside of ¶¶ [0041] and [0050]. Appx42–43. None of these reasons provide substantial evidence sufficient to support the Board's conclusion that Rezvani's ¶¶ [0041] and [0050] include obvious errors.

*First*, the Board's reliance on Figure 8 is misplaced. Figure 8 merely shows that the headset benefits from the seamless handoff between the two wireless networks, i.e., a VoIP call can be switched from a wide-area wireless network to a local area network. Appx2484, ¶ [0041]. Figure 8 does not show that the headset implements or executes the seamless handoff by itself. *See* Appx8784–8785 (McAlexander Dec.), ¶¶ 49–51. Instead, in Rezvani "the handset could switch a VoIP call from a wide-area network … to a local area network …." Appx2484, ¶ [0041]; *see also* Appx2485, ¶ [0050].

*Second*, the Board erred by imparting significance to the fact that Rezvani's ¶ [0041] uses the word "headset" before the word "handset" in that paragraph. The initial reference to "headset" in the beginning portion of ¶ [0041] is not about a seamless handoff but instead explains that the headset has multiple antennas to communicate via different wireless networks. Appx2484. The later portion of ¶ [0041] teaches how the handoff is implemented and there, as well as in ¶ [0050],

Rezvani expressly describes that the handset, not the headset, supports the seamless handoff and "switches" the VoIP call between the two wireless networks.

***Third***, the Board's conclusions that Rezvani (i) universally refers to "headset" outside of ¶¶ [0041] and [0050] and (ii) never refers to "handset" outside of ¶¶ [0041] and [0050] are wrong on their face. Most prominently, outside of ¶¶ [0041] and [0050], Rezvani's Figure 9 shows a handset in communication with a headset. Appx2479. In ¶ [0042], which references Figure 9, Rezvani explains that "peer-to-peer connectivity may be accomplished between a plurality of headsets, ***handsets***, or other network elements." Appx2484, ¶ [0042] (emphasis added). Rezvani further elaborates in ¶ [0043] that the peer-to-peer networking protocol includes two main components, one of which is neighbor discovery, in which "a ***handset*** determines which other devices it can establish a direct connection with." *Id.*, ¶ [0043] (emphasis added). *See also* Appx2485, ¶ [0052] (similar to ¶ [0043]). Still further, ¶ [0046] explains that the headset can be "developed as an open architecture so that third party applications can utilize the ***handset*** capabilities of high-fidelity sound, large memory, advanced searching capabilities, peer-to-peer networking and multiple wireless connections" and that the "architecture of the ***handset*** will enable this by providing the appropriate subsystem and software interfaces." Appx2484–2485, ¶ [0046] (emphasis added). *See also* Appx2485, ¶ [0055] (similar to ¶ [0046]). Thus, Rezvani's ¶¶ [0046] and

[0055] teach that the headset relies on the "appropriate sub-system and software interfaces" of the handset, which is consistent with the teachings in ¶¶ [0041] and [0050] that the handset performs the seamless handoff. At a minimum, no reasonable mind reading Rezvani in its entirety could accept the evidence the Board relied upon to conclude that Rezvani "universally refers to 'headset' and [that] 'handset' is never referenced outside of paragraphs 41 and 50."

*Finally*, it is undisputed that Rezvani's ¶¶ [0041] and [0050] make sense technically as written and are grammatically correct. Thus, no reasonable person would conclude that the alleged errors are obvious. Bose's expert, Williams, admitted that a handset can support seamless handoff between two wireless networks, just as stated in Rezvani's ¶¶ [0041] and [0050]. Williams testified that in the 2008 time frame, a mobile phone could execute a handoff between wireless networks. Appx8932–8933. Further, Williams admitted that Rezvani's headset could be a mobile phone. Appx2481, ¶ [0004]; Appx8933–8934 (Williams testifying that Rezvani's headset could be a mobile phone). Thus, the Board did not have substantial evidence to conclude that ¶¶ [0041] and [0050] include the allegedly obvious errors because clearly nonsensical words were not used. To the contrary, the paragraphs make sense technically and grammatically as written literally.

Moreover, the Board did not have substantial evidence to conclude, as it did,

that Rezvani made the exact same typing mistake in four different places—twice in

¶ [0041] and twice in ¶ [0050]—and that each mistake coincidentally resulted in

sentences that are technically accurate and grammatically correct.  Appx8923

(Williams testifying that the author of Rezvani made the exact same typographical

error in multiple different places).  When the evidence is properly considered, the

only conclusion that a reasonable mind could reach is that Rezvani meant to say

what it literally says.  This is an example of Occam's Razor; all things being equal,

the simplest explanation (that Rezvani meant what is literally and repeatedly

written) is more likely to be correct than a more complicated explanation (that

Rezvani made the exact same error in multiple different places, and that each error

resulted in technically accurate and grammatically correct sentences, and that

Bose's counsel and expert witnesses did not see what is literally written in Rezvani

multiple times).

    To that end, Williams's testimony that Rezvani's ¶¶ [0041] and [0050]

include errors should be discounted because the testimony was tainted by hindsight

bias.  The Supreme Court has warned against "the temptation to read into the prior

art the teachings of the invention in issue."  *Graham v. John Deere Co.*, 383 U.S.

1, 36 (1966); *see also KSR Int'l Co. v. Telefex*, 550 U.S. 398, 421 (2007)

("factfinder should be aware … of the distortion caused by hindsight bias and must

be cautious of arguments reliant upon *ex post* reasoning").  Williams, after first

reading the '155 Patent, concluded that Rezvani's ¶¶ [0041] and [0050] must include errors to demonstrate his obviousness theory and, consequently, literally read the teachings of the '155 Patent into Rezvani's ¶¶ [0041] and [0050]. *See* Appx8926 (Williams testifying that "[r]eading the '155 is the first thing I did in this case"); Appx8958–8960 (Williams admitting that at the time his opening declaration was prepared, he had reached the conclusion that Rezvani includes the alleged errors).

### B.    The Board's Determination That Rezvani Includes Obvious Errors Was Not Harmless

The Board's incorrect conclusion that Rezvani includes obvious errors was not harmless error for three reasons. ***First***, when Rezvani is not assumed to include the errors, Rezvani does not satisfy limitation 1.g., particularly when the proper construction for "transition automatically" in limitation 1.g is applied. The Board improperly construed "transition automatically." ***Second***, the Board's alternative obviousness theory was flawed factually and legally. ***Third***, the Board should not have considered Williams's reply testimony, which was the basis for the Board's alternative obviousness conclusion, because, under the Board's procedural rules, the testimony should have been included with the petition.

### 1.    Rezvani Does Not Satisfy Limitation 1.g When Rezvani is Not Assumed to Include Printing or Drafting Errors

Claim 1 of the '155 Patent states that "the ***headphone*** assembly, is

configured, with the processor, to transition automatically from playing digital audio content received wirelessly by the headphone assembly via a first wireless network to playing digital audio content received wirelessly by the headphone assembly via a second wireless network." Appx162, 18:14−19 (emphasis added). In contrast, Rezvani states that the ***handset*** switches a VoIP call between two wireless networks. Appx2484−2485, ¶¶ [0041], [0050]. Thus, Rezvani does not satisfy limitation 1.g if Rezvani is not assumed to include errors in ¶¶ [0041] and [0050]. This is particularly clear when the legally proper construction for "transition automatically" is applied. The Board improperly construed this claim term, which is an error of law reviewed *de novo* by this Court. *Hamilton Beach*, 908 F.3d at 1339.

Because obviousness is analyzed in two steps, with the claim being construed in the first step and then the properly construed claim being compared to the prior art in the second step (*see Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 714 (Fed. Cir. 1998); *see also Yorkey v. Diab*, 605 F.3d 1297, 1330 (Fed. Cir. 2010) (anticipation analysis involves the two steps)), the following argument first explains that the Board improperly construed "transition automatically"; second explains that the term should be construed to mean transition without external invention, such as from a human operator or another device; and third explains that Rezvani does not satisfy limitation 1.g under this proper construction when

Rezvani is not assumed to include errors.

a.     The Board Erred Legally in Its Construction of
       "Transition Automatically"

The *Phillips* standard applies for construing the challenged claims in this

IPR.  37 C.F.R. § 42.100(b) (2020); *Palo Alto Networks, Inc. v. Finjan, Inc.*, 836

Fed. Appx. 916, 920 (Fed. Cir. 2020); Appx10.  Under *Phillips*, claim terms must

be "given their ordinary and customary meaning," defined as "the meaning that the

term would have to a person of ordinary skill in the art in question at the time of

the invention, i.e., as of the effective filing date of the patent application." *Phillips*

*v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (*en banc*).  The primary

source for the meaning of claim terms is the intrinsic evidence, which includes the

claims themselves, the specification and the file histories.  *Id*., 1313–14, 1317.

Extrinsic evidence, such as dictionaries or expert testimony, also can be considered

"for a variety of purposes," such as "ensur[ing] that the court's understanding of

the technical aspects of the patent is consistent with that of a person of skill in the

art." *Id*., 1318.

The parties took different positions on the construction of "transition

automatically."  Koss proposed that it means without external intervention, such as

from a human operator or another device, based on the intrinsic evidence and a

general purpose dictionary definition for "automatic."  Appx11; Appx8787, ¶60;

Appx8911.  Bose proposed that no construction was necessary (Appx195;

31

Appx10), but acknowledged that the '155 Patent explains that "automatically" means "without user intervention." Appx11; Appx20 (citing Appx154–155, 2:65–3:3 and Appx156, 5:21–22).

Despite the parties' differing positions and the criticality of the construction to the ultimate determination of validity under Ground 2A, the Board did not apply the *Phillips* standard in construing the term. Instead, it found that the term did not require express construction and limited its analysis to "whether a 'seamless handoff' [as disclosed in Rezvani] falls within the meaning of 'transition automatically.'" Appx11–13. In answering this question affirmatively, Appx13, the Board committed a compound legal error.

The Board first erred by relying on Rezvani, which is extrinsic evidence, to ostensibly construe the "transition automatically" claim term. Appx12. Extrinsic evidence, like Rezvani, is less reliable than the intrinsic evidence. *Phillips*, 415 F.3d at 1318. Indeed, the Board disregarded Koss's extrinsic general purpose dictionary definition of "automatic" as unreliable, Appx12, but in turn construed "transition automatically" based on extrinsic evidence in the form of Rezvani.

The Board then compounded its improper reliance on Rezvani through an analysis that the Board based upon an alteration of what Rezvani actually states. The Board concluded that Rezvani meant "headset" instead of "handset" in ¶¶ [0041] and [0050]. Appx12. The Board also hedged its construction, stating

32

that, even if Rezvani did not mean "headset," it would not affect the Board's conclusion because Koss's expert, McAlexander, did "not say anything about Rezvani's disclosure of a 'headset.'" Appx12–13. The Board's conclusion was wrong. McAlexander testified that Rezvani's Figure 8 and its related description, including ¶¶ [0041] and [0050], do not support that the headset performs the seamless handoff. Appx8784–8785, ¶¶ 49–51. Further, McAlexander explained why Rezvani's disclosure that the handset supports the seamless handoff in ¶¶ [0041] and [0050] is consistent with the remainder of Rezvani's disclosure. *Id*. McAlexander even explained why Rezvani's teaching of a handset supporting the seamless handoff would not have suggested limitation 1.g. to a person of ordinary skill in the art: a seamless handoff is without a gap in communication, but it is not necessarily automatic. Appx8785, ¶ 52.

To the extent that the Board meant that McAlexander failed to address Bose's theory that Rezvani's ¶¶ [0041] and [0050] include errors, the Board's conclusion cannot stand. Bose did not assert that Rezvani includes error in its petition (*see* Appx44 ("The Petition did not address the fact that the use of a 'handset' was a 'typo.'")) and did not present its evidence of the alleged error until its Reply (*see* Appx43; Appx545; Appx7787), which was after the time that McAlexander permissibly could have presented a different expert viewpoint under the Board's rules. CTPG at 73 ("sur-reply may not be accompanied by new

evidence other than deposition transcripts of the cross-examination of any reply

witness").

Thus, the Board improperly construed "transition automatically" to include

only a "seamless handoff" based on unreliable extrinsic evidence in the form of

Rezvani; and the Board compounded that legal error by not even relying on the

extrinsic evidence as written but instead relying on an alteration to it.

> b.   Rezvani Does Not Teach or Suggest Limitation 1.g
>       Under the Proper Legal Construction for "Transition
>       Automatically"

Applying the *Phillips* standard, the Board should have construed "transition

automatically" to mean transition without external intervention, such as from a

human operator or another device, based primarily on the intrinsic evidence and

supported by extrinsic evidence in the form of general purpose dictionaries.  The

'155 Patent specification teaches that the earphones alone transition between

wireless networks.  Figure 6 of the '155 Patent illustrates a process by which a

wireless earphone transitions between wireless networks.  Appx154, 2:39–41

("FIG. 6 is a diagram of a process ***implemented by the wireless earphone*** to

transition automatically between wireless networks …") (emphasis added); *see*

*also* Appx158, 10:49–51 ("FIG. 6 is a diagram of the process flow … implemented

by the transceiver circuit 100 of the earphone 10.").  No human operator or other

device besides the wireless earphones is used to transition between the wireless

networks.  Confirming this point, the '155 Patent teaches that the "process shown in FIG. 6 may be implemented in part by the processor unit 114 executing firmware stored in a memory unit 120, 122 of the transceiver circuit 100." Appx158, 10:51–54.  The '155 Patent does not identify any other structure for performing the process of Figure 6.

Col.3:1–3 (Appx155) of the '155 Patent specification further supports Koss's proposed construction.  In col.3:1–3, the '155 Patent teaches that the transition from an ad hoc wireless network to an infrastructure wireless network is performed "automatically …, without user intervention."  A person of ordinary skill in the art would understand that, from this intrinsic disclosure, "automatically" means without user intervention.

In other places, the '155 Patent states that the transitions between wireless networks are performed "automatically and seamlessly, without user intervention" (Appx154, 2:65–66) and "automatically and seamlessly, e.g., without user intervention."  Appx156, 5:21–22.  The conjunction "and" between "automatically" and "seamlessly" shows that the '155 Patent treats these terms as being different.  *See e.g., United States v. Pulsifer*, 39 F.4th 1018, 1021 (8th Cir. 2022) ("A and B" means "A or B, jointly or severally"); *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 886 (Fed. Cir. 2004) (treating a list of items joined by "and" as separate items).  The fact that the '155 Patent treats these

35

adverbs as being different is consistent with their different ordinary meanings.  The parties agree that the ordinary meaning of "automatically" is "acting or operating in a manner essentially independent of external influence or control; self-moving." Appx8911; *see also* Appx8939 (Bose's expert agreeing that an ordinary meaning of "automatic" is "acting or operating in a manner essentially independent of external influence to control; self-moving").  On the other hand, the ordinary meaning of "seamless" is "without seams" or "perfectly consistent" (*see* Appx8912), which is different from the ordinary meaning of "automatic."  *See e.g.*, Appx8785, ¶53 (McAlexander testifying that a POSITA would interpret "transition automatically" differently from a "seamless" transition).  In fact, the '155 Patent confirms the difference by using "without user intervention" at col.3:1–3 (Appx155) in connection with the term "automatically," and not with the term "seamlessly."  Because the two adverbs must have different meanings under the teachings of the '155 Patent, the Board necessarily erred in construing "transition automatically" to include Rezvani's seamless handoff.

Based on the intrinsic and extrinsic evidence, "transition automatically" in limitation 1.g. must be construed to mean that the headphone assembly, with a processor, transitions "without external intervention, such as from a human operator or another device," between the first and second wireless networks. Appx8787 (McAlexander testimony).  Under that proper construction, assuming

that Rezvani does not include the errors that the Board found that it includes, Rezvani does not teach or suggest limitation 1.g. Taken for what it literally states, Rezvani teaches that the ***handset***, i.e., an external intervention, supports the seamless handoff for the headset and does the switching between wireless networks. Appx2484, ¶ [0041]; Appx2485, ¶ [0050]. To the extent that Rezvani's headset transitions networks as part of a seamless handoff, from a wide-area network to a local area network (*see* Appx2484, ¶ [0041]), that seamless handoff is supported by external intervention, i.e., Rezvani's handset. Appx8784–8785, ¶¶ 48–53. Because Rezvani's handoff for the headset involves another device, the switching between networks by the headset in Rezvani cannot be automatic as taught by the '155 Patent. *See* Appx8784–8785 (McAlexander testimony that a POSITA would not interpret Rezvani's seamless handoff to be automatic).

No other portion of Rezvani teaches the headset transitioning networks without intervention from the handset. Claims 32 and 36 of Rezvani, and Figure 8, which Bose cited in the petition (Appx219 (petition); *see also* Appx447 (Institution Decision); Appx44 (FWD)) do not teach that the headset performs automatic transitioning between networks without intervention from the handset. Neither claim 32 nor claim 36 identify the "means for seamless handoff." Rezvani's specification also does not ascribe any means, structure or component in Rezvani's headset for supporting the seamless handoff (otherwise Bose would be relying on

such a disclosure). Rezvani's Figure 8 similarly fails to show any component of the headset that supports the seamless handoff without intervention from the handset. To the contrary, Rezvani's ¶¶ [0041] and [0050] are the only paragraphs in Rezvani that describe Figure 8, and each paragraph specifically allocates the functionality of supporting the seamless handoff, and switching the VoIP call between two wireless networks, to the handset. Appx2484, ¶ [0041]; Appx2485, ¶ [0050].

Thus, the evidence fails to show that Rezvani teaches or suggests limitation 1.g under the correct construction of the term "transition automatically."

2. <u>The Board's Alternative Theory Is Flawed Factually and Legally</u>

The Board erred by offering an alternative obviousness theory that even if Rezvani reserved the "seamless handoff" to the "handset," a person of ordinary skill in the art would not have been prevented "from understanding that the claimed 'headset' would have been modified to perform the handoff." Appx44. For this alternative theory, the Board relied upon Williams's reply declaration testimony that the "Rezvani disclosures using 'handset' 'do not create ambiguity in the several additional, unambiguous disclosures in Rezvani of the 'headset' executing the automatic transition between two wireless networks.'" *Id.* (quoting Appx7792 (Williams Reply Dec.), ¶ 8). This alternative obviousness theory by the Board is flawed both factually and legally.

a.   A Reasonable Mind Would Not Accept As Adequate Williams's Testimony That Rezvani Includes "Unambiguous" Disclosures of the Headset Executing an Automatic Transition

For its alternative obviousness theory, the Board credited Williams's testimony that ¶¶ [0015]–[0016], [0019]–[0021], and Figures 1–3 and 8 of Rezvani are "unambiguous disclosures" of the headset executing the automatic transition between two wireless networks.  Appx44 (citing Appx7792, ¶ 8).  No reasonable person could credit Williams's testimony in light of what Rezvani literally states.  None of the paragraphs the Board relied upon refer to either a "seamless handoff" or an "automatic transition," much less unambiguously explain that the headset executes an automatic transition between wireless networks.  To the contrary, Rezvani repeatedly and exclusively allocates the task of supporting the seamless handoff, and switching the VoIP call between two wireless networks, to the handset.  Appx2484–2485, ¶¶ [0041] and [0050].  While the paragraphs and figures Williams cites might suggest that the headset can connect to different wireless networks, that capability is wholly irrelevant to limitation 1.g as switching between the two networks without interruptions (i.e., a seamless handoff) is different from switching without intervention from an external device (i.e., an automatic transition).

A close analysis of the paragraphs and figures cited by Williams reveals that they do not disclose the headset executing any automatic transition between

wireless networks, much less "unambiguously" disclose that the headset executes any automatic transition.

- Paragraph [0015] states that the "invention" has peer-to-peer networking capability. Rezvani's "invention," however, is not limited to the headset and includes the handset. *See* Appx2479, Fig. 9; Appx2484–2485, ¶¶ [0039], [0041], [0042], [0043], [0046], [0050], [0052], [0055]. Further, ¶ [0015] does not state that the peer-to-peer networking is performed automatically or seamlessly.

- Paragraphs [0016], [0019] and [0020] teach that the headset can have multiple wireless interfaces, thereby allowing the headset to connect to different networks. That functionality, however, is different from a teaching that the handoff between two wireless networks is without intervention from the handset. Again, Rezvani reserves to the handset the task of "switch[ing] a VoIP call from a wide-area wireless network … to a local area network …." Appx2484, ¶ [0041].

- Paragraph [0021] explains that the headset includes a SIM card and lists several functions that the SIM card provides, none of which are automatic transitioning between wireless networks.

- Figures 1–2 show, in block diagram form, components of the

40

headset.  The figures show that the headset could have multiple
antennas, but again do not show any automatic transition between two
wireless networks.

- Figure 3 is about a user interface via speech recognition.  The
  figure shows that there is a "peer-to-peer network" connection to a
  "dictionary/translation assistance," but again, nothing in the figure
  shows or suggests an automatic transition between two wireless
  networks.

- Figure 8 shows that the headset could benefit from the seamless
  handoff supported by the handset, but it does not disclose that the
  seamless handoff is executed by the headset, which Rezvani reserves
  for the handset.  Appx2484–2485, ¶¶ [0041], [0050]; *see also*
  Appx8784–8785 (McAlexander Dec.), ¶¶ 49–52.  Indeed, ¶¶ [0041]
  and [0050] are the only paragraphs in Rezvani that describe Figure 8
  and both paragraphs state repeatedly that the handset supports the
  seamless handoff.

Thus, the evidence that Williams cites as being "unambiguous" is far from
unambiguous.  What is unambiguous from Rezvani is (i) that the handset supports
the seamless handoff, and switches the VoIP between wireless networks, as
explained repeatedly in ¶¶ [0041] and [0050]; (ii) no other portion of Rezvani

41

states that the headset executes the seamless handoff or switches a VoIP call

between wireless networks; and (iii) none of the disclosures in Rezvani that the

Board relied upon disclose the headset executing an automatic transition.  For these

reasons, no reasonable person could accept Williams's testimony in the face of

Rezvani stating unambiguously, multiple times in ¶¶ [0041] and [0050], that the

handset supports the seamless handoff.

> b.    The Board Applied an Improper Obviousness Analysis
> for Its Alternative Theory

The Board concluded that claim 1 would have been obvious under its

alternative obviousness theory because it was "not persuaded that reserving the

'seamless handoff' of Rezvani to the 'handset' would have ***prevented*** a person of

ordinary skill from understanding that the claimed 'headset' would have been

modified to perform the handoff."  Appx44 (emphasis added).  An overly narrow

statement of the problem—such as, here, whether a person of ordinary skill in the

art would be "prevented" from making the claimed invention in view of the prior

art—constitutes a form of prohibited reliance on hindsight.  *See Insite Vision Inc.*

*Sandoz, Inc.*, 783 F.3d 853, 859 (Fed. Cir. 2015); *Mintz v. Dietz & Watson, Inc.*,

679 F.3d 1372, 1377 (Fed.Cir.2012).  Yet, that is exactly what the Board did when

considering whether a person of ordinary skill in the art would have been

"prevented" from making the claimed invention.

Here, there is no reliable evidence to conclude that it would have been

obvious to incorporate Rezvani's seamless handoff functionality from the handset into the headset. Williams never addressed this question. His opening declaration assumed from the outset that Rezvani's headset—not the handset—supports the seamless handoff. Appx1374 (Williams Opening Dec.), ¶ 136; *see also* Appx7791 (Williams Reply Dec.), ¶ 8 (Williams testifying that this opening declaration "identified multiple disclosures in Rezvani demonstrating that Rezvani teaches that its headset is configured, by its processor, to automatically transition between receiving VoIP (digital) audio content from WiFi and cellular networks."). Necessarily, therefore, his opening declaration could not have considered whether it would have been obvious to incorporate Rezvani's seamless handoff functionality from the handset into the headset.

For the most part, Williams's reply declaration doubled down on his opening declaration by asserting that Rezvani's headset—not the handset—has the seamless handoff functionality. Appx7791–7800, ¶¶ 8–25. The only place where Williams addressed the possibility that the handset might have the functionality was in ¶ 26 of his reply declaration. Appx7801. In that paragraph, however, Williams did not explain that incorporating Rezvani's seamless handoff functionality from the handset into the headset would have been obvious to a person of ordinary skill in the art. Instead, he contorted McAlexander's testimony to argue that if the handset performs the switching for the seamless handoff, as Rezvani teaches in ¶¶ [0041]

43

and [0050], the headset—not the handset— performs the switching automatically.

Thus, Williams never addressed whether it would have been obvious to a person of

ordinary skill in the art to incorporate Rezvani's seamless handoff functionality

from the handset into the headset.  The only evidence of record is that it would not

have been obvious to a person of ordinary skill in the art.  Appx8784−8787

(McAlexander Dec.), ¶¶ 52-58.  And the Board's finding that a person of ordinary

skill in the art would not have been "prevented" from doing so is the wrong inquiry

legally.

      3.     <u>The Board Should Not Have Considered Williams's Testimony That (i) Rezvani Includes Errors and (ii) Other Portions of Rezvani "Unambiguously" Disclose Rezvani's Headset Executing the Seamless Handoff</u>

The Board found that "the Petition did not address the fact that the use of

'handset' [in ¶¶ [0041] and [0050]] was a 'typo'" and that "both [of Bose's]

experts proceeded on the basis that a 'headset' was disclosed and was understood

to perform the 'seamless handoff.'"  Appx44.  Thus, the petition did not assert that

Rezvani includes errors, or that Rezvani's headset executes the seamless handoff,

or that it would have been obvious for Rezvani's headset to execute the seamless

handoff, in light of Rezvani's repeated teachings that the handset supports the

seamless handoff.  Appx2484–2485, ¶¶ [0041] and [0050].  Bose made the

argument that Rezvani includes errors, or that other portions of Rezvani

unambiguously disclose that Rezvani's headset executes the seamless handoff

despite Rezvani's teachings to the contrary, only after the petition was filed. *See* Appx7791–7800 (Williams Reply Dec.), ¶¶ 8–24. In view of the Board's own rules, the Board abused its discretion by considering Williams's reply declaration testimony because it was not included in Bose's petition and, as a result, Koss's expert, McAlexander, had no opportunity to address it.

An IPR petition must identify "with particularity" the asserted invalidity grounds. 35 U.S.C. § 312(a)(3); *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 270 (2016). To that end, an IPR petitioner "may not submit new evidence or argument in reply that it could have presented earlier, e.g. to make out a prima facie case of unpatentability." CTPG at 73. Nevertheless, that is exactly what Bose did here with respect to its theories that Rezvani includes multiple errors and that Rezvani "unambiguously" discloses that the headset performs the seamless handoff despite Rezvani's teachings to the contrary.

In response to the Board's request at the oral hearing to "address this handset-headset issue in the petition," Bose's counsel responded: "We, ourselves, like Dr. Williams, simply interpreted [¶ [0041] of Rezvani] or read that or saw that – maybe it's dyslexia … we saw it as the headset." Appx699. But Williams testified under oath that he did not see it as "headset." Williams testified that he "clearly" interpreted Rezvani's ¶[0041] at the time of his opening declaration "as meaning the headset is the thing that switches," which is "why 'headset' is outside

of the quotes in paragraph 136" of his opening declaration.  Appx8959–8960.

Thus, at the time of the petition, Williams knew Rezvani ¶ [0041] said that

"handset" supports the seamless handoff and he had concluded that it was an error.

Neither Bose nor Williams presented any evidence in the petition that

Rezvani's ¶ [0041] includes the alleged typos or that Rezvani teaches that the

headset performs the seamless handoff despite Rezvani's repeated teachings to the

contrary.  Instead, Bose saved until its Reply Williams's testimony that (i) a person

skilled in the art would understand that Rezvani includes errors (Appx7795–7802,

¶¶15–28) and (ii) Rezvani has "unambiguous" disclosures of the headset executing

the seamless handoff.  Appx7791–7794, ¶¶ 8–14.  By choosing to withhold this

evidence until its Reply, Bose precluded Koss from submitting a competing

declaration from its expert, McAlexander, to address Williams's new testimony.

CTPG, 73.

The alleged errors in Rezvani were critical to Bose's obviousness theories

for Grounds 2A–2E.  Bose relied on ¶136 of Williams's opening declaration (*see*

Petition at Appx219) as the primary evidence to support its argument that Rezvani

teaches the automatic transition of limitation 1.g.  In ¶ 136, Williams left "headset"

outside of the quotation from Rezvani that literally stated "handset."  Appx1374;

Appx8980.  Williams testified that he did so because he had already formed his

opinion that Rezvani includes the alleged typos.  Appx8959–8960.  Thus, Bose

knew, or at least should have known, that Koss would point out that Bose relied on a revision of Rezvani, that it did not make its case in its petition based on what Rezvani literally states multiple times, and that consequently Bose would need to articulate its "typo" theory and/or explain away Rezvani's express teachings that the handset supports the seamless handoff to rebut Koss's foreseeable arguments. Consequently, Bose should have presented in the petition its "typo" theory and/or that other portions of Rezvani unambiguously disclose the headset executing the seamless handoff despite Rezvani's teachings to the contrary. *See Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 760 (8th Cir. 2006) (rebuttal testimony must relate to topics that plaintiff could not have foreseen as being offered during defendant's case-in-chief).

Ignoring its own rules, the Board found that Bose did not need to present its typo theory earlier. Appx43. The Board reasoned that Bose alleged the theory in its Reply, to which Koss responded in its Sur-reply, so that the argument "was timely raised and [Koss] had notice and opportunity to respond." *Id.* The Board also found that Koss had not alleged any prejudice from any delay. *Id.* The Board abused its discretion in so ruling in several respects.

*First*, the Board incorrectly concluded that Koss had not alleged prejudice. To the contrary, Koss expressly argued that by Bose first presenting in Williams's reply declaration Williams's theory that Rezvani includes errors, Koss was

47

"precluded from submitting counter-evidence." Appx632; *see also Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369–70 (Fed. Cir. 2016) (Board did abuse discretion when it rejected arguments that were newly raised by a petition in a reply brief). Thus, Koss identified the manifest prejudice.

**Second**, the Board abused its discretion by accepting Bose's implausible excuse for why it did not present its "typo" theory earlier. *See 3Shape A/S v. Align Tech., Inc.*, IPR2019-00151, Paper 42, 45, 2020 WL 4031552, *17 (PTAB July 16, 2020) (Board found that a petition "exceeded the proper scope of a reply" because it failed to provide "persuasive reason that the evidence it presented with its Reply to bolster its assertion of a reasonable expectation of success could not have been provided with the Petition"). Here, the Board accepted the representation by Bose's counsel at the oral hearing that the typos in Rezvani were "unnoticed at the time of filing the Petition." Appx41. In particular, Bose's counsel stated at the oral hearing that "We, ourselves, like Dr. Williams, simply interpreted [¶ [0041] of Rezvani] or read that or saw that – maybe it's dyslexia … we saw it as the headset." Appx699. The Board accepted this explanation as "candid and credible" (Appx42), but it is neither. Williams's testimony that he noticed the alleged error at the time of his opening declaration negates Bose's counsel's representation. Williams testified that he "clearly" interpreted Rezvani's ¶[0041] at the time of his opening declaration "as meaning the headset is the thing that switches," which is

48

"why 'headset' is outside of the quotes in paragraph 136" of his original declaration. Appx8959–8960. It was an abuse of discretion for the Board to accept Bose's counsel's excuse for not presenting the theory with the petition.

*Finally*, the new "typo" theory was not simply an expansion or elaboration of what Bose argued in its petition. *See e.g.*, *Chamberlain Grp., Inc. v. One World Techs., Inc.*, 944 F.3d 919, 925 (Fed. Cir. 2019) ("Parties are not barred from elaborating on their arguments on issues previously raised."); *see also Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697, 706 (Fed. Cir. 2020); *Ericsson Inc. v. Intellectual Ventures I LLC*, 901 F.3d 1374, 1381 (Fed. Cir. 2018). Instead, Williams knew that Rezvani contained the alleged errors when the petition was filed, and those alleged errors were critical to Bose's invalidity theories for Grounds 2A–2E. But neither Bose nor Williams explained the alleged errors in the petition. Bose only "alleged 'handset' was a 'typo' in its Reply." Appx43. This sequence of events precluded Koss, under the Board's rules, from providing expert counter-evidence that rebuts specifically Bose's expert testimony about the errors that was filed with Bose's post-institution Reply. CTPG at 73.

In light of these factors, the record contains no evidence on which the Board could rationally base its decision that Bose did not need to present its "typo" theory earlier.

49

## III.    THE BOARD ERRED BY RELYING ON THE PORTIONS OF REZVANI THAT THE BOARD DETERMINED ARE ERRONEOUS

Even if the Court determines that the Board correctly concluded that Rezvani has "an error in printing or drafting that led to the appearance of 'handset' in Rezvani" (Appx41), the Board abused its discretion by failing to disregard the portions of Rezvani (i.e., ¶¶ [0041] and [0050]) that included the errors. *See ClearOne, Inc. v. Shure Acquisition Holdings, Inc.*, 35 F.4th 1345, 1351 ("The Board abuses its discretion if its decision … is based on an erroneous conclusion of law ….").  Furthermore, the Board's error was not harmless because when Rezvani's ¶¶ [0041] and [0050] are properly disregarded, there is insufficient evidence to show that Rezvani discloses or suggests limitation 1.g.

### A.    The Board Erred by Relying on Portions of Rezvani That the Board Determined Include Errors

Under this Court's precedent, portions of a prior art reference that include errors are eliminated as prior art and cannot form the basis for invalidating a patent claim.  In *LG Elecs. Inc. v. Immervision, Inc.*, 39 F.4th 1364 (Fed. Cir. 2022), the IPR petitioner relied on data from a table (Table 5) in a prior art patent (Tada) as invalidating a challenged claim.  Certain test conditions (aspheric coefficients) listed in that Table 5 were undisputedly erroneous.  *Id.* at 1371.  As a result, this Court held that the petitioner could not rely on Tada's Table 5 to invalidate the challenged claim.  *Id.* at 1373 (Tada Table 5 "cannot be said to disclose" the

claimed subject matter); *see also id.* at 1374 (Newman, J., dissenting) (majority

found that the "erroneous portion" of Tada "is eliminated as prior art").

The majority opinion in *LG Elecs.* relied on *In re Yale*, 434 F.2d 666

(C.C.P.A. 1970), wherein the Court of Customs and Patent Appeals held that the

portion of an article listing one of the claimed chemical compounds could not

constitute prior art where the listing was an obvious error. *Id.* at 669. In

explaining the holding of *Yale*, this Court in *LG Elecs.* wrote that "where a prior art

reference includes an obvious error of a typographical or similar nature that would

be apparent to one of ordinary skill in the art who would mentally disregard the

errant information as a misprint or mentally substitute it for the correct

information, *the errant information cannot be said to disclose subject matter*."

*LG Elecs.*, 39 Fed.4th at 1372 (emphasis added) (citing *In re Yale*, 434 F.2d at

669). Consequently, only other, non-erroneous portions, if any, of the prior art

reference remain relevant for assessing invalidity. *LG Elecs.*, 39 F.4th at 1372

("remainder of the reference would remain pertinent prior art disclosure"); *see also*

*Ex Parte Burger*, Appeal No. 2009-004196, 2009 WL 3497070, *8 (B.P.A.I. Oct.

27, 2009) (obvious error in prior art reference "would not have put one of ordinary

skill in the art in possession" of the claimed invention "[s]ince no other passage" in

the prior art reference includes non-erroneous, invalidating information); *Ex Parte*

*Barthelemy*, Appeal No. 2003-2023, 2004 WL 4979042, *2 (B.P.A.I. Jan. 21, 2004)

51

(reversing examiner's rejection because a person skilled in the art would have considered disclosure in a prior art reference "to be a typographical error"). In other words, the prior art reference must be taken for what it literally states, especially in an IPR. *See* 35 U.S.C. § 311(b) (IPR petition "may request to cancel as unpatentable 1 or more claims of a patent only on a ground that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications"); *see also Qualcomm Inc. v. Apple Inc.*, 24 F.4th 1367, 1373–74 (Fed. Cir. 2022) (description of prior art in challenged patent cannot form basis for IPR ground because it is not a prior art patent or printed publication). Expert testimony, like Williams's "typo" theory, "cannot take the place of a disclosure in a prior art reference, when that disclosure is required as part of the unpatentability analysis." CTPG at 36.

Despite this precedent, the Board relied extensively on Rezvani's ¶¶ [0041] and [0050] to conclude that Rezvani discloses limitation 1.g. The Board stated:

> We adopt the findings and conclusions [of] Petitioner's analysis as our own, which are predicted on Rezvani disclosing a "headset." Pet. 25–26 (citing ***Ex. 1016, ¶¶ 41, 50*** (which describe Figure 8 and include the "handset" disclosure), Fig. 8 (***described in paragraphs 41 and 50*** but depicting a "headset"), 29–36, Ex. 1003 ¶¶ 39, 106–107).

Appx47 (emphasis added).[3]  Thus, the Board cited ¶¶ [0041] and [0050] multiple

times in its reasoning that Rezvani disclosed limitation 1.g.  However, to the extent

that Rezvani's ¶¶ [0041] and [0050] contain obvious errors, which the Board found

(Appx43), Rezvani's ¶¶ [0041] and [0050] do not "disclose subject matter" and

must be eliminated as prior art.  While the remaining portions of Rezvani

theoretically remain pertinent prior art, Bose's invalidity case fails without

¶¶ [0041] and [0050] because those are the only portions of Rezvani that describe

the seamless handoff shown in Rezvani's Figure 8.  *See* Appx8784–8785

(McAlexander Dec.), ¶¶ 48–52.

### B.    Bose's Invalidity Theories for Ground 2A Collapse Without Rezvani's ¶¶ [0041] and [0050]

In its petition, Bose relied primarily on Rezvani's ¶¶ [0041] and [0050] as

disclosing limitation 1.g.  Appx219–220; *see also* Appx1374–1376 (Williams

Opening Dec.), ¶¶136–139.  After institution, Bose submitted Williams's reply

declaration in which he opined that a POSITA would understand that Rezvani's

¶¶ [0041] and [0050] include typographical errors.  Appx7792–7794, ¶¶ 8–14.  To

support his opinion that Rezvani's ¶¶ [0041] and [0050] include obvious errors,

Williams relied on Rezvani's abstract, claims 32 and 36, Figure 8 and title.

Appx7793–7794, ¶¶ 10–14.  However, these snippets from Rezvani only support,

---

[3] Ex. 1016 in the IPR is Rezvani.  *See* Appx8; Appx2470.

allegedly, that ¶¶ [0041] and [0050] include typographical errors.  None of these snippets disclose a headset that executes the seamless handoff or an automatic transitioning between two wireless networks.

Rezvani's abstract states that the "***invention*** provides a multiple-antenna wireless multi-media headset with … seamless handoff between multiple wireless interfaces …."  Appx2470 (emphasis added).  This sentence is insufficient to show that Rezvani's headset alone performs the seamless handoff for several reasons.  ***First***, it states that the "invention" provides the seamless handoff and Rezvani's "invention" undoubtedly also includes the handset.  *See* Appx2479 (Fig. 9), Appx2483–2485, ¶¶ [0038]–[0055].  ***Second***, the sentence at most suggests that the headset benefits from the seamless handoff, not that it implements or executes the seamless handoff, which Rezvani exclusively and repeatedly reserves for the handset.  Appx8784–8795 (McAlexander Dec.), ¶¶ 48–51 (citing Rezvani's ¶¶ [0041] and [0050]).

Claims 32 and 36 (Appx2486) similarly do not support Bose's argument because these claims do not identify the "means supporting simultaneous operation" or the "means for seamless handoff."  Indeed, Bose and Williams fail to cite any disclosure in Rezvani to identify the means to perform those functions.  *See e.g., Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*, 841 F.3d 1334, 1341 (Fed. Cir. 2016) ("To satisfy the definiteness requirement, a means-

plus-function claim requires sufficient disclosure of the underlying structure."). Rezvani's Figure 8 also fails to show the headset performing the seamless handoff. The only paragraphs that describe Figure 8 are ¶¶ [0041] and [0050], each of which states twice that the handset—not the headset—supports the seamless handoff. Appx8784–8785 (McAlexander Dec.), ¶¶ 49–51. Finally, Rezvani's title does not even mention seamless handoff, much less teach that the headset performs it. Appx2470. Thus, Rezvani's abstract, claims, Figure 8 and title all fail to disclose that the handset executes the seamless handoff.

The Board also credited Williams's reply declaration testimony that other portions of Rezvani are "unambiguous disclosures in Rezvani" of the headset executing the automatic transition between wireless networks, but no reasonable person could accept that opinion as adequate for the reasons described above in Section II.B.2.a. Thus, Bose's invalidity Grounds 2A–2E, and the Board's adoption of these grounds, collapse without Rezvani's ¶¶ [0041] and [0050]. For this reason, the Board's determination that Rezvani includes errors was not harmless.

## IV.  CONCLUSION

Koss has not appealed the Board's invalidation of claims 1–10 and 13–14 under Grounds 3A–3D.  However, because the Board erred in invalidating claims 1–14 under Grounds 2A–2E, this Court should reverse the Board's erroneous

invalidation of claims 11–12.

Dated: November 14, 2022          Respectfully submitted,

K&L GATES LLP

/s/ *Mark G. Knedeisen*

Mark G. Knedeisen
Christopher M. Verdini
Michelle Weaver
Ragae Ghabrial
Brian P. Bozzo
Laurén Murray
K&L Gates LLP
210 Sixth Ave., Pittsburgh, PA 15222
Ph. 412-355-6500
mark.knedeisen@klgates.com
christopher.verdini@klgates.com
michelle.weaver@klgates.com
ragae.ghabrial@klgates.com
lauren.murray@klgates.com
brian.bozzo@klgates.com

*Attorneys for Appellant Koss Corporation*

# ADDENDUM

Trials@uspto.gov
571-272-7822

Paper 41
Date: May 31, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

BOSE CORPORATION,
Petitioner,

v.

KOSS CORPORATION,
Patent Owner.

————————————

IPR2021-00297
Patent 10,368,155 B2

————————————

Before DAVID C. McKONE, GREGG I. ANDERSON, and
NORMAN H. BEAMER, *Administrative Patent Judges*.

ANDERSON, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2021-00297
Patent 10,368,155 B2

## I.  INTRODUCTION

Bose Corporation ("Petitioner") filed a Petition requesting *inter partes* review of claims 1–14 of US Patent No. 10,368,155 B2 (Ex. 1001, "the '155 patent").  Paper 2 ("Pet.").  Koss Corporation ("Patent Owner") filed a Preliminary Response.  Paper 9 ("Prelim. Resp.").  Upon our authorization, Petitioner filed a Preliminary Reply relating to discretionary denial based on the factors set forth in *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 12 (PTAB Mar. 20, 2020) (precedential).  Paper 12 ("Prelim. Reply").  Patent Owner filed a Preliminary Sur-Reply in response.  Paper 13 ("Prelim. Sur-Reply").  We instituted *inter partes* review on June 3, 2021.  Paper 16 ("Inst. Dec.").  Patent Owner filed a Response (Paper 22, "PO Resp."), Petitioner filed a Reply (Paper 25, "Reply"), and Patent Owner filed a Sur-Reply (Paper 33, "Sur-Reply).  A hearing was held on March 8, 2022, and a transcript has been made of record.  Paper 40 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6.  Upon considering the record, for the reasons discussed below, we find claims 1–14 unpatentable.

## II.  BACKGROUND

### A.  *Real Parties in Interest*

Petitioner states it is the real party in interest.  Pet. xvi.  Patent Owner asserts it is the real party in interest.  Paper 4, 2.

### B.  *Related Matters*

Both parties list lawsuits, prior filed United States applications and issued patents, and pending *inter partes* reviews as related matters.  Pet. xvi; Paper 11, 2–3.

#### 1.  *Lawsuits*

Petitioner advises us that it is a defendant in a case filed by Patent Owner asserting the '155 patent in the Western District of Texas captioned

IPR2021-00297
Patent 10,368,155 B2

*Koss Corporation v. Bose Corporation*, Case No. 6:20-cv-00661 (W.D.
Tex.) ("District Court" or "District Court Lawsuit").  Pet. xvii; *see also*
Paper 11, 2.  The parties identify three other cases in the Western District
involving the '155 patent: *Koss Corporation v. PEAG LLC d/b/a JLab
Audio*, Case No. 6:20-cv-00662 (W.D. Tex.); *Koss Corporation v.
Plantronics, Inc. et al.*, Case No. 6:20-cv-00663 (W.D. Tex.); and *Koss
Corporation v. Skullcandy, Inc.*, Case No, 6:20-cv-00664 (W.D. Tex.).
Pet. xvii; Paper 11, 2.  Patent Owner also identifies two other lawsuits, *Bose
Corporation v. Koss Corporation*, Case No. 1:20-cv-12193 (D. Mass.) and
*Koss Corporation v. Skullcandy, Inc.*, Case No. 2:21-cv-00203 (D. Utah).
Paper 11, 2.

### 2. *United States Applications and Issued Patents*

Petitioner lists applications and corresponding issued patents to which
the '155 patent is a continuation.  Pet. xvi; *see also* Ex. 1001, code (63)
("Related US Application Data" ("Related Applications")).

Patent Owner identifies the following applications listed as Related
Applications to which the '155 patent claims priority: PCT application No.
PCT/US2009/039754, filed April 7, 2009 (the "PCT Application") and
provisional application Serial No. 61/123,265 filed April 8, 2008 (the
"Provisional Application").  Paper 11, 2.  Patent Owner identifies the
following pending United States patent applications that claim priority to the
PCT Application and the Provisional Application: US 17/070,295, filed
October 14, 2020; US 17/070,363, filed October 14, 2020; and US
17/178,946, filed February 18, 2021.  *Id.* at 3.

IPR2021-00297
Patent 10,368,155 B2

### 3. *Inter Partes Review Proceedings*

Patent Owner lists the following *inter partes* review proceedings[1] challenging patents that claim priority to the PCT Application and the Provisional Application:

*Apple Inc. v. Koss Corporation*, IPR2021-00305, filed December 15, 2020, challenging US Patent 10,506,325 B1);

*Apple Inc. v. Koss Corporation*, IPR2021-00381, filed January 4, 2021, challenging US Patent 10,491,982 B1;

*Apple Inc. v. Koss Corporation*, IPR2021-00546, filed February 22, 2021, challenging US Patent 10,206,025 B2;

*Apple Inc. v. Koss Corporation*, IPR2021-00592, filed March 2, 2021, challenging US Patent 10,469,934 B2;

*Bose Corporation v. Koss Corporation*, IPR2021-00612, filed March 3, 2021, challenging US Patent 10,206,025 B2;

*Apple Inc. v. Koss Corporation*, IPR2021-00626, filed March 17, 2021, challenging US Patent 10,206,025 B2;

*Bose Corporation v. Koss Corporation*, IPR2021-00680, filed March 17, 2021, challenging US Patent 10,469,934 B2;

*Apple Inc. v. Koss Corporation*, IPR2021-00679, filed March 22, 2021, challenging US Patent 10,506,325 B1;

*Apple Inc. v. Koss Corporation*, IPR2021-00686, filed March 22, 2021, challenging US Patent 10,491,982 B1; and

*Apple Inc. v. Koss Corporation*, IPR2021-00693, filed March 23, 2021, challenging US Patent 10,469,934 B2. Paper 11, 3.

---

[1] *Apple Inc. v. Koss Corporation*, IPR2021-00255, filed November 25, 2020, and *Apple Inc. v. Koss Corporation*, IPR2021-00600, filed March 7, 2021, both challenging US Patent 10,298,451 B1 are also pending.

IPR2021-00297
Patent 10,368,155 B2

Patent Owner further advises the following *inter partes* review proceedings involve a patent related to the '155 patent:

*Apple Inc. v. Koss Corp.*, IPR2022-00053, filed Oct. 15, 2021, challenging US Patent 10,206,025 B2; and

*Apple Inc. v. Koss Corp.*, IPR2022-00188, filed Nov. 15, 2021, challenging US Patent 10,469,934.  Paper 26, 2.

### C.  The '155 Patent

The application for the '155 patent's earliest claimed priority dates are to the PCT Application filed April 7, 2009, and the Provisional Application filed April 8, 2008.  Ex. 1001, codes (63), (60); *see* Pet. xvi, 9 (acknowledging the PCT Application as a "priority application[]"); Prelim. Resp. 3 n.3 ("the '155 Patent claims priority to the PCT and Provisional Applications").

### 1.  Background Technology

The '155 patent explains that wired headphones were large and "cumbersome."  Ex. 1001, 1:43–51.  The '155 patent further explains "[r]ecently, cordless headphones that connect wirelessly via IEEE 802.11" such as via Bluetooth connection, to a laptop or personal computer "have been proposed, but such headphones are also quite large and not in-ear type phones."  *Id.* at 1:58–62; *see also* Ex. 1003 ¶ 43 (describing Bluetooth as "an ad hoc wireless network").

### 2.  The '155 Patent's Wireless Earphones

The '155 patent describes and claims a wireless earphone with "a transceiver circuit for receiving streaming audio from a data source . . . over an ad hoc wireless network.  When the data source and the earphone are out of range via the ad hoc wireless network, they may transition automatically to a common infrastructure wireless network."  Ex. 1001, 1:66–2:5.  The

IPR2021-00297
Patent 10,368,155 B2

patent defines "ad hoc wireless network" as "a network where two . . . wireless-capable devices, such as the earphone and a data source, communicate directly and wirelessly, without using an access point." *Id.* at 3:3–6, 4:57–60.

Figure 2A of the '155 patent is reproduced below.



FIG. 2A

**Figure 2A illustrates one of the communication modes for the wireless earphone.**

Ex. 1001, 2:28–30.  Figure 2A illustrates a data source 20 in communication with earphone 10 over ad hoc wireless network 24. *Id.* at 4:26-28.  The data source may be a "digital audio player (DAP)." *Id.* at 4:33–34. The DAP transmits audio wirelessly to earphone(s) via an ad hoc network if the DAP and earphone(s) are "in range" of that network. *Id.* at 4:56–57. "When the earphone 10 and data source 20 are out of range for the ad hoc wireless network 24, that is, when the received signals degrade below the threshold minimum signal strength level, both the earphone 10 and the data source 20 may transition automatically to communicate over an infrastructure wireless network (such as a wireless LAN (WLAN)) 30 that is in the range of both the earphone and data source." *Id.* at 5:9–17, *see also* Fig. 2B (ad hoc network replaced by "NETWORK 33").

IPR2021-00297
Patent 10,368,155 B2

*D. Illustrative Claim*

Claims 1–14 of the '155 patent are challenged. Pet. 4. Claims 2–13 depend directly or indirectly from claim 1. All claims are directed to a "wireless headphone assembly." Claim 1 is reproduced below as illustrative.

[1.a][2] A wireless headphone assembly comprising:

[1.b] first and second earphones, wherein each of the first and second earphones comprises an acoustic transducer;

[1.c] an antenna for receiving wireless signals;

[1.d] a wireless communication circuit connected to the antenna, wherein the wireless communication circuit is for receiving and transmitting wireless signals to and from the wireless headphone assembly;

[1.e] a processor in communication with the wireless communication circuit; and

[1.f] a rechargeable battery for powering the wireless headphone assembly,

[1.g] wherein the headphone assembly is configured, with the processor, to transition automatically from playing digital audio content received wirelessly by the headphone assembly via a first wireless network to playing digital audio content received wirelessly by the headphone assembly via a second wireless network.

---

[2] For purposes of this Decision, we follow Petitioner's format as shown in the Summary of the Challenged Claims, where each claim recitation is identified by claim number followed by a letter for each recitation of the claim. Pet. 7. In the Patent Owner Response, Patent Owner argues certain limitations without reference to the format. *See*, *e.g.*, PO Resp. 9 ("processor, to transition automatically").

IPR2021-00297
Patent 10,368,155 B2

Ex. 1001, 18:2–19; Pet. 7.

### E.  Evidence of Record

This proceeding relies on the following prior art references and expert testimony:

Pelland[3] (Ex. 1013), WO 2009/126614 A1, published Oct. 15, 2009;

Rezvani (Ex. 1016), US 2007/0165875 A1, published July 19, 2007;

Skulley (Ex. 1017), US 6,856,690 B1, issued Feb. 15, 2005;

Feder (Ex. 1018), US 2004/0142693 A1, published July 22, 2004;

Hind (Ex. 1019), US 7,069,452 B1, issued June 27, 2006;

Rosener (Ex. 1020), US 2008/0076489 A1, published Mar. 27, 2008;

Wilson (Ex. 1021), US 7,457,649 B1, issued Nov. 25, 2008; and

Nakagawa (Ex. 1022), US 2003/0223604 A1, published Dec. 4, 2003.

Petitioner also relies on the Declaration of Tim A. Williams, Ph.D. (Ex. 1003, "Williams Declaration"), Reply Declaration of Tim A. Williams, Ph.D. (Ex. 1104, "Williams Reply Declaration") and the Declaration of John G. Casali, Ph.D., CPE (Ex. 1005, "Casali Declaration").

Patent Owner relies on the Declaration of Joseph C. McAlexander III (Ex. 2023, "McAlexander Declaration").

### F.  Asserted Grounds

Petitioner asserts that claims 1–14 would have been unpatentable on the following grounds (Pet. 4, 11–80):

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–14 | 102 | Pelland |
| 1–4, 6–8, 14 | 103 | Rezvani, Skulley |
| 11–12 | 103 | Rezvani, Skulley, Feder |
| 13 | 103 | Rezvani, Skulley, Hind |

---

[3] Pelland is the published version of the "PCT Application" listed above in Section II.B.2.

IPR2021-00297
Patent 10,368,155 B2

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 5, 9 | 103 | Rezvani, Skulley Rosener |
| 10 | 103 | Rezvani, Skulley, Wilson |
| 1–3, 6–8, 10, 14 | 103 | Nakagawa, Wilson |
| 1, 4–5, 9 | 103 | Nakagawa, Rosener |
| 13 | 103 | Nakagawa, Wilson, Hind |
| 13 | 103 | Nakagawa, Rosener, Hind |

## III. PATENTABILITY ANALYSIS

### A. Level of Ordinary Skill in the Art

Petitioner relies on Drs. Williams and Casali, and alleges that a person having ordinary skill in the art "would principally have had a background in wireless networks, including at least a bachelor's degree in electrical engineering or a related field and experience with ad hoc and infrastructure wireless networks" and "would have worked on a team including a member with headphone design experience." Pet. 8 (citing Ex. 1003 ¶¶ 29–34; Ex. 1005 ¶¶ 41–43).

Based on the McAlexander Declaration, Patent Owner proposes that a person of ordinary skill in the art "would be someone working in the electrical engineering field and specializing in or knowledgeable of speaker components for small wireless devices," would have a "bachelor's degree in electrical engineering and at least two or more years of work experience in the industry," and would have practical experience with circuit design, speaker components, and wireless communication. PO Resp. 4 (citing Ex. 2023 ¶ 15).

Patent Owner states that its proposal is "not far removed" from Petitioner's. Neither party argues the level of ordinary skill as part of their arguments on the merits. We instituted trial on Petitioner's proposed level of ordinary skill. We are not presented with any reason to change that

9

IPR2021-00297
Patent 10,368,155 B2

determination and, given Patent Owner's acquiescence, we maintain the level of skill proposed by Petitioner.

### B.    Claim Construction

The Petition was accorded a filing date of December 7, 2020. Paper 3.  For petitions filed on or after November 13, 2018, a claim shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent.  37 C.F.R. § 42.100 (2019). Thus, we apply the claim construction standard as set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).

Petitioner, citing 37 C.F.R. § 42.100, asserts construction is unnecessary and does not propose any term for construction.  Pet. 11.  In the Institution Decision, we preliminarily determined that no disputed term required construction to resolve this dispute.  *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.").  Inst. Dec. 20–21.

Limitation 1.g recites, in pertinent part, "the headphone assembly is configured with the processor, to transition automatically from . . . a first wireless network to . . . a second wireless network."  Patent Owner disputes that Rezvani's "seamless handoff" falls within the meaning of "transition automatically."  PO Resp. 15 (citing Pet. 36 (citing Ex. 1016 ¶ 41)).  Patent Owner argues there is no disclosure in Rezvani of any logic or mechanism for the "handset" described in Rezvani's paragraph 41 to perform the

10

IPR2021-00297
Patent 10,368,155 B2

seamless handoff "automatically." *Id*. at 16 (citing Ex. 2023 ¶ 61); *see also* Ex. 1016 ¶¶ 41, 50 (both referencing "handset" and not "headphone").

We limit the current discussion to whether a "seamless handoff" falls within the meaning of "transition automatically." The "handset" versus "headphone" issue is addressed in connection with patentability. *See* Section III.G below.

Relying on the McAlexander Declaration (Ex. 2023), Patent Owner asserts that "'automatically' means by itself, without external intervention, such as from a human operator or another device." PO Resp. 15 (citing Ex. 2023 ¶ 60). Patent Owner contends that "automatic" and "seamless" are not synonyms. Sur-Reply 15. Petitioner cites the '155 patent where "'automatically' means 'without user intervention.'" Pet. 36 (citing Ex. 1001, 2:65–66, 3:1–3, 5:21–22). Patent Owner agrees that "automatic" as used in limitation 1.g means "without external intervention." PO Resp. 15 (citing Ex. 2023 ¶ 60; Ex. 2025,[4] 4; Ex. 2026,[5] 27).

Patent Owner asserts "[s]eamless," on the other hand, means "without interruption." Sur-Reply 15–16 (citing Ex. 2023 ¶ 52 ("without a gap"); Ex. 2025, 5 ("without seams"); Ex. 2026, 27–28). Patent Owner argues "[s]omething can be seamless without being automatic." *Id*. at 16 (citing Ex. 2023 ¶¶ 52–53). Petitioner responds by arguing the prior art "uniformly confirms a 'seamless handoff is where . . . ***the user does not have to do anything***." Reply 20 (citing Ex. 1031[6] ¶¶ 278–279; Ex. 1003 ¶ 139;

---

[4] THE AMERICAN HERITAGE DICTIONARY, 143 automatic 1.a: "Acting or operating in a manner essentially independent of external influence or control; self-moving;" 1106 seamless: "without seams," Second College Edition).

[5] Deposition of Tim A. Williams, Ph.D. (Ex. 2026, "Williams Deposition").

[6] Tagg, US 2005/0286466 A1, published Dec. 29, 2005 (Ex. 1031).

IPR2021-00297
Patent 10,368,155 B2

Ex. 1102[7] ¶ 6 ("seamless" handoff is one in which a user "do[es] not have to take any specific action to effectuate . . . the handover"); Ex. 1103[8] ¶ 47 ("'seamless' handoff 'occurs without user input'"); Ex. 1104 ¶ 31).

We are not persuaded that the extrinsic evidence Patent Owner relies on, in the form of dictionary definitions and conclusory expert testimony, supports any difference between "seamless handoff" and "transition automatically." Extrinsic evidence is, in general, less reliable than intrinsic evidence in determining how to interpret the claim. *Phillips*, 415 F.3d at 1318 (listing reasons extrinsic evidence lacks the reliability of the patent and its prosecution history).

Neither are we persuaded that Rezvani's paragraphs 41 and 50 description of a "handset" in conjunction with the seamless handoff is "strong evidence" that the described "seamless handoff does not occur automatically." PO Resp. 16–17 (citing Ex. 1016 ¶ 41). As detailed in Section III.G below, we find that the use of "handset" in Rezvani was a mistake in printing or drafting.

Mistake or not, Rezvani's description of "handset" is the only fact relied on in the McAlexander Declaration supporting his conclusion that "seamless handoff" is outside the meaning of "automatically transition." *See* Ex. 2023 ¶¶ 60–61. Mr. McAlexander testifies "there is no disclosure in Rezvani of any logic or mechanism for the handset to perform the seamless handoff 'automatically.'" *Id*. ¶ 60. However, Mr. McAlexander does not

---

[7] Krishnamurthi, US 2004/0246990 A1, published Dec. 9, 2004 (Ex. 1102).
[8] Chiueh, US 2005/053034 A1, published Mar. 10, 2005 (Ex. 1103).

say anything about Rezvani's disclosures of a "headset." We give very little weight to the conclusory McAlexander Declaration.

Both parties agree, and the '155 patent all but defines, that "automatic" means "without user intervention." Pet. 36 (citing Ex. 1001, 2:65–66, 3:1–3, 5:21–22; PO Resp. 15 (citing Ex. 2023 ¶ 60 ("without external intervention")). We are not persuaded that a "seamless handoff" is any different from "transition automatically." We therefore maintain our preliminary determination that the term does not require express construction, adding that a "seamless handoff" is encompassed within the meaning of "transition automatically."

## C. Legal Standard for Obviousness

A patent claim is invalid as obvious if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a).

> The ultimate determination of obviousness is a question of law, but that determination is based on underlying factual findings. . . . The underlying factual findings include (1) "the scope and content of the prior art," (2) "differences between the prior art and the claims at issue," (3) "the level of ordinary skill in the pertinent art," and (4) the presence of secondary considerations of nonobviousness such "as commercial success, long felt but unsolved needs, failure of others," and unexpected results.

In re NuVasive, Inc., 842 F.3d 1376, 1381 (Fed. Cir. 2016) (citing inter alia Graham v. John Deere Co., 383 U.S. 1, 17–18 (1966)).[9]

---

[9] The parties do not present argument or evidence of secondary considerations of nonobviousness.

IPR2021-00297
Patent 10,368,155 B2

"To satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. The petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016). Furthermore, in assessing the prior art, the Board must consider whether a person of ordinary skill would have been motivated to combine the prior art to achieve the claimed invention. *NuVasive*, 842 F.3d at 1381.

As the Federal Circuit found, in quoting from the Supreme Court's decision in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418–419 (2007),

> "because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known," "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does."

*Personal Web Technologies, LLC v. Apple, Inc.*, 848 F.3d 987, 991–92 (Fed. Cir. 2017).

### D. Obviousness of Claims 1–3, 6–8, 10, and 14 over Nakagawa and Wilson

Petitioner alleges claims 1–3, 6–8, 10, and 14 would have been obvious over Nakagawa and Wilson. Pet. 4, 56–80. Petitioner also relies on the Williams and Casali Declarations. Ex. 1003 ¶¶ 225–296; Ex. 1005 ¶¶ 47–100, 103, 123–129.

#### 1. Nakagawa (Ex. 1022)

Nakagawa includes a wireless audio output apparatus 11, illustrated in Figure 1, which is reproduced below.

14

IPR2021-00297
Patent 10,368,155 B2



**Figure 1 is a diagram showing sound source devices connected by radio to an audio output apparatus, for example a wireless headset.**

Ex. 1022 ¶¶ 15, 25.  As shown in Figure 1, the audio output apparatus 11 receives audio data via a radio signal and generates sound that is output via a speaker or headphone 11.  *Id.* ¶¶ 24–25.  Sound source devices "are wireless audio transmitters that can transmit audio representing speech, music and the like, in the form of radio signals," which signals can be in accord with the Bluetooth™ standard.  *Id.* ¶¶ 26–27.  Still referring to Figure 1, Nakagawa identifies three sound source devices:  a portable audio player like a CD (Compact Disc) 12; a mobile phone 13; and an audio guidance device 14.  *Id.* ¶¶ 27–31, Fig. 1.

Regarding the audio player 12 and the mobile phone 13, the user can assign a priority level to each sound source device.  Ex. 1022 ¶ 38.  For example, if a higher priority level is given to the phone and the user is listening to the audio player, upon receiving a call, the user is "automatically

IPR2021-00297
Patent 10,368,155 B2

switched" by the audio output apparatus to the phone. *Id.* ¶ 39. Ending the call, and thus disconnecting the phone from the audio output device, the audio player or second sound source device is "automatically selected" again. *Id.* ¶ 42.

Similarly, if the third sound source device, the audio guidance device 14, is connected to the audio output apparatus 11, it may be given the "highest priority" among the three devices. Ex. 1022 ¶ 45. In this situation, the wireless output device is "automatically switched from the sound source device 12 or 13 to the sound source device 14" when "the headphone 111 is generating sound from the audio data transmitted from the sound source device 12 or 13." *Id.*

Figure 3 of Nakagawa is reproduced below.



FIG. 3

**Figure 3 is a block diagram of the audio output apparatus of Figure 1.** Ex. 1022 ¶¶ 17, 52. A microphone 112 is part of the mobile phone of the second sound source device and transmits speech input to a mobile phone

IPR2021-00297
Patent 10,368,155 B2

network. *Id.* ¶ 30. The audio output apparatus 11 includes a control unit 32, which is a processor that controls other components. *Id.* ¶ 54, Fig. 3. As shown in Figure 3, the control unit 32 "executes the programs stored in the memory device 31 to control the audio-data generating unit 33, audio data-outputting unit 34, prior-connection request analyzing unit 35, sound-source switching unit 36, and wireless communication device 37." *Id.*

The sound-source switching unit 36 determines from which sound-source device the headset "should acquire audio data." Ex. 1022 ¶ 58. When a sound-source device is triggered to send audio data to the headset, the device "transmits a wireless-connection request to the" headset and "starts a procedure to establish" a wireless connection with the headset. *Id.* ¶ 61. For example, the mobile phone, the second sound-source device 14, "is triggered when it receives a call from . . . the mobile phone network." *Id.* ¶ 62. The sound-source device "generates a priority-level notifying command" indicating the device's "priority level." *Id.* ¶ 63. As discussed above, the "sound source is automatically switched in accordance with the priority levels." *Id.* ¶ 72.

### 2. *Wilson (Ex. 1021)*[10]

Wilson teaches recharging wireless headsets with rechargeable batteries using "a charging station," "also . . . referred to as [a] docking station[]." Ex. 1021, 1:14–23. Wilson also teaches that conventional

---

[10] Wilson was filed August 31, 2005. Ex. 1021, code (22). Petitioner alleges Wilson is prior art under pre-AIA § 102(e) or post-AIA § 102(a) depending on whether or not we agree with the priority argument Petitioner makes regarding Pelland. Pet. 54; *see also* Section III.M below (analyzing the challenge based on Pelland).

IPR2021-00297
Patent 10,368,155 B2

docking stations were compatible with over-ear headphone assemblies. *Id.*
at 1:34–44, 2:44–47, 4:4–27, Figs. 1, 4.



FIG. 4

**Figure 4 is a perspective view of a wireless headset.**

Ex. 1021, 2: 61–62. "The wireless headset includes a headband 30, speaker
18, speaker 20, and a wireless communication module installed within the
housing of the headset." *Id.* at 4:5–7.

### 3. Claim 1

Claim 1 is an independent apparatus claim illustrative of the claimed
subject matter. *See* Section II.D above. Patent Owner argues there would
have been no motivation for a person of ordinary skill in the art to combine
Nakagawa with Wilson. PO Resp. 17–26. Patent Owner also argues,
Nakagawa's "control unit," which the Petition alleges is the claimed
"processor," is not the structure of Nakagawa which "perform[s] the source-
switching." *Id.* at 27 (citing Pet. 66).

We first analyze the parties' dispute as to reasons for combining
Nakagawa and Wilson, and address Patent Owner's arguments in support of
patentability. We follow with Petitioner's showing regarding the undisputed
limitations of claim 1.

*a. Reasons for Nakagawa and Wilson Combination*

Petitioner relies on Wilson's Figure 4 for the "form-factor"[11] it combines with Nakagawa. Pet. 60–61. Petitioner advances three reasons why a person of ordinary skill would have implemented Wilson's "form-factor" with Nakagawa's portable audio player. *Id*. at 60–62.

The first reason Petitioner alleges is Wilson's stereo design, using two speakers, would have been "consistent" with Nakagawa's intended use as a portable audio player and its illustrated wireless headset having two earphones. Pet. 61 (citing Ex. 1022 ¶¶ 3, 28, Fig. 1; Ex. 1003 ¶ 236; Ex. 1005 ¶ 125). Second, Petitioner argues that Nakagawa suggests its wireless headset is battery powered which would lead a person of ordinary skill to Wilson's teaching using rechargeable batteries and a docking station for recharging wireless headsets. *Id.* at 62 (citing Ex. 1021, 1:5–13; Ex. 1003 ¶ 237). Third, Petitioner asserts that "stereo wireless headsets were known and common" and incorporating them into the two-earphone design of Nakagawa "would have been applying a known technique to improve similar devices in the same way (*i.e.*, to produce stereo sound)." *Id.* at 62 (citing Ex. 1003 ¶ 238).

Petitioner argues a person of ordinary skill would have expected success in combining Wilson with Nakagawa. Pet. 62. According to Petitioner, the resulting combination required "only ordinary skill to implement" because Nakagawa's headset with two connected earpieces was a "well-known configuration" that a person of ordinary skill "would have

---

[11] "Another design consideration for headphone assemblies is the overall form factor of the assembly itself—e.g., physical design of the body and earphones' housing." Ex. 1005 ¶ 50.

understood could (and likely did) comprise respective speakers," as taught by Wilson. *Id.* (citing Ex. 1003 ¶ 239; Ex. 1005 ¶ 125).

Patent Owner disputes generally that a person of ordinary skill in the art would have reasons to combine Wilson with Nakagawa.[12] PO Resp. 17. Patent Owner summarizes Petitioner's reasons as "(i) enabling a stereo design using two speakers, (ii) the absence of a power source in Nakagawa, and (iii) that stereo wireless headsets are known and common." *Id*. at 18 (citing Pet. 61–62). Patent Owner also disputes the showing made of a need for a wireless design and application of a known technique to improve similar devices. *Id.* (citing Pet. 51).

Patent Owner argues that Nakagawa alone shows the use of two headphones and Wilson is cited to "give rise to Petitioner's irrelevant reasons for the combinations." PO Resp. 19 (citing Ex. 1022, Fig. 1 (annotated)). Thus, Patent Owner alleges "Nakagawa already comprises a stereo design" and that reason for the combination is "moot." *Id*. at 20 (citing Ex. 2023 ¶ 33).

Patent Owner also argues that achieving a completely wireless design would not lead a person of ordinary skill in the art to look at Wilson. PO Resp. 20. Patent Owner points to Nakagawa as connecting the headphones by wire, not wirelessly. *Id.* (citing Ex. 2023 ¶ 34).

---

[12] Patent Owner's arguments for the Nakagawa and Wilson combination analyzed here are substantially the same as for the Nakagawa and Rosener combination analyzed in Section III.E below. *See* PO Resp. 17 (referring to both Wilson and Rosener). Wilson and Rosener are both argued by Petitioner as showing the recited "rechargeable battery," limitation 1.f. Pet. 66 (Wilson), 77 (Rosener). Patent Owner focuses on Wilson and we limit our analysis here to Wilson, addressing Rosener in Section III.E.

IPR2021-00297
Patent 10,368,155 B2

As to Petitioner's reason based on lack of a power source in Nakagawa, Patent Owner argues the issue is not whether a battery would have been understood as beneficial to Nakagawa.  PO Resp. 20 (citing Ex. 2023 ¶ 35).  Rather, the issue is "whether Rosener's battery or Wilson's battery is capable of satisfying unknown power requirements of unknown components, particularly Nakagawa's sound-source switching devices 35, 36, in addition to powering components in common between the Nakagawa design and the Rosener design or Wilson design."  *Id*. at 20–21 (citing Ex. 2023 ¶ 35).  Patent Owner recognizes that no power source is disclosed in Nakagawa.  *Id*. at 21 (citing Pet. 62; Ex. 2023 ¶ 36).  Patent Owner contends that, even if a person of ordinary skill in the art would have understood the need for a power source, the power requirements of Nakagawa's sound switching devices 35 and 36 are unknown.  *Id*. (citing Ex. 2023 ¶ 36 (testifying that Nakagawa does not disclose structure of the switching devices 35 and 36 or whether they could be implemented with software)).

Patent Owner argues the design of Wilson differs from Nakagawa.  PO Resp. 22 (citing Pet. 51; Ex. 2023 ¶ 38).  Patent Owner argues the Nakagawa design requires "additional components, i.e., the sound-source switching devices 35, 36, with additional power requirements."  *Id.*  In sum, according to Patent Owner, knowledge of the "nature of Nakagawa's sound-switching devices 35, 36" and their power requirements is needed.  Patent Owner alleges that without knowing the power needed for the sound-source switching devices, along with the existing common earphone components between Nakagawa and Wilson, Nakagawa would be "crippled" and adding Wilson's battery would not have been a simple substitution.  *Id*. at 23 (citing Ex. 1022, Fig. 3: Ex. 2023 ¶ 39).

IPR2021-00297
Patent 10,368,155 B2

In another argument based on the specific structure of Nakagawa, Patent Owner alleges the combination is based on hindsight because of Nakagawa's lack of disclosure "regarding powering the wireless audio output apparatus 11, including the sound-source switching devices 35, 36." PO Resp. 24 (citing Pet. 66, 77). Patent Owner contends the only reason "to provide a battery for powering Nakagawa's wireless audio output apparatus 11" is hindsight. *Id*. at 24–26 (citing Ex. 1022, Fig. 3). Patent Owner argues the sound-switching devices need to be described with specific structural detail. *Id*. at 27–30 (citing Ex. 1022 ¶¶ 53, 57, Fig. 3).

The Sur-Reply argues Petitioner changed theories from modifying Nakagawa with Wilson's battery powered earphones to modifying Wilson with Nakagawa's sound-source switching functionality. Sur-Reply 2 (citing Reply 4). There has not been a change in theory. Page 4 of the Reply cites to page 61 of the Petition. Reply 4 (citing Pet. 61). Page 61 alleges there are "several reasons to implement Nakagawa's wireless headset using Wilson's form-factor." Pet. 61 (citing Ex. 1003 ¶¶ 235–239). The reasons are summarized above. Regardless, there is no authority cited as to how such a reversal of a combination is relevant to the reasons cited for the combination.

We find the desirability of stereo sound playback would have motivated combining Wilson with Nakagawa. Nakagawa does not disclose or mention stereo sound but does describe using the earphones for music playback. *See* Reply 4 (citing Ex. 1005 ¶ 125 (citing Ex. 1022 ¶¶ 24, 27–31)). Paragraph 28 specifically refers to "music data." Ex. 1022 ¶ 28.

Wilson is a design having two speakers 18 and 20 where stereo is disclosed as the preferred embodiment. Pet. 61 (citing Ex. 1021, 4:4–7); *see also* Ex.1021, 7:41–43 (preferred embodiment is "stereo headset").

22

IPR2021-00297
Patent 10,368,155 B2

Drs. Williams and Casali both testify "Wilson's stereo design would have been consistent with Nakagawa's intended use and its depiction of a wireless headset having two earphones (Nakagawa, Fig. 1)." *Id.* (citing Ex. 1003 ¶ 236; Ex. 1005 ¶ 125). Dr. Casali testifies that a monaural design can include two earphones. *See* Ex. 1005 ¶ 47. Dr. Casali further explains that "diotic" is where "both earphones receiv[e] and output[] the same signal." *Id.* (citing Ex. 1017, 1:22–23 (by the filing date of the '155 patent one or two headphones were used for "monaural or stereo listening")); *contra* Ex. 2023 ¶ 33 (two headphones are necessarily stereo). We credit the Casali Declaration and its discussion of Nakagawa that the sound input and output of two headphones is not necessarily stereo and can be monaural.

Based on the preceding, we find that Nakagawa does not expressly disclose stereo headphones and Wilson does. A person of ordinary skill would have had reason to add stereo output taught by Wilson to the headphones of Nakagawa. Pet. 61 (citing Ex. 1003 ¶ 236; Ex. 1005 ¶ 125; Ex. 1022 ¶¶ 3, 28).

We credit the Williams Declaration and find that a person or ordinary skill would have understood that "wireless headsets (like Nakagawa's) by 2008 were 'often battery powered,' 'generally [by] rechargeable [batteries] so that the batteries can be re-used instead of being discarded after use.'" Ex. 1003 ¶ 237 (citing Ex. 1021, 1:5–13) (alterations in original). We further find that, although Nakagawa does not expressly disclose that its wireless headset is battery powered, power is needed for the electrical components and is suggested. *See* Pet. 62 (citing Ex. 1021, 1:5–13; Ex. 1003 ¶ 237); *see also* PO Resp. 23 (acknowledging a battery is needed to power common components of Wilson and Nakagawa). A person of ordinary skill would have reason to look to Wilson's teaching of

23

IPR2021-00297
Patent 10,368,155 B2

rechargeable batteries and a docking station for recharging wireless headsets. *See* Ex. 1003 ¶ 237.

We are not persuaded that the power requirements for Nakagawa's sound-switching devices 35, 36 are needed in order to add Wilson's battery. Specifications of components like power requirements for Nakagawa's sound-source devices are not needed in order for a person of ordinary skill to have had reason to combine the references.

> The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference; nor is it that the claimed invention must be expressly suggested in any one or all of the references. Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art.

*In re Keller*, 642 F.2d 413, 425 (C.C.P.A. 1981).

Patent Owner has not persuaded us that the addition of Wilson's battery would "cripple" Nakagawa and therefore would not have been a simple substitution. *See* PO Resp. 23 (citing Ex. 1022, Fig. 3; Ex. 2023 ¶ 39). The citation to paragraph 39 of the McAlexander Declaration copies the Patent Owner's Response. Copying argument from the Patent Owner Response adds nothing new for us to consider. The verbatim adoption of Patent Owner's argument by Mr. McAlexander demonstrates the conclusory nature of the testimony. The testimony does not identify the basis for the opinion. As such, we give the McAlexander opinion little weight. 37 C.F.R. § 42.65.

Petitioner has shown a reasonable "expectation of success without undue experimentation." There are not multiple design choices here. The proposed combination is finite, a one for one substitution of Wilson's headset with a rechargeable battery for the headphone of Nakagawa. *See*

IPR2021-00297
Patent 10,368,155 B2

Pet. 62 (combination requires "only ordinary skill"), 66 ("Nakagawa-Wilson includes Wilson's rechargeable battery." (citing Ex. 1021, 3:19–21; Ex. 1003 ¶ 248; *KSR*, 550 U.S. at 421 ("When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp."))). Petitioner has provided sufficient evidence that a person of ordinary skill would have expected success in making the combination. *Id.* (citing Ex. 1003 ¶ 239; Ex. 1005 ¶ 125; Ex. 1021, 1:5–13).

On this record, Petitioner has sufficiently shown that a person of ordinary skill would have had reason to combine Wilson with Nakagawa.

### b. *Limitations of Claim 1*

We have reviewed Petitioner's showing on the recitations of claim 1, recitations 1.a–g.[13] Pet. 56–66; Ex. 1003 ¶¶ 225–248; Ex. 1005 ¶¶ 93–94, 123–128. Petitioner's argument and evidence are summarized below. For the reasons stated below, we find Petitioner's argument and evidence is sufficient to show all the limitations of claim 1.

We first analyze the one disputed limitation, limitation 1.e. Limitation 1.e recites "a processor in communication with the wireless communication circuit." Nakagawa includes a system control unit which is asserted by Petitioner to be the claimed processor. Pet. 65 (citing Ex. 1022

---

[13] Recitation 1.a is the preamble of claim 1. Pet. 63. Neither party argues whether or not the preamble is limiting. Nor do we determine whether or not the preamble is limiting. Regardless, Petitioner presents argument and evidence that the claimed "headphone" is taught by Wilson. *Id.* (citing Ex. 1021, 1:5–13, Fig. 1" Ex. 1003 ¶241; Ex. 1005 ¶¶ 47, 125). We determine that, if the preamble is limiting, Petitioner has sufficiently shown it is taught by the combination of Wilson and Nakagawa.

IPR2021-00297
Patent 10,368,155 B2

¶ 54).  Petitioner alleges the control unit 37 is connected to the RF unit 37. *Id*. at 65–66 (citing Ex. 1022 ¶¶ 53–56, 59, Fig. 3 (annotated at Pet. 66 outlining "System control unit" and showing the connection between control unit 32 and RF unit 37); Ex. 1003 ¶ 247).

Patent Owner disputes this limitation is taught because the "sound-source switching devices" 35 and 36 disclosed in Nakagawa are not described as part of the "control unit."  PO Resp. 27 (citing Ex. 1022, Fig. 3).  Patent Owner argues "Nakagawa merely depicts the [sound-source switching] devices 35, 36 as boxes and describes them in functional terms only."  *Id*. at 28 (citing Ex. 1022 ¶¶ 53, 57, Fig. 3).

Petitioner responds that a person of ordinary skill in the art would need to exercise "ordinary creativity" to "include components performing Nakagawa's sound-source switching functionality even if doing so required modifications to account for specific aspects of Wilson or Rosener." Reply 11 (citing Ex. 1003 ¶¶ 239, 278).  Petitioner also cites to the '155 patent for the same proposition that a person of ordinary skill in the art "would be able to design software and control hardware to implement the embodiments."  *Id*. (citing Ex. 1001, 17:1–9).

We are not persuaded that the sound-source switching devices 35 and 36 are not a part of the system control unit 32.  As Petitioner shows in its annotated Figure 3, all three components are shown as interconnected in Nakagawa's Figure 3 as part of the "audio output apparatus 11."  Ex. 1022, Fig. 3; Pet. 66.  Further, the "sound source devices are connected by radio to the audio output apparatus."  Ex. 1022 ¶ 24.

We agree with Petitioner and find that the function of the component is sufficient to allow a person of ordinary skill in the art to make the necessary component.  More specifically, a person of ordinary skill in the art

IPR2021-00297
Patent 10,368,155 B2

is "not [an] automaton[] forced to 'blindly incorporate' Nakagawa's 'exact' components into the Wilson or Rosener headphones." Reply 10–11 (citing *PGS v. Iancu*, 891 F.3d 1354, 1366 (Fed. Cir. 2018)). In view of our findings, as summarized above, Petitioner has shown that limitation 1.e is taught by Nakagawa.

Patent Owner does not dispute that the Nakagawa and Wilson combination shows all the remaining limitations of claim 1. *See* PO Resp. 17–31. Patent Owner's arguments are limited to whether a person of ordinary skill in the art would have had reason to combine Wilson with Nakagawa. *Id*. These arguments were analyzed immediately above in Section III.D.3.a.

The preamble recites as recitation 1.a "[a] wireless headphone assembly comprising." Neither party argues whether or not the preamble is limiting. Nor do we determine whether or not the preamble is limiting. Petitioner presents argument and evidence that the claimed "headphone" is taught by Wilson's "headset." Pet. 63 (citing Ex. 1021, 1:5–13, Fig. 1). Dr. Casali testifies that a person of ordinary skill in the art would have understood a headset to be a "headphone." *Id*. (citing Ex. 1005 ¶¶ 47, 125). Petitioner alleges that adding "Nakagawa's collection (*i.e.*, assembly) of functional components (*e.g.*, 'system control unit 32,' 'wireless communication device 37,' 'antenna 113') and Wilson's rechargeable battery,'" the preamble is shown. *Id*. (citing Ex. 1022 ¶¶ 52–59, Fig. 3; Ex. 1021, 1:5–13; Fig. 1; Ex. 1003 ¶ 241). We determine that, if the preamble is limiting, Petitioner has sufficiently shown it is taught by the combination of Wilson and Nakagawa.

Limitation 1.b recites "first and second earphones, wherein each of the first and second earphones comprises an acoustic transducer." Petitioner

IPR2021-00297
Patent 10,368,155 B2

relies on "Wilson's speakers 18, 20 ('earphones') comprising 'acoustic transducer[s]' as claimed." Pet. 63 (citing Ex. 1021, 4:4–15, 4:28–35; Fig. 4; Ex. 1005 ¶ 125; Ex. 1003 ¶¶ 242–243) (alteration in original).

Limitation 1.c recites "an antenna for receiving wireless signals." Nakagawa is cited by Petitioner as having an antenna for "***wireless communication*** with [*i.e.*, 'for receiving wireless signals' as claimed] various sound-source devices.'" Pet. 64–65 (citing Ex. 1022 ¶¶ 26, 30–34, 52–59, Fig. 3; Ex. 1003 ¶ 244) (alteration in original).

Limitation 1.d recites "a wireless communication circuit connected to the antenna, wherein the wireless communication circuit is for receiving and transmitting wireless signals to and from the wireless headphone assembly." Nakagawa teaches a wireless communication device 37 and RF unit receiving and transmitting wireless signals. Ex. 1022 ¶¶ 30, 53–56, 59, 69, 76, 79, Fig. 3. Petitioner cites the preceding from Nakagawa to show limitation 1.d. Pet. 64–65.

Limitation 1.f recites "a rechargeable battery for powering the wireless headphone assembly." Petitioner relies on Wilson's rechargeable battery to show this limitation. Pet. 66 (citing Ex. 1021, 3:19–21; Ex. 1003 ¶ 248).

Limitation 1.g recites

wherein the headphone assembly is configured, with the processor, to transition automatically from playing digital audio content received wirelessly by the headphone assembly via a first wireless network to playing digital audio content received wirelessly by the headphone assembly via a second wireless network.

Petitioner cites to two teachings of Nakagawa to meet this limitation. The first, and the one we summarize, is that Nakagawa's headset is

28

IPR2021-00297
Patent 10,368,155 B2

"automatically switched" from one to another sound source device based on "priority information." Ex. 1022 ¶¶ 45–46. For example, one sound source device is "connected by radio" and may provide music data for listening." *Id.* ¶ 39. The second sound source device can output audio and can receive a call. *Id.* If the call receiving sound source device has been assigned a higher priority level than the music device the headphone is automatically switched to the call. *Id.* ¶¶ 39, 72. The preceding, along with the Williams Declaration are cited, among other disclosures of Nakagawa, to show limitation 1.g. Pet. 66–67 (citing Ex. 1022 ¶¶ 27–32, 33, 39, 45–46, 56, 72; Ex. 1003 ¶¶ 249–250).

We adopt the findings and conclusions of Petitioner's analysis of recitations 1.a., 1.b, 1.c, 1.d, and 1.f. above, which are not contested by Patent Owner. On this record, Petitioner has sufficiently shown that the combination of Nakagawa and Wilson teaches claim 1.

### 4. Claims 2–3, 6–8, 10, and 14

Claims 2, 3, 6–8, 10, and 14 all depend directly or indirectly from claim 1. We have reviewed Petitioner's showing with respect to claims 2, 3, 6–8, 10, and 14. Pet. 68–74. Patent Owner does not dispute the showing for these claims. *See* PO Resp. 17–31. Petitioner's argument and evidence are summarized below. We agree with Petitioner's argument and evidence and find it sufficiently shows all the limitations of claims 2, 3, 6–8, 10, and 14.

Claim 2 recites that the processor be "configured to, upon activation of a user-control of the headphone assembly, initiate transmission of a request to a remote network server." Petitioner relies on Wilson's disclosure of a "'user interface' comprising 'buttons' on the headset allowing a user to control functions like 'volume' and 'link active/end.'" Pet. 68 (citing

Ex. 1021, 4:16–23). Dr. Williams points to these teachings as "conventional for allowing users to control headset functionality." *Id*. (quoting Ex. 1003 ¶ 255).

Claim 3 depends from claim 2 and recites that claim 2 further includes a "microphone" to "process audible utterances" of a user and to transmit the audible utterances "via the first or second wireless networks." Nakagawa discloses that a "user's speech" is "input to the microphone." Ex. 1022 ¶ 30; claim 3. Petitioner cites the preceding as well as Nakagawa's teaching that the microphone then "generate[s]" a "voice signal" from the user's speech which is converted, or processed as claimed, into "audio data." Pet. 70 (citing Ex. 1022 ¶ 55, claim 3; Ex. 1003 ¶¶ 261–262) (alteration in original). It is alleged the control unit, i.e., "processor," performs this function in controlling the "audio-data generating unit." *Id*. (citing Ex. 1022 ¶ 54; Ex. 1003 ¶ 262). It is further alleged that the "microphone" transmits speech of the user. *Id*. (citing Ex. 1022 ¶ 30; Ex. 1003 ¶ 263).

Claim 6 depends from claim 1 and recites a "headband connected between the first and second earphones." Claims 7 and 8 depend from claim 6 and recite, respectively, "speaker elements" are housed in "on-ear headphones" and "over ear headphones." Petitioner cites Wilson's Figure 4 showing a headset 4, headband 30 connecting two speakers 18, 20 housed within the earphones. Pet. 71 (citing Ex. 1021, 4:5–6; Ex. 1005 ¶ 127; Ex. 1003 ¶¶ 264–265). Petitioner alleges "[a]lthough Wilson does not explicitly state which design Figure 4 depicts, it would have been routine to implement Nakagawa-Wilson with either over-ear or on-ear earphones ([Ex. 1017], 1:28–34), as those are the two possible options for the headphone depicted in Wilson, and each option had its own benefits, giving [a person of ordinary skill in the art] reason to implement Nakagawa-Wilson

IPR2021-00297
Patent 10,368,155 B2

using either option." *Id.* at 72 (citing Ex. 1005 ¶¶ 54–55, 58–59; Ex. 1003 ¶¶ 266–267).

Claim 10 depends from claim 1 and additionally recites "a docking station to charge the rechargeable battery." Petitioner relies on Wilson's headset 4 which is intended for use with a "docking station." Pet. 72–73 (citing Ex. 1021, 1:5–45, 2:45–62), Fig. 1 (element 2 ("charging station")).

Claim 14 depends from claim 1 and requires "a memory unit that stores network identifiers for the first and second wireless networks." Nakagawa is cited by Petitioner for teaching a "memory device 31" that "stores programs and various data items." Pet. 73 (citing Ex. 1022 ¶¶ 53–54, Fig. 3). The Williams Declaration testimony is cited to show the programs are used to control an operation, including automatic transitioning between wireless networks. *Id.* at 74 (citing Ex. 1003 ¶ 269 (citing Ex. 1046[14] ¶ 166; Ex. 1047[15] ¶ 51)). Exhibits 1046 and 1047 are cited by Dr. Williams to corroborate that "Bluetooth devices exchanged network identifiers." *Id.*

We adopt the findings and conclusions Petitioner's analysis of claims 2–3, 6–8, 10, and 14 above, which are not contested by Patent Owner. On this record, Petitioner has sufficiently shown that the combination of Nakagawa and Wilson teaches claims 2–3, 6–8, 10, and 14.

*5. Conclusion*

Petitioner has shown by a preponderance of the evidence that claims 1–3, 6–8, 10, and 14 would have been obvious over Nakagawa and Wilson.

---

[14] Terlizzi, US 2008/0166005 A1, published July 10, 2008 (Ex. 1046).
[15] Barnes, US 2003/0065805 A1, published Apr. 3, 2003 (Ex. 1047).

IPR2021-00297
Patent 10,368,155 B2

*E. Obviousness of Claims 1, 4–5, and 9 over Nakagawa and Rosener*

Petitioner alleges claims 1, 4–5, and 9 would have been obvious over Nakagawa and Rosener.  Pet. 4, 74–79.  Petitioner also relies on the Williams and Casali Declarations.  Ex. 1003 ¶¶ 270–293; Ex. 1005 ¶¶ 81–95, 99–104.

*1. Nakagawa (Ex. 1022)*

Nakagawa was described in Section III.D.1 above.

*2. Rosener (Ex. 1020)*

Rosener relates to wireless communication between an external data or audio device, like a cell phone or PDA, MP3, or CD player, radio personal computer or game console, and first and second earphones. Ex. 1020 ¶¶ 1, 30.  Rosener explains that conventional wireless earphones came in different designs, each with "its own unique benefits and drawbacks."  *Id.* ¶¶ 5–10, Figs. 2–4.  Rosener focuses on wireless "earbuds." *Id.* at Abs., ¶¶ 11, 30, Fig. 5.  Each earbud includes a "transceiver" "configured to receive data signals over one or more single-access wireless links or over a multi-access wireless link."  *Id.* ¶ 11.  Each earbud also contains a speaker, an RF receiver or transceiver, and a battery.  *Id.* ¶ 30.

*3. Claim 1*

*a. Reasons for Nakagawa and Rosener Combination*

Patent Owner's arguments disputing Petitioner's proffered reasons for combining Rosener with Nakagawa are the same arguments made with respect to the Nakagawa and Wilson challenge.  *See* PO Resp. 17–31; *see* Section III.D.3.a, n.12.  We address only arguments that differ from those made for the Nakagawa and Wilson combination, which are discussed in Section III.D.3.a above.

32

IPR2021-00297
Patent 10,368,155 B2

Patent Owner argues "Rosener does not constitute a finite number of identified, predictable solutions, that a [person of ordinary skill in the art] has good reason to pursue." PO Resp. 23 (citing Ex. 2023 ¶ 40). Patent Owner alleges Rosener's earbuds "are small in size to fit into a user's ear and, as such, include small batteries with limited power capabilities." *Id.*

We give the McAlexander testimony little weight. The testimony repeats the attorney argument of the Response and does not state the basis for the testimony. *Compare* PO Resp. 23–24 *and* Ex. 2023 ¶ 40. In addition, the argument is based on specifications of components like the physical size of the battery which are not needed in order for a person of ordinary skill to have had reason to combine the references. *See* Ex. 2023 ¶ 40. Thus, we are not persuaded by Patent Owner's argument that Rosener's earbud construction would not have been accomplished without impermissible hindsight or would have "frustrated any expectation of success." *See* PO Resp. 24–25 (hindsight), 28–29 (expectation of success).

### b. Limitations of Claim 1

We have reviewed Petitioner's showing on the recitations of claim 1, recitations 1.a–g. Pet. 74–79; Ex. 1003 ¶¶ 270–285; Ex. 1005 ¶¶ 93–94, 123–128. Patent Owner does not dispute that the Nakagawa and Rosner combination shows all the limitations of claim 1. *See* PO Resp. 17–31. Patent Owner's arguments are limited to whether a person of ordinary skill in the art would have had reason to combine Wilson with Rosener. *Id*. These arguments were analyzed immediately above in Section III.E.3.a.

Petitioner's argument and evidence are summarized below. We find Petitioner's showing is sufficient on all the limitations of claim 1 and adopt Petitioner's argument and evidence.

IPR2021-00297
Patent 10,368,155 B2

For the preamble, recitation 1.a, Petitioner cites "Rosener's earbud-based headphone and battery with Nakagawa's functional components." Pet. 76 (citing Ex.1022 ¶¶ 52–59, Fig. 3; Ex. 1020 ¶ 30; Ex. 1003 ¶ 281).

For the "first and second earphones" of limitation 1.b., Petitioner cites Rosener's Figure 5, showing two earbuds.  Pet. 76 (citing Ex. 1020 ¶ 30; Ex. 1003 ¶282; Ex. 1005 ¶¶ 118–120)

Petitioner alleges the Nakagawa and Rosener combination show limitations 1.c ("antenna"), 1.d (wireless communication circuit"), and 1.e ("processor") as discussed above in connection with the Nakagawa and Wilson challenge.  Pet. 77 (citing Ex. 1003 ¶ 283); *see* Section III.D.3.b above.

For the "rechargeable battery" recited in limitation 1.f, Petitioner relies on Rosener for its teaching of a battery along with the understanding of a person of ordinary skill in that art that the battery would have been rechargeable.  Pet. 77 (citing Ex. 1022 ¶ 30. 3; Ex. 1003 ¶ 284 (citing Ex. 1022 ¶ 30)).

For limitation 1.g Petitioner relies on reasons set forth in the Nakagawa and Wilson combination.  Pet. 78 (citing Pet. 66–67; *see* Section III.D.3.b above).

### 4. Claims 4 and 9

Claims 4 and 9 depends from claim 1.  We have reviewed Petitioner's showing with respect to claims 4 and 9.  Pet. 78–79.  We agree that Petitioner's evidence shows that Nakagawa and Rosener teach each limitation of claims 4 and 9.  Patent Owner does not dispute the showing made with respect to any of the challenged claims.  *See* PO Resp. 17–31.

For dependent claims 4 and 9 Petitioner relies on reasons for the combination set forth above with respect to claim 1.  Pet. 78–79 (citing Pet.

IPR2021-00297
Patent 10,368,155 B2

75–77 (claim 4), 76–77 (citing Pet. 76–78)); *see* Section III.D.3.a above.
Petitioner also cites to the Williams and Casali Declarations. *Id*. at 78
(citing Ex. 1003 ¶ 286; Ex. 1005 ¶¶ 61–63). For claim 9, reciting a "hangar
bar [and] body," Petitioner cites to Rosener. *Id*. at 79 (citing Ex. 1020 ¶¶ 8,
30, Fig. 4); 52–54 (analyzing claim 9 (applying Rosener to subject matter of
claim 9)).

We adopt the findings and conclusions Petitioner's analysis of claims
4 and 9, which are not contested by Patent Owner. On this record, Petitioner
has sufficiently shown that the combination of Nakagawa and Rosener
teaches claims 4 and 9.

### 5. *Claim 5*

Claim 5 depends from claim 4. We have reviewed Petitioner's
showing with respect to claim 5. Pet. 78–79. Claim 5 recites that each of
the first and second headphones comprises the structure recited in claim
limitations 1.c, 1.d, 1.e, and 1.f of claim 1. Petitioner relies on those
showings for claim 5. Pet. 78 (citing Pet. 77; Ex. 1003 ¶¶ 287–288)). We
adopt as our own Petitioner's argument and evidence that Nakagawa and
Rosener teach each limitation of claim 5.

Patent Owner disputes the showing made with respect to claim 5. *See*
PO Resp. 31–37. Patent Owner first relies on its arguments for the
Nakagawa and Rosener combination made in connection with claim 1. PO
Resp. 31–32. As discussed above, these arguments were not persuasive.
*See* Section III.E.3.a above.

Specific to claim 5, Patent Owner argues "Nakagawa discloses a
particular form factor, namely two headphones connected by a wire to a
separate wireless audio output apparatus." PO Resp. 32 (citing Ex. 1022,
Fig. 1). Rosener differs from Nakagawa in disclosing a design where,

IPR2021-00297
Patent 10,368,155 B2

according to Patent Owner, "all components, including its battery, are housed in headphones that are 'physically and electrically' separated." *Id*. (citing Ex. 1020, Abs., Fig. 5). Because of this alleged structural difference, Patent Owner argues a person of ordinary skill in the art "cannot simply ignore the power and weight repercussions that would need to be addressed to effectively combine Nakagawa's function with Rosener's form-factor." *Id*. at 33 (citing Ex. 2024, 55:10 (Williams Deposition testimony that implementation is "immaterial"); Ex. 2023 ¶¶ 34, 38, 40).

Patent Owner next argues that Rosener discloses a battery but not a "rechargeable battery." PO Resp. 34–35. Although this is a dispute about limitation 1.f, which Patent Owner did not dispute with respect to claim 1, we address it here. *See id*. at 34 (alleging a "rechargeable battery" is "required by limitation 1.f of claim 1"). Patent Owner alleges "Rosener's battery to power the Nakagawa components in addition to Rosener's components does not constitute applying a known technique to improve similar devices in the same way." *Id*. at 34 (citing Ex. 2023 ¶¶ 38–40). Patent Owner further alleges the size and power requirements of both Nakagawa's components common with Rosener as well as Rosener's earbuds need to be known before a person of ordinary skill could have made the combination operable.

For the "rechargeable battery" recited in limitation 1.f, Petitioner relies on Rosener for its teaching of a battery along with the understanding of a person of ordinary skill in that art that the battery would have been rechargeable. Pet. 77 (citing Ex. 1022 ¶ 30; Ex. 1003 ¶ 284 (citing Ex. 1022 ¶ 30)).

IPR2021-00297
Patent 10,368,155 B2

Patent Owner's arguments are not persuasive.  As already discussed, the question of obviousness does not turn on physical combinability, which is the lynchpin to Patent Owner's arguments.

Patent Owner also argues the combination is based on hindsight.  PO Resp. 35–37.  Despite the question being raised in the Institution Decision, Patent Owner "failed to identify any specific reason 'how or why' [persons of ordinary skill in the art] needed to know the specific power required by Nakagawa and/or provided by Wilson or Rosener to pursue the combinations."  *See* Reply 11–12 (citing Inst. Dec. 30).  Patent Owner does not respond to Petitioner's assertion regarding the Institution Decision in its Sur-Reply.  *See generally* Sur-Reply.  We are not persuaded the combination is based on hindsight.

### 6. *Conclusion*

Petitioner has shown by a preponderance of the evidence that claims 1, 4–5, and 9 would have been obvious over Nakagawa and Rosener.

### F. *Obviousness of Claim 13 over Nakagawa, Wilson, and Hind or Nakagawa, Rosener, and Hind*

Petitioner alleges claim 13 would have been obvious over Nakagawa, Wilson, and Hind or Nakagawa, Rosener, and Hind.  Pet. 4, 80.  Petitioner also relies on the Williams and Casali Declarations.  Ex. 1003 ¶¶ 294–296; Ex. 1005 ¶¶ 116–128.

### 1. *Nakagawa (Ex. 1022)*

Nakagawa was described in Section III.D.1 above.

### 2. *Rosener (Ex. 1020)*

Rosener was described in Section III.E.2 above.

### 3. *Wilson (Ex. 1021)*

Wilson was described in Section III.D.2 above.

37

IPR2021-00297
Patent 10,368,155 B2

### 4. Hind (Ex. 1019)

Hind relates to "[m]ethods, systems and computer program products which provide secure updates of firmware (i.e. data stored in a programmable memory device of a processing system." Ex. 1019, Abs. Hind explains that "[m]any devices today" include "software instructions embedded in the device to give the device its functional personality." *Id.* at 1:23–25. This software, "often called firmware," can be "communicated" to a device via "a network connection" with a remote server accessible over a network like the Internet. *Id.* at 1:40–44, 18:51–64, Fig. 10. Hind teaches that a "pair of wireless stereo headphones" could receive such firmware updates securely. *Id.* at 19:40–53.

### 5. Claim 13

Claim 13 depends from claim 1 and recites "wherein the processor is further configured to receive firmware updates from a remoter computer device." Petitioner cites Nakagawa for teaching the "sound source automatic switching functionality can be implemented with 'firmware.'" Pet. 80 (citing Ex. 1022 ¶ 84; Ex. 1003 ¶ 295). Petitioner argues a person of ordinary skill would have had reason to configure either the combination of Nagakawa and Wilson or Nagakawa and Rosener to receive updates of Hind from a remote network server for reasons stated in connection with its challenge based on Rezvani, Skulley, and Hind. *Id.* (citing Pet. 45–48; Ex. 1003 ¶ 296).

Patent Owner does not separately argue claim 13. As discussed above in Section III.D.3.a, Patent Owner makes the same argument regarding reasons for combining either Wilson or Rosener with Nakagawa. We refer to our prior analysis analyzing the argument.

IPR2021-00297
Patent 10,368,155 B2

Petitioner has shown by a preponderance of the evidence that claim 13 would have been obvious over Nakagawa, Rosener, and Hind, or Nakagawa, Wilson, and Hind.

### G. Obviousness of Claims 1–4, 6–8, and 14 over Rezvani and Skulley

Petitioner alleges claims 1–4, 6–8, and 14 would have been obvious over Rezvani and Skulley. Pet. 4, 43. Petitioner also relies on the Williams and Casali Declarations. Ex. 1003 ¶¶ 102–169; Ex. 1005 ¶¶ 106–112.

#### 1. Rezvani (Ex. 1016)

Rezvani discloses a "wireless multi-media headset with high fidelity sound" that performs "seamless handoff between multiple wireless interfaces." Ex. 1016, Abs., ¶¶ 15–16, Fig. 1. The headset is capable of several applications and multiple wireless systems may be incorporated. *Id.* ¶ 19. For example, support may be provided for cellular standards (*e.g.*, 3G), WiFi standards (*e.g.*, IEEE 802.11n), and the Bluetooth standard among others. *Id.*

The headset also "supports Voice over IP (VoIP)" communications using the Internet. Ex. 1016 ¶ 19. The headset supports "simultaneous operation on the different wireless interfaces" in order to maintain a voice conversation while switching networks. *Id.* ¶ 40.

Figure 8 is reproduced below.

IPR2021-00297
Patent 10,368,155 B2





**FIG. 8**

**Figure 8 illustrates simultaneous operation over a cellular system and Wifi system.**

Ex. 1016 ¶ 12.  Figure 8 illustrates a "headset" but is described as a "handset."  *Id.* ¶ 41.  Simultaneous operation where a seamless handoff occurs between two systems by a "handset" is also described in connection with a VoIP call from a wide-area wireless network to a local area network. *Id.* ¶ 50.

### 2. *Skulley (Ex. 1017)*

Skulley explains that headsets "can be classified into three general types:" (1) "'In-the-ear'. . . sometimes referred to as 'ear buds,'" (2) "On-the-ear," and (3) "Over-the-ear."  Ex. 1017, 1:22–34.  Skulley explains that

IPR2021-00297
Patent 10,368,155 B2

headsets "typically" included a "headband" to "forcefully maintain[]" the earphone against (or in) the ear. *Id.* at 1:35–38.

### 3. *Claim 1*

#### a. *Arguments based on Rezvani's* "*handset*" *disclosure*

Patent Owner's arguments relate to the disclosure in Rezvani of a "handset" as well as a "headset." *Compare* Ex. 1016, Fig. 8 ("headset") *and* Ex. 1016 ¶¶ 41, 50 ("handset"). For the reasons below, we find that an error in printing or drafting led to the appearance of "handset" in Rezvani. Petitioner alleges "handset" is a "typo[]." Reply 15 (citing Ex. 1104 ¶¶ 15–22). We discuss Patent Owner's arguments below.

#### (1) *Rezvani's* "*handset*"

Patent Owner argues that Rezvani's "seamless handoff" is not supported by the disclosed "handset," which is not the claimed "headset." PO Resp. 11–13 (citing Ex. 1016 ¶¶ 41, 50; Ex. 2023 ¶¶ 48–49, 50–51). Thus, according to Patent Owner, claim 1's recitations of a "headphone assembly" are not taught. *Id*. at 12. Patent Owner argues that Dr. Williams knew "handset" was wrong and intentionally avoided the issue by interpreting paragraph 41 as "headset." Tr. 50:14–51:6; *see also* Sur-Reply 10–12 (arguing the "typo" theory is neither credible nor supported by the record).

Petitioner alleges "handset" was a "typo" in paragraph 41 that went unnoticed at the time of filing the Petition. Tr. 19:16–25; *see also* Reply 15–18 (arguing "handset" in Rezvani is a "typo"). Further, Petitioner contends the error in printing "handset" is "obvious" and a person of ordinary skill in the art would have understood "headset" was intended. Reply 15 (citing Ex. 1104 ¶¶ 15–22; *In re Yale*, 434 F.2d 666, 668–669 (CCPA 1970) ("Since it is an obvious error, it cannot be said that one of ordinary skill . . . would

IPR2021-00297
Patent 10,368,155 B2

do anything more than mentally disregard [it] as a misprint or mentally substitute [the correct word] in its place.")).

We are not persuaded any deception has been shown or, if shown, how it might impact this proceeding. Patent Owner proposes the "handset" of Rezvani does not meet the "headphone" limitations of claim 1, which is presumably supported by the alleged deception, and this challenge should fail. Tr. 52:23–53:25 (Patent Owner agreeing counsel "might not have been aware of [the 'typo'], but Dr. Williams was"). Essentially, Patent Owner suggests without citation to any authority, dismissal of the challenge based in part on a misrepresentation by omission of a material fact. We decline to go so far on this record. *See Glaros v. H.H. Robertson Co.*, 797 F.2d 1564, 1574 (Fed. Cir. 1986) (denying motion to dismiss appeal based on "misrepresentation of fact" as "too draconian a remedy").

We accept the representation of counsel that a mistake occurred. We asked counsel for an explanation of the failure to give us notice that Rezvani actually referred to a "handset" and not a "headset." *See* Tr. 19:10–25. The explanation was candid and credible and we accept it for purposes of this Decision. Furthermore, we do not find that Dr. Williams' testimony regarding reading "handset" as referring to "headset" is unreasonable or deceptive. Petitioner's other expert, Dr. Casali, also cited paragraph 41 of Rezvani while testifying "Rezvani is directed to 'a High-Fidelity Multimedia Wireless *Headset*' for providing 'a high fidelity sound system' for use with applications like VoIP calling and playback of music." Ex. 1005 ¶ 108 (emphasis added).

Rezvani supports a conclusion that "handset" was a mistake and "headset" was intended. Paragraph 41 describes Figure 8, which clearly labels "headset 805." Ex. 1016, Fig. 8; *see also* Ex. 1104 ¶ 8 (Rezvani

IPR2021-00297
Patent 10,368,155 B2

paragraphs 41 and 50 "mistakenly refer to 'handset'") (citing Ex. 1016
¶¶ 15–16, 19, 21, 41, 50, Figs. 1–3, 8).  Paragraph 41 also references "a
headset 805" *before* referring to "*the* handset." Ex. 1016 ¶ 41 (emphasis
added).  Paragraph 50 is identical in describing that "the handset can support
seamless handoff between two systems." *Id*. ¶ 50.  The remaining
description in Rezvani universally refers to "headset" and "handset" is never
referenced outside paragraphs 41 and 50.  *Id*. (*see*, e.g., Title, Abs., Figs. 1,
8, ¶¶ 2, 4, 15–19, 33–35, 38–41).  For the above reasons, we find that
"handset" was "an obvious typographical error" that "would be apparent to
one of ordinary skill in the art." *In re Yale*, 434 F.2d 668–69.

Because the testimony of Dr. Williams interprets paragraph 41 to
read out "handset" and read in "headset," Patent Owner argues, Rezvani is
no longer a printed publication.  Sur-Reply 9 (citing 35 U.S.C. § 311); *see
also* Tr. 52:6–23 (making same argument).  We disagree.  We find the
understanding of a person of ordinary skill in the art as testified to by both of
Petitioner's experts that Rezvani is directed to a "headset" establishes that
Rezvani, as printed, is a printed publication.  Regardless, even if the use of
"handset" is not a mistake in printing or drafting, both of Petitioner's experts
cite Rezvani paragraph 41 and assert it discloses a "headset," without
mention of the fact that the paragraph literally discloses a "handset." *See*
Ex. 1003 ¶ 106; Ex. 1005 ¶ 108.

We are not persuaded that the "typo" theory should have been
presented earlier.  *See* Sur-Reply 13–15.  Patent Owner has not alleged
prejudice from any delay.  Upon the discrepancy being raised, Petitioner
alleged "handset" was a "typo" in its Reply.  Reply 15–18.  Patent Owner
responded in its Sur-Reply.  Sur-Reply 13–15.  We find the argument was
timely raised and Patent Owner had notice and opportunity to respond.

*(2) A "seamless handoff" by the "handset" would not have suggested the claimed "headphone assembly configured with the processor to transition automatically"*

Patent Owner argues a "seamless handoff" by the "handset" would not have suggested the claimed "headphone assembly configured with the processor to transition automatically." PO Resp. 13–15. Even if paragraph 41 is not a "typo," the question is whether or not a person of ordinary skill would understand that there is a "seamless handoff" that occurs automatically. The precise structure for doing so need not be disclosed. *See In re Keller*, 642 F.2d at 425. Petitioner has provided evidence that a seamless handoff is taught by Rezvani. Pet. 26 (citing Ex. 1003 ¶¶ 39, 106–107), 35 (citing Ex. 1016 ¶ 50, Fig. 8 ("illustrat[ing] ***the seamless handoff*** of a VoIP call between a cellular and Wifi system"), claims 32, 36; Ex. 1003 ¶ 136).

We are not persuaded that reserving the "seamless handoff" of Rezvani to the "handset" would have prevented a person of ordinary skill from understanding that the claimed "headset" would have been modified to perform the handoff. *See* PO Resp. 13 (citing Ex. 2023 ¶ 55). The Petition did not address the fact that the use of "handset" was a "typo." *See* Pet. 36 (citing Ex. 1016 ¶ 41). As discussed above, both experts proceeded on the basis that a "headset" was disclosed and was understood to perform the "seamless handoff." Ex. 1003 ¶ 106; Ex. 1005 ¶ 108. Dr. Williams testifies that "even if it were not a typographical error," the Rezvani disclosures using "handset" "do not create ambiguity in the several additional, unambiguous disclosures in Rezvani of the 'headset' executing the automatic transition between two wireless networks." Ex. 1104 ¶ 8 (citing Ex. 1003 ¶¶ 105–107, 110, 133, 136–138 (citing Ex. 1016 ¶¶ 15–16, 19–21,

Figs. 1–3, 8)).  Mr. McAlexander repeats the attorney argument but does not contradict Dr. Williams' testimony.  *See* Ex. 2023 ¶¶ 47–61.  We credit the Williams Declaration and Reply Declaration, which is based on Rezvani. The McAlexander Declaration is conclusory, cites to a disputed issue regarding the "handset," and accordingly we give it little weight.

> *(3) Rezvani's disclosure of a "seamless handoff" is not the "transition automatically" recited in limitation 1.g*

Patent Owner contends Rezvani's disclosure of a "seamless handoff" is not the "transition automatically" recited in claim 1.  PO Resp. 15–16. We determined above that "transition automatically" includes Rezvani's "seamless handoff."  *See* Section III.B above.

### b.  The European prosecution and Rezvani

In the European prosecution of the corresponding application to the one here, Petitioner alleges that "Rezvani ('D1') anticipated even the narrowed independent claims."  Pet. 10 (citing Ex. 1011[16], 4).  Petitioner argues Patent Owner conceded the determination and rewrote the claims in "two part form with respect to prior art document D1 [Rezvani]."  *Id*. (citing Ex. 1012[17], 3).  Based on the European prosecution, Petitioner argues Patent Owner admitted that Rezvani teaches limitation 1.g, the "transition automatically" limitation.  *See* Pet. 10, 36.

We agree with Patent Owner that the proceedings in the European Patent Office have little relevance here.  *See* PO Resp. 16–17.  Petitioner does not respond to Patent Owner's argument regarding relevance of the European prosecution.  *See generally* Reply.  We do not find Patent Owner's

---

[16] European Patent Application No. 09731146.8 Office Action.
[17] Patent Owner response to European Office Action.

IPR2021-00297
Patent 10,368,155 B2

actions constitute a "blatant admission." *See* Pet. 33 (citing *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005)).

### c. The combination of Rezvani and Skulley

Petitioner alleges there are three reasons for combining the two earphones of Skulley with Rezvani. Pet. 28–29 (citing Ex. 1005 ¶¶ 47–48, 110; Ex. 1003 ¶¶ 103–105, 117–118, 121–125). Petitioner alleges that a person of ordinary skill would have expected success in implementing the combination. *Id.* at 29 (citing Ex. 1005 ¶ 111; Ex. 1003 ¶ 125). As part of its arguments made regarding the "handset" disclosure addressed above, Patent Owner argues there is an insufficient showing of reasons to combine Skulley with Rezvani. PO Resp. 13–15.

Patent Owner argues modification of Rezvani requires an understanding of "what attribute or components of the handset to transfer from the handset to the headset to support a seamless handoff." *Id.* at 15 (citing Ex. 2023 ¶ 58). This argument is not persuasive because it relies on physical combinability and not what would have been obvious to a person of ordinary skill in the art. *In re Etter*, 756 F.2d 852, 859–860 (Fed. Cir. 1985).

Patent Owner argues the combination would be inoperable because the "seamless handoff" occurs randomly. PO Resp. 15 (citing Ex. 2023 ¶¶ 60–61). The inoperable argument is not stated with clarity and Petitioner does not respond in its Reply. The McAlexander Declaration citations do not discuss operability at all. For these reasons, we do not find the argument persuasive.

### d. Limitations of claim 1

Patent Owner argues Rezvani does not show the claim "headphone assembly" of claim 1 because of the "typo" discussed above. *See, e.g.,* PO Resp 11 (citing Ex. 2023 ¶ 48). Patent Owner argues that paragraphs 41 and

IPR2021-00297
Patent 10,368,155 B2

50 of Rezvani "explain that the handset—***not the headset***—supports the seamless handoff." *Id*. Patent Owner argues that the "handset" disclosed in Rezvani would not have suggested the claims "headphone assembly." *Id*. at 13–15 (citing Ex. 2023 ¶ 54). No other arguments relating to claim 1 are presented by Patent Owner.

We adopt the findings and conclusions Petitioner's analysis as our own, which are predicated on Rezvani disclosing a "headset." Pet. 25–26 (citing Ex. 1016 ¶¶ 41, 50 (which describe Figure 8 and include the "handset" disclosure), Fig. 8 (described in paragraphs 41 and 50 but depicting a "headset"), 29–36; Ex. 1003 ¶¶ 39, 106–107).

On this record, Petitioner has sufficiently shown that the combination of Rezvani and Skulley teaches the limitations of claim 1.

### 4. Claims 2–4, 6–8, and 14

Claims 2–4, 6–8, and 14 all depend directly or indirectly from claim 1. We have reviewed Petitioner's showing with respect to claims 2–4, 6–8, and 14, Pet. 37–42, and agree that Rezvani and Skulley teach each limitation of claims 2–4, 6–8, and 14. Patent Owner does not dispute the showing made with respect to claims 2–4, 6–8, and 14.

### 5. Conclusion

Petitioner has shown by a preponderance of the evidence that claims 1–4, 6–8, and 14 would have been obvious over Rezvani and Skulley.

### H. Obviousness of Claims 11–12 over Rezvani, Skulley, and Feder

Petitioner alleges claims 11–12 would have been obvious over Rezvani, Skulley, and Feder. Pet. 4, 43–45. Petitioner also relies on the Williams Declaration. Ex. 1003 ¶¶ 170–184.

### 1. Rezvani (Ex. 1016)

Rezvani was described in Section III.G.1 above.

47

IPR2021-00297
Patent 10,368,155 B2

### 2. Skulley (Ex. 1017)

Skulley was described in Section III.G.2 above.

### 3. Feder (Ex. 1018)

Feder "relates to wireless and wire-line communication," specifically "a method for a mobile client to choose amongst wireless and wireline service providers." Ex. 1018 ¶ 1. Feder discloses "a system selection algorithm (SSA)" allowing a "mobile client" to "seamlessly switch" between wireless networks based on "various criteria," including each network's wireless signal strength according to a "received signal strength indication (RSSI)." Id. ¶¶ 4, 44.

Feder explains that "seamless switching" is provided between cellular networks like 3G and wireless packet data networks like WiFi. Ex. 1018 ¶¶ 16–17. For example, "[t]hresholds for handoff from 3G to system to an 802.11 system [both IEEE and Bluetooth systems]" are set according to "preference rules" which are reported to the SSA to determine the best available system. Id. ¶¶ 12, 16, 83. The SSA determines if the RSSI measurement for the WiFi network exceeds a minimum RSSI the selected WiFi system "must achieve in order to perform a handoff." Id. ¶ 83. Feder compares the signal strength to "high" and "low" thresholds to avoid a "ping-pong effect," "whereby the mobile station is repeatedly handed off between the two systems because the measured RSSI of the 802.11 network fluctuates above and below" a single threshold. Id. ¶¶ 84–85.

### 4. Claims 11 and 12

Claims 11 and 12 depend directly or indirectly from claim 1. Claim 11 recites switching networks based on signal strength. Claim 12 also recites switching based on signal strength but the signal needs to be "above a threshold level." We have reviewed Petitioner's showing with respect to

48

IPR2021-00297
Patent 10,368,155 B2

claims 11 and 12, which includes citations to Feder for the claimed subject matter. Pet. 45 (citing Ex. 1018 ¶¶ 83–85; Ex. 1003 ¶ 184). We agree with Petitioner that Rezvani, Skulley, and Feder teach each limitation of claims 11 and 12. Patent Owner does not dispute the showing made with respect to claims 11 and 12 on this ground. *See* generally PO Resp.

Petitioner has shown by a preponderance of the evidence that claims 11 and 12 would have been obvious over the combination of Rezvani, Skulley, and Feder.

### I. *Obviousness of Claim 13 over Rezvani, Skulley, and Hind*

Petitioner alleges claim 13 would have been obvious over Rezvani, Skulley, and Hind. Pet. 4, 45–48. Petitioner also relies on the Williams Declaration. Ex. 1003 ¶¶ 185–196.

#### 1. *Rezvani (Ex. 1016)*

Rezvani was described in Section III.G.1 above.

#### 2. *Skulley (Ex. 1017)*

Skulley was described in Section III.G.2 above.

#### 3. *Hind (Ex. 1019)*

Hind was described in Section III.F.4 above.

#### 4. *Claim 13*

Claim 13 depends from claim 1. We have reviewed Petitioner's showing with respect to claim 13. Pet. 45–48. We agree that the combination of Rezvani, Skulley, and Hind teach each limitation of claim 13. Patent Owner does not dispute the showing made with respect to claim 13. *See generally* PO Resp.

#### 5. *Conclusion*

Petitioner has shown by a preponderance of the evidence that claim 13 would have been obvious over Rezvani, Skulley, and Hind.

IPR2021-00297
Patent 10,368,155 B2

### *J. Obviousness of Claims 5 and 9 over Rezvani, Skulley, and Rosener*

Petitioner alleges claims 5 and 9 would have been obvious over Rezvani, Skulley, and Rosener. Pet. 4, 48–54. Petitioner also relies on the Williams and Casali Declarations. Ex. 1003 ¶¶ 197–216; Ex. 1005 ¶¶ 105–122.

#### *1. Rezvani (Ex. 1016)*

Rezvani was described in Section IV.G.1 above.

#### *2. Skulley (Ex. 1017)*

Skulley was described in Section IV.G.2 above.

#### *3. Rosener (Ex. 1020)*

Rosener was described in Section IV.F.2 above.

#### *4. Claims 5 and 9*

Claim 5 depends from claim 4 and claim 9 depends from claim 1. We have reviewed Petitioner's showing with respect to claims 5 and 9. Pet. 48–54. We agree that Rezvani, Skulley, and Rosener teach each limitation of claims 5 and 9. Patent Owner does not dispute the showing made with respect to claims 5 and 9 on this ground. *See* generally PO Resp. Petitioner has shown by a preponderance of the evidence that claims 5 and 9 would have been obvious over Rezvani, Skulley, and Rosener.

### *K. Obviousness of Claim 10 over Rezvani, Skulley, and Wilson*

Petitioner alleges claim 10 would have been obvious over Rezvani, Skulley, and Wilson. Pet. 4, 54–56. Petitioner also relies on the Williams and Casali Declarations. Ex. 1003 ¶¶ 217–224; Ex. 1005 ¶¶ 105–115.

#### *1. Rezvani (Ex. 1016)*

Rezvani was described in Section III.G.1 above.

#### *2. Skulley (Ex. 1017)*

Skulley was described in Section III.G.2 above.

IPR2021-00297
Patent 10,368,155 B2

### 3. Wilson (Ex. 1021)

Wilson was described in Section III.D.2 above.

### 4. Claim 10

Claim 10 depends from claim 1.  We have reviewed Petitioner's
showing with respect to claim 10.  Pet. 54–60.  We agree that the
combination of Rezvani, Skulley, and Wilson teach each limitation of claim
10.  Patent Owner does not dispute the showing made with respect to claim
10 on this ground.  *See generally* PO Resp.

Petitioner has shown by a preponderance of the evidence that claim 10
would have been obvious over Rezvani, Skulley, and Wilson.

### L. Legal Standard for Anticipation

Anticipation "requires that every element and limitation of the claim
was previously described in a single prior art reference, either expressly or
inherently, so as to place a person of ordinary skill in possession of the
invention." *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1082 (Fed.
Cir. 2008) (citing *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373,
1379 (Fed. Cir. 2003); *Continental Can Co. v. Monsanto Co.*, 948 F.2d
1264, 1267–69 (Fed. Cir. 1991)).

### M. Anticipation of Claims 1–14 by Pelland

Petitioner alleges claims 1–14 would have been anticipated by
Pelland.  Pet. 4, 11–24.  Petitioner also relies on the Williams Declaration.
Ex. 1003 ¶¶ 62–100, 101 (Claim Chart Comparing Claims 1–14 to Pelland).

The issue on this challenge is whether or not the '155 patent is entitled
to the filing date of the PCT Application.  Petitioner asserts that Pelland is
prior art under pre-AIA 35 U.S.C. § 102(a) because the challenged claims
are not entitled to claim priority to the PCT Application due to an alleged

IPR2021-00297
Patent 10,368,155 B2

lack of adequate written description[18] for the claims of the '155 Patent.
Pet. 12. If the '155 patent is entitled to the PCT Application filing date, then
Pelland is not prior art. *Id.* Specifically, Petitioner asserts that limitation
1.g, the "transition automatically" limitation, which is present in all claims
of the '155 patent is not supported by sufficient written description. *Id.*
Conversely, if the PCT Application has written description support, the
challenged claims are entitled to claim priority to the PCT Application and
Pelland is not prior art.

### 1. Pelland (Ex. 1013)

Pelland is the published version of the PCT Application. Ex. 1013.[19]
Exhibit 1013, "Pelland," is what Petitioner relies on for this challenge.
Pet. xi (Exhibit 1013 is "Pelland"), 4 ("Unpatentability Grounds"). The '155
patent claims priority to Pelland. *See* Ex. 1001, code (63) ("Related U.S.
Application Data"). As we find below, the disclosures of the '155 patent
and Pelland are identical. *See* Section II.C.2 (describing the '155 patent).

### 2. Claim 1

As already stated, claim 1 is the only independent claim and is
illustrative of the challenge. Dr. Williams testifies that the Pelland
specification and all applications in the priority chain are "substantively
identical" to the written description of the '155 patent. Ex. 1003 ¶ 91 (citing

---

[18] Because the '155 patent is not entitled to the priority date of the PCT
Application, Petitioner alleges the AIA changes to Title 35 of the United
States Code apply. *See* Pet. 12 n.7. As is relevant here, there is no
difference in our analysis under pre-AIA or the AIA and neither party argues
otherwise.

[19] Patent Owner cites to Pelland (Ex. 1013), and not the PCT Application
(Ex. 1007). As discussed below, Exhibits 1007 and 1013 are all but
identical, differing only in that Exhibit 1007 lacks the publication page of
Exhibit 1013.

IPR2021-00297
Patent 10,368,155 B2

"Redline comparisons of written description text in alleged priority chain of US Patent No. 10,368,155" (Ex. 1054)).  Patent Owner agrees that the written descriptions of "all applications in the priority chain are substantively identical to the written description of the '155 Patent."  PO Resp. 6.

Petitioner argues that the PCT Application/Pelland describes an example falling within claim 1, but does not provide written description for the full scope of claim 1.  Pet. 17 ("While Pelland fails to support the claims' breadth as required by Section 112, . . . it discloses embodiments within their scope—reflecting the difference 'between the requirements for claim-anticipating disclosures and for claim-supporting disclosures." (quoting *Chester v. Miller*, 906 F.2d 1574, 1577 (Fed. Cir. 1990)).  Specifically, Petitioner argues that Pelland describes an automatic transition in response to a lost connection, but does not describe an automatic transition that is not in response to a lost connection (which Petitioner argues is within the scope of claim 1).  *Id.* 13–15.  Petitioner also argues that Pelland describes an automatic transition from an ad hoc network to an infrastructure network, but does not describe an automatic transition from an ad hoc network to another ad hoc network.  *Id.* at 16.

We find that the '155 patent description is identical to that of Pelland.  Thus, if Pelland is prior art because it does not provide written description support, every element and limitation of claim 1 was previously described in Pelland's written description and claim 1 is anticipated.  *See Sanofi-Synthelabo, Inc. v. Apotex, Inc.*, 550 F.3d 1075, 1082 (Fed. Cir. 2008); *see also* Pet. 17–24 (claim chart comparing written description of Pelland to the claims of the '155 patent showing anticipation absent priority).

IPR2021-00297
Patent 10,368,155 B2

Petitioner argues that the PCT Application's[20] original reference to a "transition" is limited to describing that "the earphone (1) ***transitions when out of range of a first network*** (2) ***between ad hoc and infrastructure networks***." Pet. 12. Petitioner argues the earphone transition is the "focus" of the Summary and every embodiment. *Id.* (citing Ex. 1001,[21] 1:66–2:6, 5:9–16, 5:37–41, 10:7–17, 10:27–42, 11:8–21, 14:8–11, 14:24–36, 14:44–55, 15:33–37, 15:60–64, 16:12–22, 16:29–35; Ex. 1003 ¶¶ 49–52, 93–95); *see also* Ex. 1001, 3:3–12 (describing "ad hoc wireless network" and "infrastructure network").

Petitioner further notes that the Specification discusses certain features as "not limited" by the description but does not say the same for "transition," limiting the disclosure to loss of connection between networks and not "transition automatically" between networks, without qualification based on why the transition occurs. Pet. 13 (citing Ex. 1001, 2:64, 3:42, 16:63, 17:40–43; Ex. 1003 ¶¶ 95–96; *Rivera v. Int'l Trade Comm'n*, 857 F.3d 1315, 1317, 1320, 1322 (Fed. Cir. 2017) (written description requirement lacking where it was silent on type of coffee filter)). Thus, according to Petitioner the only transition described is one based on a loss of connection, including loss of connection when the devices are "not in range" of the first or ad hoc network. *Id.* at 14–15. In other words, Petitioner argues that the claims broadly claiming "transition automatically" between

---

[20] Unless otherwise indicated, the PCT Application is the only application in the '155 patent family discussed in the Petition or here.

[21] As Petitioner does, our cites to the Specification are to the '155 patent Specification. *See* Pet. 12 n.8.

IPR2021-00297
Patent 10,368,155 B2

generic "first" and "second wireless networks" are not supported by the limited disclosure.

We are not persuaded that the PCT Application is limited to lost connection transitions.  We do not find *Rivera* persuasive authority.  The patent specification in *Rivera* defined a "pod" in a coffee brewer, but the court found the written description made a distinction between "pods" and a receptacle.  *Rivera*, 857 F.3d at 1320–21.  Thus, the court determined there was no written description support for broad claims covering a receptacle. *Id*.  Other than the argument that only lost connections are described, the written descriptions here do not expressly limit what "transition automatically" supports, as was the case in *Rivera* where "pod" was distinguished from a receptacle.

We agree with Patent Owner and find Figure 6 of the PCT Application shows that "when the headphone assembly is not communicating via an ad hoc wireless network (block 61), it can *transition to a highest priority infrastructure wireless network* (block 63) and keep transitioning to other infrastructure wireless networks by priority order when the current infrastructure wireless network is not 'ok' (block 65, feedback back to blocks 61 and 63)."  *See* PO Resp. 6–7 (citing Ex. 1013, 12:24–13:19) (emphasis added).  The description is not limited to lost connections and the prioritization described may be based on signal strength.  Ex. 1013, 13:11–15.

We also agree with Patent Owner and find that the PCT Application explains that "[f]or purposes of the description to follow, it is assumed that the data source 20 and the earphone communicate using a Wi-Fi protocol, *although the invention is not so limited and other wireless communication protocols may be used in other embodiments of the invention*."  PO Resp. 7

IPR2021-00297
Patent 10,368,155 B2

(citing Ex. 1013, 5:17–20). The PCT Application describes "various embodiments." Ex. 1013, 16:20. We are not persuaded by Petitioner that Figure 6's disclosure is limited by referring to "the present invention." Reply 25 (citing Ex. 1001, 2:39–42). Petitioner ignores that part of the citation relied upon states that the diagram of Figure 6 shows "transition automatically between wireless networks according to *various embodiments* of the present invention." Ex. 1001, 2:40–42; *see also* Ex. 1013, 2:19–21 (including the identical description of Figure 6) (emphasis added).

In addition to the "transition" of the earphone, discussed above, Petitioner argues "[t]he only other transition is from an infrastructure network back to an ad hoc network (if the infrastructure connection is lost)." Pet. 15 (citing Ex. 1001, Fig. 6 (steps 65, 69), 11:31–33, 11:46–48). Further, Petitioner argues that none of the intermediate priority applications "disclose, as the challenged claims cover, transitioning from one ad hoc network to another ad hoc network. Such a transition would be inconsistent with the focus on transitioning *when ad hoc communication fails*." *Id.* at 16 (citing Ex. 1003 ¶¶ 95–100).

We agree with Patent Owner that limiting claim 1 to the scope of the disclosure specifically identified in the Specification is not warranted because "[t]he PCT Application also does not unambiguously limit the invention to switching from an ad hoc network to an infrastructure network." PO Resp. 6. The PCT Application explains that

> [f]or purposes of the description to follow, it is assumed that the data source 20 and the earphone communicate using a Wi-Fi protocol, *although the invention is not so limited and other wireless communication protocols may be used in other embodiments of the invention*.

*Id.* at 7 (citing Ex. 1013, 5:17–20).

IPR2021-00297
Patent 10,368,155 B2

The PCT Application conveys that the networks include both ad hoc and infrastructure networks. *See*, *e.g.*, Ex. 1013, 5:8–9 ("a wireless network (e.g., the ad hoc wireless network 24 or an infrastructure wireless network)."). We find that whether or not the network transition is described as between ad hoc and infrastructure networks, or between ad hoc networks only, is not a failure to "reasonably convey[]" to a person of ordinary skill in the art that "the claimed genericized network transition at the time that application was filed." *See* Reply 22 (citing *Ariad v. Eli Lilly*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc)).

Petitioner has not shown that a person of ordinary skill in the art would have failed to understand any distinction of significance between transitioning from an ad hoc network to an infrastructure network and, for example, transitioning between ad hoc networks. *See* Reply 25–27. Petitioner argues "ad hoc networks use wireless protocols to create direct connections between devices whereas infrastructure networks use wireless protocols to create indirect connections between devices using access points as intermediaries." *Id*. at 26 (citing Ex. 1001, 3:3–11; Ex. 1104 ¶ 43). But the '155 patent recognizes the distinction and a person of ordinary skill would have been presented with this information. Ex. 1001, 3:3–11.

The Williams Reply Declaration limits, without sufficient explanation, what a person of ordinary skill would have understood. The end result is a conclusion, without any stated basis, that "wireless protocols that can be used for the ad hoc network does not in any way convey to [a person of ordinary skill in the art] that the inventors possessed an automatic transition between one ad hoc network and another ad hoc network." Ex. 1104 ¶ 43. The descriptions in Pelland show transition from an ad hoc network to an infrastructure network and describe both. Ex. 1013, 2:32–

3:10.  Petitioner has not shown that this would have not conveyed enough information that a person of ordinary skill in the art would have understood that transition could occur between generic networks, both ad hoc and infrastructure.

We have reviewed the relevant portions of the Williams Declaration. Ex. 1003 ¶¶ 93–99.  Dr. Williams repeats Petitioner's central theme that the "focus of all embodiments" is "transitions between an ad hoc network and an infrastructure network due to a lost connection."  *Id*. ¶ 95.  But this is not the question we need to answer.  The question is: do the descriptions of the intermediate priority applications, as represented by the PCT Application, "reasonably convey" to a person of ordinary skill in the art the claimed limitation of "transition automatically" between networks, as recited in limitation 1.g?

Dr. Williams partially answers the question by stating "none of the priority applications' specifications showed possession, by the inventors, of a 'transition' for reasons other than due to lost connection."  Ex. 1003 ¶ 96.  Dr. Williams' answer is but one example of why a transition would happen and his answer is more limiting than what a person of ordinary skill would have understood from the disclosure.  Indeed, Dr. Williams testifies that "the transition can occur because audio received over a second network is higher-priority than audio from a first network."  *Id*.  As discussed above, the PCT Application describes transitions based on network priority, all in the context of Figure 6.  *See* PO Resp. 6–7.  Specifically, "transition to a highest priority infrastructure wireless network" is suggested and would have been considered by a person of ordinary skill in the art.  *Id.* (citing Ex. 1013, 12:24–13:19).  We are not persuaded that a person of ordinary skill would have required more than the lost connection example plus the suggestion that

IPR2021-00297
Patent 10,368,155 B2

network priority would also be a consideration. As discussed above, prioritization is described based on signal strength, which would have conveyed additional understanding to a person of ordinary skill in the art. Ex. 1013, 13:11–15.

We note that Patent Owner also argues Dr. Williams' direct testimony that "transitions between an ad hoc network and an infrastructure network due to a lost connection" is arguably contradicted by his deposition testimony. PO Resp. 8–9 (citing Ex. 1003 ¶ 95; Ex. 2024, 41, 45). Petitioner also criticizes Patent Owner's failure to have expert testimony regarding written support. Reply 22. First, we do not fault Patent Owner for not repeating its arguments through an expert. The arguments are made with or without expert support. As to the criticism of Dr. Williams' alleged inconsistency, we do not find it diminishes his testimony in any significant way.

Petitioner argues there is an extended time between the filing of the '155 patent and the PCT Application, almost ten years. Pet. 2. The delay is not a reason to find the claim unpatentable and Petitioner does not present any argument supporting such a position.[22]

For the reasons discussed above, we find the '155 patent is entitled to the filing date of the PCT Application. Accordingly, Pelland is not prior art and claim 1 is not anticipated by it.

_____

[22] The "long ago discredited 'late claiming' label . . . is and always was without merit." *R.R. Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1517 (Fed. Cir. 1984) (finding the disclosure supported amended claims).

IPR2021-00297
Patent 10,368,155 B2

### 3. Claims 2–14

Claims 2 through 14 depend from claim 1 and, because Petitioner has not shown claim 1 would have been anticipated by Pelland, it has not shown claims 2 through 14 would have been anticipated by Pelland.

### 4. Conclusion

Petitioner has not shown by a preponderance of the evidence that claims 1–14 are anticipated by Pelland.

## IV. CONCLUSION[23]

For the reasons discussed above, Petitioner has shown by a preponderance of the evidence that claims 1–14 of the '155 patent are unpatentable as summarized in the table below.

## V. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner has shown that challenged claims 1–14 are unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

In summary:

---

[23] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2021-00297
Patent 10,368,155 B2

| Claims | 35 US.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–14 | 102 | Pelland | | 1–14 |
| 1–4, 6–8, 14 | 103 | Rezvani, Skulley | 1–4, 6–8, 14 | |
| 11–12 | 103 | Rezvani, Skulley, Feder | 11–12 | |
| 13 | 103 | Rezvani, Skulley, Hind | 13 | |
| 5, 9 | 103 | Rezvani, Skulley Rosener | 5, 9 | |
| 10 | 103 | Rezvani, Skulley, Wilson | 10 | |
| 1–3, 6–8, 10, 14 | 103 | Nakagawa, Wilson | 1–3, 6–8, 10, 14 | |
| 1, 4–5, 9 | 103 | Nakagawa, Rosener | 1, 4–5, 9 | |
| 13 | 103 | Nakagawa, Wilson, Hind | 13 | |
| 13 | 103 | Nakagawa, Rosener, Hind | 13 | |
| **Overall Outcome** | | | 1–14 | |

IPR2021-00297
Patent 10,368,155 B2

For PETITIONER

Michael Rader
Gregory Nieberg
WOLF GREENFIELD & SACKS, P.C
mrader-ptab@wolfgreenfield.com
gnieberg-ptab@wolfgreenfield.com


For PATENT OWNER:

Mark Knedeisen
K&L GATES LLP
mark.knedeisen@klgates.com

62



US010368155B2

(12) **United States Patent**     (10) **Patent No.:**    **US 10,368,155 B2**

Koss et al.                 (45) **Date of Patent:**    *Jul. 30, 2019

(54) **SYSTEM WITH WIRELESS EARPHONES**

(71) Applicant: **Koss Corporation**, Milwaukee, WI (US)

(72) Inventors: **Michael J. Koss**, Milwaukee, WI (US); **Michael J. Pelland**, Princeton, WI (US); **Michael Sagan**, Fairfield, CA (US); **Steven R. Reckamp**, Crystal Lake, IL (US); **Gregory J. Hallingstad**, Deforest, WI (US); **Jeffery K. Bovee**, Sterling, IL (US); **Morgan J. Lowery**, Deforest, WI (US)

(73) Assignee: **Koss Corporation**, Milwaukee, WI (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/182,927**

(22) Filed: **Nov. 7, 2018**

(65)        **Prior Publication Data**

US 2019/0075390 A1    Mar. 7, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/962,305, filed on Apr. 25, 2018, now Pat. No. 10,206,025, which is a (Continued)

(51) **Int. Cl.**
     *H04R 3/00*       (2006.01)
     *H04R 1/10*       (2006.01)
     (Continued)

(52) **U.S. Cl.**
     CPC ............. *H04R 1/1041* (2013.01); *H03G 3/02* (2013.01); *H03K 17/9622* (2013.01); (Continued)

(58) **Field of Classification Search**
     CPC ............................ H04R 1/1016; H04R 1/1008
     (Continued)

(56)        **References Cited**

U.S. PATENT DOCUMENTS

5,410,735 A   *   4/1995   Borchardt ........... H04B 1/0096
                                         348/E5.093
5,784,685 A       7/1998   Stanford et al.
                    (Continued)

FOREIGN PATENT DOCUMENTS

JP          2004-320597     11/2004
WO    WO 2006/047724 A2     5/2006
                   (Continued)

OTHER PUBLICATIONS

Supplementary European Search Report for European Application No. 09731146.3 dated Jun. 10, 2011, '7 pages.
                   (Continued)

*Primary Examiner* — Kiet M Doan
(74) *Attorney, Agent, or Firm* — K&L Gates LLP

(57)        **ABSTRACT**

Apparatus comprises adapter and speaker system. Adapter is configured to plug into port of personal digital audio player. Speaker system is in communication with adapter, and comprises multiple acoustic transducers, programmable processor circuit, and wireless communication circuit. In first operational mode, processor circuit receives, via adapter, and processes digital audio content from personal digital audio player into which adapter is plugged, and the multiple acoustic transducers output the received audio content from the personal digital audio player. In second operational mode, wireless communication circuit receives digital audio content from a remote digital audio source over a wireless network, processor circuit processes the digital audio content received from remote digital audio source, and the
                   (Continued)



Bose Exhibit 1001
Bose v. Koss

US 10,368,155 B2

Page 2

multiple acoustic transducers output the audio content received from the remote digital audio source.

**14 Claims, 16 Drawing Sheets**

### Related U.S. Application Data

continuation of application No. 15/650,362, filed on Jul. 14, 2017, now Pat. No. 9,986,325, which is a continuation of application No. 15/293,785, filed on Oct. 14, 2016, now Pat. No. 9,729,959, which is a continuation of application No. 15/082,040, filed on Mar. 28, 2016, now Pat. No. 9,497,535, which is a continuation of application No. 14/695,696, filed on Apr. 24, 2015, now Pat. No. 9,438,987, which is a continuation of application No. 13/609,409, filed on Sep. 11, 2012, now Pat. No. 9,049,502, which is a continuation of application No. 13/459,291, filed on Apr. 30, 2012, now Pat. No. 8,571,544, which is a continuation of application No. 12/936,488, filed as application No. PCT/US2009/039754 on Apr. 7, 2009, now Pat. No. 8,190,203.

(60)  Provisional application No. 61/123,265, filed on Apr. 7, 2008.

(51)  **Int. Cl.**

| | |
|---|---|
| *H04M 1/02* | (2006.01) |
| *H04R 5/033* | (2006.01) |
| *H04R 5/04* | (2006.01) |
| *H04W 48/20* | (2009.01) |
| *H03G 3/02* | (2006.01) |
| *H03K 17/96* | (2006.01) |
| *H04R 1/02* | (2006.01) |
| *H04H 20/95* | (2008.01) |
| *H04L 29/12* | (2006.01) |
| *H04W 4/80* | (2018.01) |
| *H04R 25/00* | (2006.01) |
| *H04W 84/18* | (2009.01) |
| *H04W 84/12* | (2009.01) |

(52)  **U.S. Cl.**
CPC ......... *H04H 20/95* (2013.01); *H04L 61/6068* (2013.01); *H04M 1/0254* (2013.01); *H04R 1/02* (2013.01); *H04R 1/1091* (2013.01); *H04R 3/00* (2013.01); *H04R 5/033* (2013.01); *H04R 5/04* (2013.01); *H04W 4/80* (2018.02); *H04W 48/20* (2013.01); *H03K 2217/960785* (2013.01); *H04R 25/554* (2013.01); *H04R 2201/103* (2013.01); *H04R 2201/107* (2013.01); *H04R 2225/55* (2013.01); *H04R 2420/07* (2013.01); *H04W 84/12* (2013.01); *H04W 84/18* (2013.01)

(58)  **Field of Classification Search**
USPC ..... 381/74, 80, 311; 455/556.1, 41.2, 343.2, 455/569.1, 553.1, 575.2, 412.2; 345/8, 345/156, 7
See application file for complete search history.

(56)  **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,389,463 B2 | 5/2002 | Bolas | |
| 6,671,494 B1 | 12/2003 | James | |
| 6,674,864 B1 | 1/2004 | Kitamura | |
| 6,792,091 B2 | 9/2004 | Lemchen et al. | |
| 6,937,712 B2 | 8/2005 | Lemchen et al. | |
| 7,003,515 B1 | 2/2006 | Glaser | |
| 7,027,311 B2 | 4/2006 | Vanderelli | |
| 7,095,455 B2 | 8/2006 | Jordan | |
| 7,099,370 B2 | 8/2006 | Takahashi | |
| 7,120,388 B2 | 10/2006 | Hall | |
| 7,139,585 B2 | 11/2006 | Hachimura et al. | |
| 7,266,390 B2 | 9/2007 | Mathews | |
| 7,337,027 B2 | 2/2008 | Nishiguchi et al. | |
| 7,467,021 B2 | 12/2008 | Yuen | |
| 7,512,414 B2 | 3/2009 | Jannard et al. | |
| 7,599,679 B2 | 10/2009 | Awiszus | |
| 7,650,168 B2 | 1/2010 | Bailey | |
| 7,680,490 B2 | 3/2010 | Bloebaum et al. | |
| 7,697,899 B2 | 4/2010 | Rofougaran | |
| 7,734,055 B2 | 6/2010 | Chiloyan | |
| 7,764,775 B2 | 7/2010 | Tarkoff et al. | |
| 7,805,210 B2 | 9/2010 | Cucos | |
| 7,861,312 B2 | 12/2010 | Lee et al. | |
| 7,962,482 B2 | 6/2011 | Handman | |
| 8,023,663 B2 | 9/2011 | Goldberg | |
| 8,027,638 B2 | 9/2011 | Sanguino | |
| 8,055,007 B2 | 11/2011 | Kim | |
| 8,073,137 B2 | 12/2011 | Weinans et al. | |
| 8,086,281 B2 | 12/2011 | Rabu et al. | |
| 8,102,836 B2 | 1/2012 | Jerlhagen | |
| 8,190,203 B2 | 5/2012 | Pelland et al. | |
| 8,295,516 B2 | 10/2012 | Kondo et al. | |
| 8,335,312 B2 | 12/2012 | Gerhardt et al. | |
| 8,401,202 B2 | 3/2013 | Brooking | |
| 8,478,880 B2 | 7/2013 | Finkelstein et al. | |
| 8,483,755 B2 | 7/2013 | Kumar | |
| 8,553,865 B2 | 10/2013 | Menard et al. | |
| 8,571,544 B2 | 10/2013 | Pelland et al. | |
| 8,655,420 B1 | 2/2014 | Pelland et al. | |
| 8,792,945 B2 | 7/2014 | Russell et al. | |
| 9,049,502 B2 | 6/2015 | Pelland et al. | |
| 2004/0063459 A1* | 4/2004 | Yamashita ............. H04H 20/88 | |
| | | | 455/556.1 |
| 2004/0107271 A1 | 6/2004 | Ahn et al. | |
| 2005/0064853 A1 | 3/2005 | Radpour | |
| 2005/0198233 A1 | 9/2005 | Manchester | |
| 2006/0206487 A1 | 9/2006 | Harada | |
| 2006/0212442 A1 | 9/2006 | Conrad | |
| 2006/0212444 A1 | 9/2006 | Handman et al. | |
| 2006/0238878 A1 | 10/2006 | Miyake | |
| 2006/0268830 A1 | 11/2006 | Evans | |
| 2007/0008984 A1 | 1/2007 | Phillips | |
| 2007/0037615 A1 | 2/2007 | Glezerman | |
| 2007/0049198 A1 | 3/2007 | Walsh et al. | |
| 2007/0053543 A1 | 3/2007 | Lee | |
| 2007/0165875 A1 | 7/2007 | Rezvani | |
| 2007/0253603 A1 | 11/2007 | Kimura et al. | |
| 2007/0281676 A1* | 12/2007 | Borras ................ H04M 1/2745 | |
| | | | 455/418 |
| 2007/0297618 A1 | 12/2007 | Nurmi et al. | |
| 2008/0019557 A1 | 1/2008 | Bevirt et al. | |
| 2008/0031470 A1 | 2/2008 | Angelhag | |
| 2008/0062939 A1 | 3/2008 | Van Horn | |
| 2008/0076489 A1 | 3/2008 | Rosener et al. | |
| 2008/0242312 A1 | 10/2008 | Paulson et al. | |
| 2008/0298606 A1 | 12/2008 | Johnson et al. | |
| 2008/0311852 A1 | 12/2008 | Hansen et al. | |
| 2009/0005129 A1* | 1/2009 | McLoone ............. A63F 13/02 | |
| | | | 455/575.2 |
| 2009/0116678 A1 | 5/2009 | Bevirt et al. | |
| 2009/0129605 A1 | 5/2009 | Camp et al. | |
| 2009/0248178 A1 | 10/2009 | Paulson et al. | |
| 2009/0262205 A1* | 10/2009 | Smith .............. H04N 5/2251 | |
| | | | 348/211.4 |
| 2010/0022283 A1* | 1/2010 | Terlizzi ............... H04M 1/05 | |
| | | | 455/570 |
| 2010/0290642 A1 | 11/2010 | Haseagawa | |
| 2011/0275323 A1* | 11/2011 | Goldman ............. H04M 1/04 | |
| | | | 455/41.2 |
| 2013/0039510 A1 | 2/2013 | Pelland et al. | |
| 2013/0099507 A1 | 4/2013 | Moriya et al. | |

**US 10,368,155 B2**

Page 3

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2015/0237439 A1 | 8/2015 | Koss et al. | |
| 2017/0318378 A1 | 11/2017 | Koss et al. | |
| 2018/0249240 A1 | 8/2018 | Koss et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | WO 2007/136620 A2 | 11/2007 | |
| WO | WO 2007/139578 A1 | 12/2007 | |
| WO | WO 2008/033478 A1 | 3/2008 | |
| WO | WO 2008/054985 A2 | 5/2008 | |
| WO | WO 2009/086555 A1 | 7/2009 | |

OTHER PUBLICATIONS

International Search Report for International Application No. PCT/US09/39754 dated Jun. 11, 2009, 2 pages.
International Preliminary Examination Report for International Application No. PCT/US09/39754 dated Oct. 28, 2010, 8 pages.
Written Opinion of the International Searching Authority for International Application No. PCT/US09/39754 dated Jun. 11, 2009, 5 pages.
IT Review, "LTB 802.11 WiFi Headphones", http://itreview.belproject.com/item/1536 accessed on Mar. 13, 2008 (4 pages).

\* cited by examiner



FIG. 1A



FIG. 1B



FIG. 1C



FIG. 1D

FIG. 1E



FIG. 2A



FIG. 2B



FIG. 2C

U.S. Patent        Jul. 30, 2019        Sheet 7 of 16        US 10,368,155 B2



FIG. 2D



FIG. 3



FIG. 4A



FIG. 4B



FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10



FIG. 11

US 10,368,155 B2

1

# SYSTEM WITH WIRELESS EARPHONES

## PRIORITY CLAIM

The present application claims priority as a continuation to U.S. nonprovisional patent application Ser. No. 15/962, 305, filed Apr. 25, 2018, which is a continuation of U.S. nonprovisional patent application Ser. No. 15/650,362, filed Jul. 14, 2017, now U.S. Pat. No. 9,986,325, issued May 29, 2018, which is a continuation of U.S. nonprovisional patent application Ser. No. 15/293,785, filed Oct. 14, 2016, now U.S. Pat. No. 9,729,959, issued Aug. 8, 2017, which is a continuation of U.S. nonprovisional patent application Ser. No. 15/082,040, filed Mar. 28, 2016, now U.S. Pat. No. 9,497,535, issued Nov. 15, 2016, which is a continuation of U.S. nonprovisional patent application Ser. No. 14/695,696, filed Apr. 24, 2015, now U.S. Pat. No. 9,438,987, issued on Sep. 6, 2016, which is a continuation of U.S. nonprovisional patent application Ser. No. 13/609,409, filed Sep. 11, 2012, now U.S. Pat. No. 9,049,502, issued Jun. 2, 2015, which is a continuation of U.S. nonprovisional patent application Ser. No. 13/459,291, filed Apr. 30, 2012, now U.S. Pat. No. 8,571,544, issued Oct. 29, 2013, which is a continuation of U.S. patent application Ser. No. 12/936,488, filed Dec. 20, 2010, now U.S. Pat. No. 8,190,203, issued May 29, 2012, which is a national stage entry of PCT/US2009/039754, filed Apr. 7, 2009, which claims priority to U.S. provisional patent application Ser. No. 61/123,265, filed Apr. 7, 2008, all of which are incorporated herein by reference in their entireties.

## CROSS-REFERENCE TO RELATED APPLICATIONS

U.S. nonprovisional patent application Ser. No. 14/031, 938, filed Sep. 13, 2013, now U.S. Pat. No. 8,655,420, issued Feb. 18, 2014, is also a continuation of U.S. nonprovisional patent application Ser. No. 13/609,409, filed Sep. 11, 2012, now U.S. Pat. No. 9,049,502, mentioned above.

## BACKGROUND

Digital audio players, such as MP3 players and iPods, that store and play digital audio files, are very popular. Such devices typically comprise a data storage unit for storing and playing the digital audio, and a headphone set that connects to the data storage unit, usually with a ¼″ or a 3.5 mm jack and associated cord. Often the headphones are in-ear type headphones. The cord, however, between the headphones and the data storage unit can be cumbersome and annoying to users, and the length of the cord limits the physical distance between the data storage unit and the headphones. Accordingly, some cordless headphones have been proposed, such as the Monster iFreePlay cordless headphones from Apple Inc., which include a docking port on one of the earphones that can connect directly to an iPod Shuffle. Because they have the docking port, however, the Monster iFreePlay cordless headphones from Apple are quite large and are not in-ear type phones. Recently, cordless headphones that connect wirelessly via IEEE 802.11 to a WLAN-ready laptop or personal computer (PC) have been proposed, but such headphones are also quite large and not in-ear type phones.

## SUMMARY

In one general aspect, the present invention is directed to a wireless earphone that comprises a transceiver circuit for

2

receiving streaming audio from a data source, such as a digital audio player or a computer, over an ad hoc wireless network. When the data source and the earphone are out of range via the ad hoc wireless network, they may transition automatically to a common infrastructure wireless network (e.g., a wireless LAN). If there is no common infrastructure wireless network for both the data source and the earphone, the earphone may connect via an available infrastructure wireless network to a host server. The host server may, for example, broadcast streaming audio to the earphone and/or transmit to the earphone a network address (e.g., an Internet Protocol (IP) address) for a network-connected content server that streams digital audio. The earphone may then connect to the content server using the IP address. The content server may be an Internet radio server, including, for example, an Internet radio server that broadcasts streaming audio from the data source or some other content.

These and other advantageous, unique aspects of the wireless earphone are described below.

## FIGURES

Various embodiments of the present invention are described herein by way of example in conjunction with the following figures, wherein:

FIGS. 1A–1E are views of a wireless earphone according to various embodiments of the present invention;

FIGS. 2A–2D illustrate various communication modes for a wireless earphone according to various embodiments of the present invention;

FIG. 3 is a block diagram of a wireless earphone according to various embodiments of the present invention;

FIGS. 4A–4B show the wireless earphone connected to another device according to various embodiments of the present invention;

FIG. 5 is a diagram of a process implemented by a host server according to various embodiments of the present invention;

FIG. 6 is a diagram of a process implemented by the wireless earphone to transition automatically between wireless networks according to various embodiments of the present invention;

FIGS. 7, 8 and 10 illustrate communication systems involving the wireless earphone according to various embodiments of the present invention;

FIG. 9 is a diagram of a headset including a wireless earphone and a microphone according to various embodiments of the present invention; and

FIG. 11 is a diagram of a pair of wireless earphones with a dongle according to various embodiments of the present invention.

## DESCRIPTION

In one general aspect, the present invention is directed to a wireless earphone that receives streaming audio data via ad hoc wireless networks and infrastructure wireless networks, and that transitions seamlessly between wireless networks. The earphone may comprise one or more in-ear, on-ear, or over-ear speaker elements. Two exemplary in-ear earphone shapes for the wireless earphone 10 are shown in FIGS. 1A and 1B, respectively, although in other embodiments the earphone may take different shapes and the exemplary shapes shown in FIGS. 1A and 1B are not intended to be limiting. In one embodiment, the earphone transitions automatically and seamlessly, without user intervention, between communication modes. That is, the earphone may

US 10,368,155 B2

3

transition automatically from an ad hoc wireless network to an infrastructure wireless network, without user intervention. As used herein, an "ad hoc wireless network" is a network where two (or more) wireless-capable devices, such as the earphone and a data source, communicate directly and wirelessly, without using an access point. An "infrastructure wireless network," on the other hand, is a wireless network that uses one or more access points to allow a wireless-capable device, such as the wireless earphone, to connect to a computer network, such as a LAN or WAN (including the Internet).

FIGS. 1A and 1B show example configurations for a wireless earphone 10 according to various embodiments of the present invention. The examples in FIGS. 1A and 1B are not limiting and other configurations are within the scope of the present invention. As shown in FIGS. 1A and 1B, the earphone 10 may comprise a body 12. The body 12 may comprise an ear canal portion 14 that is inserted in the ear canal of the user of the earphone 10. In various embodiments, the body 12 also may comprise an exterior portion 15 that is not inserted into user's ear canal. The exterior portion 15 may comprise a knob 16 or some other user control (such as a dial, a pressure-activated switch, lever, etc.) for adjusting the shape of the ear canal portion 14. That is, in various embodiments, activation (e.g. rotation) of the knob 16 may cause the ear canal portion 14 to change shape so as to, for example, radially expand to fit snugly against all sides of the user's ear canal. Further details regarding such a shape-changing earbud earphone are described in application PCT/US08/88656, filed 31 Dec. 2008, entitled "Adjustable Shape Earphone," which is incorporated herein by reference in its entirety. The earphone 10 also may comprise a transceiver circuit housed within the body 12. The transceiver circuit, described further below, may transmit and receive the wireless signals, including receive streaming audio for playing by the earphone 10. The transceiver circuit may be housed in the exterior portion 15 of the earphone 10 and/or in the ear canal portion 14.

Although the example earphones 10 shown in FIGS. 1A and 1B include a knob 16 for adjusting the shape of the ear canal portion 14, the present invention is not so limited, and in other embodiments, different means besides a knob 16 may be used to adjust the ear canal portion 14. In addition, in other embodiments, the earphone 10 may not comprise a shape-changing ear canal portion 14.

In various embodiments, the user may wear two discrete wireless earphones 10: one in each ear. In such embodiments, each earphone 10 may comprise a transceiver circuit. In such embodiments, the earphones 10 may be connected by a string or some other cord-type connector to keep the earphones 10 from being separated.

In other embodiments, as shown in FIG. 1C, a headband 19 may connect the two (left and right) earphones 10. The headband 19 may be an over-the-head band, as shown in the example of FIG. 1C, or the headband may be a behind-the-head band. In embodiments comprising a headband 19, each earphone 10 may comprise a transceiver circuit; hence, each earphone 10 may receive and transmit separately the wireless communication signals. In other embodiments comprising a headband 19, only one earphone 10 may comprise the transceiver circuit, and a wire may run along the headband 19 to the other earphone 10 to connect thereby the transceiver circuit to the acoustic transducer in the earphone that does not comprise the transceiver circuit. The embodiment shown in FIG. 1C comprises on-ear earphones 10; in other embodiments, in-ear or over-ear earphones may be used.

4

In other embodiments, the earphone 10 may comprise a hanger bar 17 that allows the earphone 10 to clip to, or hang on, the user's ear, as shown in the illustrated embodiment of FIGS. 1D-1E. FIG. 1D is a perspective view of the earphone and FIG. 1E is a side view according to one embodiment. As shown in the illustrated embodiment, the earphone 10 may comprise dual speaker elements 106-A, 106-B. One of the speaker elements (the smaller one) 106-A is sized to fit into the cavum concha of the listener's ear and the other element (the larger one) 106-B is not. The listener may use the hanger bar to position the earphone on the listener's ear. In that connection, the hanger bar may comprise a horizontal section that rests upon the upper external curvature of the listener's ear behind the upper portion of the auricula (or pinna). The earphone may comprise a knurled knob that allows the user to adjust finely the distance between the horizontal section of the hanger bar and the speaker elements, thereby providing, in such embodiments, another measure of adjustability for the user. More details regarding such a dual element, adjustable earphone may be found in U.S. provisional patent application Ser. No. 61/054,238, which is incorporated herein by reference in its entirety.

FIGS. 2A-2D illustrate various communication modes for a wireless data communication system involving the earphone 10 according to embodiments of the present invention. As shown in FIG. 2A, the system comprises a data source 20 in communication with the earphone 10 via an ad hoc wireless network 24. The earphone 10, via its transceiver circuit (described in more detail below), may communicate wirelessly with a data source 20, which may comprise a wireless network adapter 22 for transmitting the digital audio wirelessly. For example, the data source 20 may be a digital audio player (DAP), such as an mp3 player or an iPod, or any other suitable digital audio playing device, such as a laptop or personal computer, that stores and/or plays digital audio files. In other embodiments, the data source 20 may generate analog audio, and the wireless network adapter 22 may encode the analog audio into digital format for transmission to the earphone 10.

The wireless network adapter 22 may be an integral part of the data source 20, or it may be a separate device that is connected to the data source 20 to provide wireless connectivity for the data source 20. For example, the wireless network adapter 22 may comprise a wireless network interface card (WNIC) or other suitable transceiver that plugs into a USB port or other port or jack of the data source 20 (such as a TRS connector) to stream data, e.g., digital audio files, via a wireless network (e.g., the ad hoc wireless network 24 or an infrastructure wireless network). The digital audio transmitted from the data source 20 to the earphone 10 via the wireless networks may comprise compressed or uncompressed audio. Any suitable file format may be used for the audio, including mp3, lossy or lossless WMA, Vorbis, Musepack, FLAC, WAV, AIFF, AU, or any other suitable file format.

When in range, the data source 20 may communicate with the earphone 10 via the ad hoc wireless network 24 using any suitable wireless communication protocol, including Wi-Fi (e.g., IEEE 802.11a/b/g/n), WiMAX (IEEE 802.16), Bluetooth, Zigbee, UWB, or any other suitable wireless communication protocol. For purposes of the description to follow, it is assumed that the data source 20 and the earphone 10 communicate using a Wi-Fi protocol, although the invention is not so limited and other wireless communication protocols may be used in other embodiments of the invention. The data source 20 and the earphone 10 are considered in range for the ad hoc wireless network 24 when the signal

US 10,368,155 B2

5                                                                         6

strengths (e.g., the RSSI) of the signals received by the two devices are above a threshold minimum signal strength level. For example, the data source 20 and the earphone 10 are likely to be in range for an ad hoc wireless network when then are in close proximity, such as when the wearer of the earphone 10 has the data source 20 on his/her person, such as in a pocket, strapped to their waist or arm, or holding the data source in their hand.

When the earphone 10 and the data source 20 are out of range for the ad hoc wireless network 24, that is, when the received signals degrade below the threshold minimum signal strength level, both the earphone 10 and the data source 20 may transition automatically to communicate over an infrastructure wireless network (such as a wireless LAN (WLAN)) 30 that is in the range of both the earphone 10 and the data source 20, as shown in FIG. 2B. The earphone 10 and the data source 20 (e.g., the wireless network adapter 22) may include firmware, as described further below, that cause the components to make the transition to a common infrastructure wireless network 30 automatically and seamlessly, e.g., without user intervention. The earphone 10 may cache the received audio in a buffer or memory for a time period before playing the audio. The cached audio may be played after the connection over the ad hoc wireless network is lost to give the earphone 10 and the data source 20 time to connect via the infrastructure wireless network.

For example, as shown in FIG. 2B, the infrastructure network may comprise an access point 32 that is in the range of both the data source 20 and the earphone 10. The access point 32 may be an electronic hardware device that acts as a wireless access point for, and that is connected to, a wired and/or wireless data communication network 33, such as a LAN or WAN, for example. The data source 20 and the earphone 10 may both communicate wirelessly with the access point 32 using the appropriate network data protocol (a Wi-Fi protocol, for example). The data source 20 and the earphone 10 may both transition automatically to an agreed-upon WLAN 30 that is in the range of both devices when they cannot communicate satisfactorily via the ad hoc wireless network 24. A procedure for specifying an agreed-upon infrastructure wireless network 30 is described further below. Alternatively, the infrastructure wireless network 30 may have multiple access points 32a-b, as shown in FIG. 2C. In such an embodiment, the data source 20 may communicate wirelessly with one access point 32b and the earphone 10 may communicate wirelessly with another access point 32a of the same infrastructure wireless network 30. Again, the data source 20 and the earphone 10 may transition to an agreed-upon WLAN.

If there is no suitable common infrastructure wireless network over which the earphone 10 and the data source 20 can communicate, as shown in FIG. 2D, the earphone 10 may transition to communicate with an access point 32a for an available (first) wireless network (e.g., WLAN) 30a that is in the range of the earphone 10. In this mode, the earphone 10 may connect via the wireless network 30a to a network-enabled host server 40. The host server 40 may be connected to the wireless network 30a via an electronic data communication network 42, such as the Internet. In one mode, the host server 40 may transmit streaming digital audio via the networks 33a, 42 to the earphone 10. In another mode, the host server 40 may transmit to the earphone 10 a network address, such as an Internet Protocol (IP) address, for a streaming digital audio content server 70 on the network 42. Using the received IP address, the earphone 10 may connect to the streaming digital audio content server 70 via the networks 30a, 42 to receive and process digital audio from the streaming digital audio content server 70.

The digital audio content server 70 may be, for example, an Internet radio station server. The digital audio content server 70 may stream digital audio over the network 42 (e.g., the Internet), which the earphone 10 may receive and process. In one embodiment, the streaming digital audio content server 70 may stream digital audio received by the streaming digital audio content server 70 from the data source 20. For example, where the data source 20 is a wireless-capable device, such as a portable DAP, the data source 20 may connect to the streaming digital audio content server 70 via a wireless network 30b and the network 42. Alternatively, where for example the data source 20 is non-wireless-capable device, such as a PC, the data source 20 may have a direct wired connection to the network 42. After being authenticated by the streaming digital audio content server 70, the data source 20 may stream digital audio to the streaming digital audio content server 70, which may broadcast the received digital audio over the network 42 (e.g., the Internet). In such a manner, the user of the earphone 10 may listen to audio from the data source 20 even when (i) the earphone 10 and the data source 20 are not in communication via an ad hoc wireless network 24 and (ii) the earphone 10 and the data source 20 are not in communication via a common local infrastructure wireless network 30.

FIG. 3 is a block diagram of the earphone 10 according to various embodiments of the present invention. In the illustrated embodiment, the earphone 10 comprises a transceiver circuit 100 and related peripheral components. As shown in FIG. 3, the peripheral components of the earphone 10 may comprise a power source 102, a microphone 104, one or more acoustic transducers 106 (e.g., speakers), and an antenna 108. The transceiver circuit 100 and some of the peripheral components (such as the power source 102 and the acoustic transducers 106) may be housed within the body 12 of the earphone 10 (see FIG. 1). Other peripheral components, such as the microphone 104 and the antenna 108 may be external to the body 12 of the earphone 10. In addition, some of the peripheral components, such as the microphone 104, are optional in various embodiments.

In various embodiments, the transceiver circuit 100 may be implemented as a single integrated circuit (IC), such as a system-on-chip (SoC), which is conducive to miniaturizing the components of the earphone 10, which is advantageous if the earphone 10 is to be relatively small in size, such as an in-ear earphone (see FIGS. 1A-1B for example). In alternative embodiments, however, the components of the transceiver circuit 100 could be realized with two or more discrete ICs or other components, such as separate ICs for the processors, memory, and RF (e.g., Wi-Fi) module, for example.

The power source 102 may comprise, for example, a rechargeable or non-rechargeable battery (or batteries). In other embodiments, the power source 102 may comprise one or more ultracapacitors (sometimes referred to as supercapacitors) that are charged by a primary power source. In embodiments where the power source 102 comprises a rechargeable battery cell or an ultracapacitor, the battery cell or ultracapacitor, as the case may be, may be charged for use, for example, when the earphone 10 is connected to a docking station or computer. The docking station may be connected to or part of a computer device, such as a laptop computer or PC. In addition to charging the rechargeable power source 102, the docking station and/or computer may facilitate downloading of data to and/or from the earphone

US 10,368,155 B2

7

10. In other embodiments, the power source **102** may comprise capacitors passively charged with RF radiation, such as described in U.S. Pat. No. 7,027,311. The power source **102** may be coupled to a power source control module **103** of transceiver circuit **100** that controls and monitors the power source **102**.

The acoustic transducer(s) **106** may be the speaker element(s) for conveying the sound to the user of the earphone **10**. According to various embodiments, the earphone **10** may comprise one or more acoustic transducers **106**. For embodiments having more than one transducer, one transducer may be larger than the other transducer, and a crossover circuit (not shown) may transmit the higher frequencies to the smaller transducer and may transmit the lower frequencies to the larger transducer. More details regarding dual element earphones are provided in U.S. Pat. No. 5,333,206, assigned to Koss Corporation, which is incorporated herein by reference in its entirety.

The antenna **108** may receive and transmit the wireless signals from and to the wireless networks **24**, **30**. A RF (e.g., Wi-Fi) module **110** of the transceiver circuit **100** in communication with the antenna **108** may, among other things, modulate and demodulate the signals transmitted from and received by the antenna **108**. The RF module **110** communicates with a baseband processor **112**, which performs other functions necessary for the earphone **10** to communicate using the Wi-Fi (or other communication) protocol.

The baseband processor **112** may be in communication with a processor unit **114**, which may comprise a microprocessor **116** and a digital signal processor (DSP) **118**. The microprocessor **116** may control the various components of the transceiver circuit **100**. The DSP **114** may, for example, perform various sound quality enhancements to the digital audio received by the baseband processor **112**, including noise cancellation and sound equalization. The processor unit **114** may be in communication with a volatile memory unit **120** and a non-volatile memory unit **122**. A memory management unit **124** may control the processor unit's access to the memory units **120**, **122**. The volatile memory **122** may comprise, for example, a random access memory (RAM) circuit. The non-volatile memory unit **122** may comprise a read only memory (ROM) and/or flash memory circuits. The memory units **120**, **122** may store firmware that is executed by the processor unit **114**. Execution of the firmware by the processor unit **114** may provide various functionality for the earphone **10**, such as the automatic transition between wireless networks as described herein. The memory units **120**, **122** may also cache received digital audio.

A digital-to-analog converter (DAC) **125** may convert the digital audio from the processor unit **114** to analog form for coupling to the acoustic transducer(s) **106**. An I²S interface **126** or other suitable serial or parallel bus interface may provide the interface between the processor unit **114** and the DAC **125**. An analog-to-digital converter (ADC) **128**, which also communicates with the I²S interface **126**, may convert analog audio signals picked up by the microphone **104** for processing by the processor unit **114**.

The transceiver circuit **100** also may comprise a USB or other suitable interface **130** that allows the earphone **10** to be connected to an external device via a USB cable or other suitable link. As shown in FIG. **4A**, the external device may be a docking station **200** connected to a computer device **202**. Also, in various embodiments, the earphone **10** could be connected directly to the computer **202** without the docking station **200**. In addition, the external device may be a DAP **210**, as shown in FIG. **4B**. In that way, the earphone

8

**10** could connect directly to a data source **20**, such as the DAP **210** or the computer **202**, through the USB port **130**. In addition, through the USB port **130**, the earphone **10** may connect to a PC **202** or docking station **202** to charge up the power source **102** and/or to get downloads (e.g., data or firmware).

According to various embodiments, the earphone **10** may have an associated web page that a user may access through the host server **40** (see FIG. **2D**) or some other server. An authenticated user could log onto the website from a client computing device **50** (e.g., laptop, PC, handheld computer device, etc., including the data source **20**) (see FIG. **2D**) to access the web page for the earphone **10** to set various profile values for the earphone **10**. For example, at the web site, the user could set various content features and filters, as well as adjust various sound control features, such as treble, bass, frequency settings, noise cancellation settings, etc. In addition, the user could set preferred streaming audio stations, such as preferred Internet radio stations or other streaming audio broadcasts. That way, instead of listening to streaming audio from the data source **20**, the user could listen to Internet radio stations or other streaming audio broadcasts received by the earphone **10**. In such an operating mode, the earphone user, via the web site, may prioritize a number of Internet radio stations or other broadcast sources (hosted by streaming digital audio content servers **70**). With reference to FIG. **7**, the host server **40** may send the IP address for the earphone user's desired (e.g., highest priority) Internet radio station to the earphone **10**. A button **11** on the earphone **10**, such as on the rotating dial **16** as shown in the examples of FIGS. **1A** and **1B**, may allow the user to cycle through the preset preferred Internet radio stations. That is, for example, when the user presses the button **11**, an electronic communication may be transmitted to the host server **40** via the wireless network **30**, and in response to receiving the communication, the host server **40** may send the IP address for the user's next highest rated Internet radio station via the network **42** to the earphone **10**. The earphone **10** may then connect to the streaming digital audio content server **70** for that Internet radio station using the IP address provided by the host server **40**. This process may be repeated, e.g., cycled through, for each preset Internet radio station configured by the user of the earphone **10**.

At the web site for the earphone **10** hosted on the host server **40**, in addition to establishing the identification of digital audio sources (e.g., IDs for the user's DAP or PC) and earphones, the user could set parental or other user controls. For example, the user could restrict certain Internet radio broadcasts based on content or parental ratings, etc. That is, for example, the user could configure a setting through the web site that prevents the host server **40** from sending an IP address for a streaming digital audio content server **70** that broadcasts explicit content based on a rating for the content. In addition, if a number of different earphones **10** are registered to the same user, the user could define separate controls for the different earphones **10** (as well as customize any other preferences or settings particular to the earphones **10**, including Internet radio stations, sound quality settings, etc. that would later be downloaded to the earphones **10**). In addition, in modes where the host server **40** streams audio to the earphone **10**, the host server **40** may log the files or content streamed to the various earphones **10**, and the user could view at the web site the files or content that were played by the earphones **10**. In that way, the user could monitor the files played by the earphones **10**.

US 10,368,155 B2

9

In addition, the host server **40** may provide a so-called eavesdropping function according to various embodiments. The eavesdropping service could be activated via the web site. When the service is activated, the host server **40** may transmit the content that it is delivering to a first earphone **10***a* to another, second earphone **10***b*, as shown in FIG. **8**. Alternatively, the host server **40** may transmit to the second earphone **10***b* the most recent IP address for a streaming digital audio content server **70** that was sent to the first earphone **10***a*. The second earphone **10***b* may then connect to the streaming digital audio content server **70** that the first earphone **10***a* is currently connected. That way, the user of the second earphone **10***b*, which may be a parent, for example, may directly monitor the content being received by the first earphone **10***a*, which may belong to a child of the parent.

This function also could be present in the earphones **10** themselves, allowing a parent (or other user) to join an ad-hoc wireless network and listen to what their child (or other listener) is hearing. For example, with reference to FIG. **10**, a first earphone **10***a* may receive wireless audio, such as from the data source **20** or some other source, such as the host server **40**. The first earphone **10***a* may be programmed with firmware to broadcast the received audio to a second earphone **10***b* via an ad hoc wireless network **24**. That way, the wearer of the second earphone **10***b* can monitor in real-time the content being played by the first earphone **10***a*.

At the web site, the user may also specify the identification number ("ID") of their earphone(s) **10**, and the host server **40** may translate the ID to the current internet protocol (IP) addresses for the earphone **10** and for the data source **20**. This allows the user to find his or her data source **20** even when it is behind a firewall or on a changing IP address. That way, the host server **40** can match the audio from the data source **20** to the appropriate earphone **10** based on the specified device ID. The user also could specify a number of different data sources **20**. For example, the user's DAP may have one specified IP address and the user's home (or work) computer may have another specified IP address. Via the web site hosted by the host server **40**, the user could specify or prioritize from which source (e.g., the user's DAP or computer) the earphone **10** is to receive content.

The host server **40** (or some other server) may also push firmware upgrades and/or data updates to the earphone **10** using the IP addresses of the earphone **10** via the networks **30**, **42**. In addition, a user could download the firmware upgrades and/or data updates from the host server **40** to the client computing device **202** (see FIG. **4**A) via the Internet, and then download the firmware upgrades and/or data updates to the earphone **10** when the earphone **10** is connected to the client computer device **202** (such as through a USB port and/or the docking station **200**).

Whether the downloads are transmitted wirelessly to the earphone **10** or via the client computing device **202** may depend on the current data rate of the earphone **10** and the quantity of data to be transmitted to the earphone **10**. For example, according to various embodiments, as shown in the process flow of FIG. **5**, the host server **40** may be programmed, at step **50**, to make a determination, based on the current data rate for the earphone **10** and the size of the update, whether the update should be pushed to the earphone **10** wirelessly (e.g., via the WLAN **30***a* in FIG. **2**D). If the update is too large and/or the current data rate is too low that the performance of the earphone **10** will be adversely affected, the host server **40** may refrain from pushing the update to the earphone **10** wirelessly and wait instead to

10

download the update to the client computing device **202** at step **51**. Conversely, if the host server **40** determines that, given the size of the update and the current data rate for the earphone **10** that the performance of the earphone **10** will not be adversely affected, the host server **40** may transmit the update wirelessly to the earphone **10** at step **52**.

As mentioned above, the processor unit **114** of the speakerphones **14** may be programmed, via firmware stored in the memory **120**, **122**, to have the ability to transition automatically from the ad hoc wireless network **24** to an infrastructure wireless network **30** (such as a WLAN) when the quality of the signal on the ad hoc wireless network **24** degrades below a suitable threshold (such as when the data source **20** is out of range for an ad hoc wireless network). In that case, the earphone **10** and the data source **20** may connect to a common infrastructure wireless network (e.g., WLAN) (see, for example, FIGS. **2**B-**2**C). Through the web site for the earphone **10**, described above, the user could specify a priority of infrastructure wireless networks **30** for the data source **20** and the earphone **10** to connect to when the ad hoc wireless network **24** is not available. For example, the user could specify a WLAN servicing his/her residence first, a WLAN servicing his/her place of employment second, etc. During the time that the earphone **10** and the data source **20** are connected via the ad hoc wireless network **24**, the earphone **10** and the data source **20** may exchange data regarding which infrastructure networks are in range. When the earphone **10** and the data source **20** are no longer in range for the ad hoc wireless network **24** (that is, for example, the signals between the device degrade below an acceptable level), they may both transition automatically to the highest prioritized infrastructure wireless network whose signal strength is above a certain threshold level. That way, even though the earphone **10** and the data source **20** are out of range for the ad hoc wireless network **24**, the earphone **10** may still receive the streaming audio from the data source **20** via the infrastructure wireless network **30** (see FIGS. **2**B-**2**C).

When none of the preferred infrastructure networks is in range, the earphone **10** may connect automatically to the host server **40** via an available infrastructure wireless network **30** (see FIG. **2**D), e.g., the infrastructure wireless network **30** having the highest RSSI and to which the earphone **10** is authenticated to use. The host server **40**, as mentioned above, may transmit IP addresses to the earphone **10** for streaming digital audio content servers **70** and the host sever **40** may stream digital audio to the earphone **10** itself when in this communication mode.

FIG. **6** is a diagram of the process flow, according to one embodiment, implemented by the transceiver circuit **100** of the earphone **10**. The process shown in FIG. **6** may be implemented in part by the processor unit **114** executing firmware stored in a memory unit **120**, **122** of the transceiver circuit **100**. At step **61**, the earphone **10** may determine if it can communicate with the data source **20** via an ad hoc wireless network **24**. That is, the earphone **10** may determine if the strength of the wireless signals from the data source **20** exceed some minimum threshold. If so, the data source **20** and the earphone **10** may communicate wirelessly via the ad hoc wireless network **24** (see FIG. **2**A). While in this communication mode, at step **62**, the data source **20** and the earphone **10** also may exchange data regarding the local infrastructure wireless networks, if any, in the range of the data source **20** and the earphone **10**, respectively. For example, the earphone **10** may transmit the ID of local infrastructure wireless networks **30** that the earphone **10** can detect whose signal strength (e.g., RSSI) exceeds some

US 10,368,155 B2

11

minimum threshold level. Similarly, the data source 20 may transmit the ID the local infrastructure wireless networks 30 that the data source 20 can detect whose signal strength (e.g., RSSI) exceeds some minimum threshold level. The earphone 10 may save this data in a memory unit 120, 122. Similarly, the data source 20 may store in memory the wireless networks that the earphone 10 is detected.

The data source 20 and the earphone 10 may continue to communicate via the ad hoc wireless network mode 24 until they are out of range (e.g., the signal strengths degrade below a minimum threshold level). If an ad hoc wireless network 24 is not available at block 61, the transceiver circuit 100 for the data source 20 may execute a process, shown at block 63, to connect to the user's highest prioritized infrastructure wireless network 30. For example, of the infrastructure wireless networks whose signal strength exceeded the minimum threshold for both the earphone 10 and the data source 20 determined at step 62, the earphone 10 and the data source 20 may both transition to the infrastructure wireless network 30 having the highest priority, as previously set by the user (seen FIGS. 2B-2C, for example). For example, if the user's highest prioritized infrastructure wireless network 30 is not available, but the user's second highest prioritized infrastructure wireless network 30 is, the earphone 10 and the data source 20 may both transition automatically to the user's second highest prioritized infrastructure wireless network 30 at block 64. As shown by the loop with block 65, the earphone 10 and the data source 20 may continue to communicate via one of the user's prioritized infrastructure wireless networks 30 as long as the infrastructure wireless network 30 is available. If the infrastructure wireless network becomes unavailable, the process may return to block 61.

If, however, no ad hoc wireless network and none of the user's prioritized infrastructure wireless networks are available, the earphone 10 may transition automatically to connect to the host server 40 at block 66 (see FIG. 2D) using an available infrastructure wireless network 30. At block 67, the host server 40 may transmit an IP address to the earphone 10 for one of the streaming digital audio content servers 70, and at block 68 the earphone 10 may connect to the streaming digital audio content server 70 using the received IP address. At step 69, as long as the earphone 10 is connected to the streaming digital audio content server 70, the earphone 10 may continue to communicate in this mode. However, if the earphone 10 loses its connection to the digital audio content server 70, the process may return to block 61 in one embodiment. As mentioned above, at block 67, instead of sending an IP address for a streaming digital audio content server 70, the host server 40 may stream digital audio to the earphone 10. The user, when configuring their earphone 10 preferences via the web site, may specify and/or prioritize whether the host server 40 is to send IP addresses for the streaming digital audio content servers 70 and/or whether the host server 40 is to stream audio to the earphone 10 itself.

In another embodiment, the earphone 10 may be programmed to transition automatically to the host server 40 when the earphone 10 and the data source 20 are not in communication via the ad hoc wireless network 24. That is, in such an embodiment, the earphone 10 may not try to connect via a local infrastructure wireless network 30 with the data source 20, but instead transition automatically to connect to the host server 40 (see FIG. 2D).

In various embodiments, as shown in FIG. 1B, the button 11 or other user selection device that allows the wearer of the earphone 10 to indicate approval and/or disapproval of

12

songs or other audio files listened to by the wearer over an Internet radio station. The approval/disapproval rating, along with metadata for the song received by the earphone 10 with the streaming audio, may be transmitted from the transceiver circuit 100 of the earphone 10 back to the host server 40, which may log the songs played as well as the ratings for the various songs/audio files. In addition to being able to view the logs at the website, the host server 40 (or some other server) may send an email or other electronic communication to the earphone user, at a user specified email address or other address, which the user might access from their client communication device 50 (see FIG. 2D). The email or other electronic communication may contain a listing of the song/audio files for which the user gave approval ratings using the button 11 or other user selection device. Further, the email or other electronic communication may provide a URL link for a URL at which the user could download song/audio files that the user rated (presumably song/audio files for which the user gave an approval rating). In some instances, the user may be required to pay a fee to download the song/audio file.

The user song ratings also may be used by the host server 40 to determine the user's musical preferences and offer new music that the user might enjoy. More details about generating user play lists based on song ratings may be found in published U.S. patent applications Pub. No. 2006/0212444, Pub. No. 2006/0206487, and Pub. No. 2006/0212442, and U.S. Pat. No. 7,003,515, which are incorporated herein by reference in their entirety.

In addition or alternatively, the user could log onto a web site hosted by the host server 40 (or some other server) to view the approval/disapproval ratings that the user made via the button 11 on the earphone 10. The web site may provide the user with the option of downloading the rated songs/audio files (for the host server 40 or some other server system) to their client computer device 50. The user could then have their earphone 10 connect to their client computer device 50 as a data source 20 via an ad hoc wireless network 24 (see FIG. 2A) or via an infrastructure wireless network (see FIGS. 2B-2D) to listen to the downloaded songs. In addition, the user could download the song files from their client computer device 50 to their DAP and listen to the downloaded song files from their DAP by using their DAP as the data source 20 in a similar manner.

Another application of the headsets may be in vehicles equipped with Wi-Fi or other wireless network connectivity. Published PCT application WO 2007/136620, which is incorporated herein by reference, discloses a wireless router for providing a Wi-Fi or other local wireless network for a vehicle, such as a car, truck, boat, bus, etc. In a vehicle having a Wi-Fi or other local wireless network, the audio for other media systems in the vehicle could be broadcast over the vehicle's wireless network. For example, if the vehicle comprises a DVD player, the audio from the DVD system could be transmitted to the router and broadcast over the vehicle's network. Similarly, the audio from terrestrial radio stations, a CD player, or an audio cassette player could be broadcast over the vehicle's local wireless network. The vehicle's passengers, equipped with the earphones 10, could cycle through the various audio broadcasts (including the broadcasts from the vehicle's media system as well as broadcasts from the host server 40, for example) using a selection button 11 on the earphone 10. The vehicle may also be equipped with a console or terminal, etc., through which a passenger could mute all of the broadcasts for direct voice communications, for example.

US 10,368,155 B2

13

As described above, the earphones **10** may also include a microphone **104**, as shown in the example of FIG. **9**. The headset **90** shown in FIG. **9** includes two earphones **10**, both of which may include a transceiver circuit **100** or only one of which may include the transceiver circuit, as discussed above. The microphone **104** could be used to broadcast communications from one earphone wearer to another earphone wearer. For example, one wearer could activate the microphone by pressing a button **92** on the headset **90**. The headset **90** may then transmit a communication via an ad hoc wireless network **24** or other wireless network to a nearby recipient (or recipients) equipped with a headset **90** with a transceiver circuit **100** in one or both of the earphones **10**. When such communication is detected by the recipient's headset **90**, the streaming audio received over the wireless network by the recipient's headset **90** may be muted, and the intercom channel may be routed to the transducer(s) of the recipient's headset **90** for playing for the recipient. This functionality may be valuable and useful where multiple wearers of the headsets **90** are in close proximity, such as on motorcycles, for example.

Another exemplary use of the earphones **10** is in a factory, warehouse, construction site, or other environment that might be noisy. Persons (e.g., workers) in the environment could use the earphones **10** for protection from the surrounding noise of the environment. From a console or terminal, a person (e.g., a supervisor) could select a particular recipient for a communication over the Wi-Fi network (or other local wireless network). The console or terminal may have buttons, dials, or switches, etc., for each user/recipient, or it could have one button or dial through which the sender could cycle through the possible recipients. In addition, the console or terminal could have a graphical user interface, through which the sender may select the desired recipient(s).

As mentioned above, the earphones **10** may comprise a USB port. In one embodiment, as shown in FIG. **11**, the user may use an adapter **150** that connects to the USB port of each earphone **10**. The adapter **150** may also have a plug connector **152**, such as a 3.5 mm jack, which allows the user to connect the adapter **150** to devices having a corresponding port for the connector **152**. When the earphones **10** detect a connection via their USB interfaces in such a manner, the Wi-Fi (or other wireless protocol) components may shut down or go into sleep mode, and the earphones **10** will route standard headphone level analog signals to the transducer(s) **106**. This may be convenient in environments where wireless communications are not permitted, such as airplanes, but where there is a convenient source of audio contact. For example, the adapter **150** could plug into a person's DAP. The DSP **118** of the earphone **10** may still be operational in such a non-wireless mode to provide noise cancellation and any applicable equalization.

The examples presented herein are intended to illustrate potential and specific implementations of the embodiments. It can be appreciated that the examples are intended primarily for purposes of illustration for those skilled in the art. No particular aspect of the examples is/are intended to limit the scope of the described embodiments.

According to various embodiments, therefore, the present invention is directed to an earphone **10** that comprises a body **12**, where the body **12** comprises: (i) at least one acoustic transducer **106** for converting an electrical signal to sound; (ii) an antenna **108**; and (iii) a transceiver circuit **100** in communication with the at least one acoustic transducer **106** and the antenna **108**. The transceiver circuit **100** is for receiving and transmitting wireless signals via the antenna **108**, and the transceiver circuit **100** is for outputting the

14

electrical signal to the at least one acoustic transducer **106**. The wireless transceiver circuit also comprises firmware, which when executed by the transceiver circuit, causes the transceiver circuit to: (i) receive digital audio wirelessly from a data source **20** via an ad hoc wireless network **24** when the data source **20** is in wireless communication range with the earphone **10** via the ad hoc wireless network **24**; and (ii) when the data source **20** is not in wireless communication range with the earphone **10** via the ad hoc wireless network **24**, transition automatically to receive digital audio via an infrastructure wireless network **30**.

According to various implementations, the data source may comprise a portable digital audio player, such as an MP3 player, iPod, or laptop computer, or a nonportable digital audio player, such as a personal computer. In addition, the transceiver circuit **100** may comprise: (i) a wireless communication module **110** (such as a Wi-Fi or other wireless communication protocol module); (ii) a processor unit **114** in communication with the wireless communication module **110**; (iii) a non-volatile memory unit **122** in communication with the processor unit **114**; and (iv) a volatile memory **120** unit in communication with the processor unit **114**. The infrastructure wireless network may comprise a WLAN. The transceiver circuit **100** may receive digital audio from the data source **20** via the infrastructure wireless network **30** when the data source **20** is not in wireless communication range with the earphone **10** via the ad hoc wireless network **24**. The transceiver circuit firmware, when executed by the transceiver circuit **100**, may cause the transceiver circuit **100** of the earphone **10** to transition automatically to a pre-set infrastructure wireless network **30** that the data source **20** transitions to when the data source **20** is not in wireless communication range with the earphone **10** via the ad hoc wireless network **24** and when the pre-set infrastructure wireless network **30** is in range of both the earphone **10** and the data source **20**. In addition, the transceiver circuit firmware, when executed by the transceiver circuit **100**, may cause the transceiver circuit **100** of the earphone **10** to transmit data via the ad hoc wireless network **24** to the data source **20** regarding one or more infrastructure wireless networks **30** detected by the transceiver circuit **100** when the earphone **10** and the data source **20** are communicating via the ad hoc wireless network **24**.

In addition, the transceiver circuit firmware, when executed by the transceiver circuit **100**, may cause the transceiver circuit **100** of the earphone **10** to connect to a host server **40** via an available infrastructure wireless network **30** when the data source **20** is not in wireless communication range with the earphone **10** via the ad hoc wireless network **24**. The earphone **10** may receive streaming digital audio from the host server **40** via the infrastructure wireless network **30**. In addition, the earphone **10** may receive a first network address for a first streaming digital audio content server **70** from the host server **40** via the infrastructure wireless network **30**. In addition, the earphone **10** may comprise a user control, such as button **11**, dial, pressure switch, or other type of user control, that, when activated, causes the earphone **10** to transmit an electronic request via the infrastructure wireless network **30** to the host server **40** for a second network address for a second streaming digital audio content server **70**.

In other embodiments, the present invention is directed to a system that comprises: (i) a data source **20** for wirelessly transmitting streaming digital audio; and (ii) a wireless earphone **10** that is in wireless communication with the data source **20**. In yet other embodiments, the present invention is directed to a communication system that comprises: (i) a

US 10,368,155 B2

15                                      16

host server **40**; (ii) a first streaming digital audio content server **70** that is connected to the host server **40** via a data network **42**; and (iii) a wireless earphone **10** that is in communication with the host server **40** via a wireless network **30**. The host server **40** is programmed to transmit to the earphone **10** a first network address for the first streaming digital audio content server **70** on the data network **42**. The host server **40** and the streaming digital audio content server(s) **70** each may comprise one or more processor circuits and one or more memory circuits (e.g., ROM circuits and/or RAM circuits).

In yet another embodiment, the present invention is directed to a headset that comprises: (i) a first earphone **10**a that comprises one or more acoustic transducers **10**b for converting a first electrical signal to sound; and (ii) a second earphone **10**b, connected to the first earphone **10**a, wherein the second earphone **10**b comprises one or more acoustic transducers **10**b for converting a second electrical signal to sound. In one embodiment, the first earphone **10**a comprises: (i) a first antenna **108**; and (ii) a first transceiver circuit **100** in communication with the one or more acoustic transducers **106** of the first earphone **10**a and in communication with the first antenna **108**. The first transceiver circuit **100** is for receiving and transmitting wireless signals via the first antenna **108**, and for outputting the first electrical signal to the one or more acoustic transducers **10**b of the first earphone **10**a. The first transceiver circuit **100** also may comprise firmware, which when executed by the first transceiver circuit **100**, causes the first transceiver circuit **100** to: (i) receive digital audio wirelessly from a data source **20** via an ad hoc wireless network **24** when the data source **20** is in wireless communication range with the first earphone **10**a via the ad hoc wireless network **24**; and (ii) when the data source **20** is not in wireless communication range with the first earphone **10**a via the ad hoc wireless network **24**, transition automatically to receive digital audio via an infrastructure wireless network **30**.

In various implementations, the headset further may comprise a head band **19** that is connected to the first and second earphones **10**. In addition, the headset **19** further may comprise a microphone **104** having an output connected to the first transceiver circuit **100**. In one embodiment, the first transceiver circuit **100** is for outputting the second electrical signal to the one or more acoustic transducers **106** of the second earphone **10**b. In another embodiment, the second earphone **10**b comprises: (i) a second antenna **108**; and (ii) a second transceiver circuit **100** in communication with the one or more acoustic transducers **106** of the second earphone **10**b and in communication with the second antenna **108**. The second transceiver circuit **100** is for receiving and transmitting wireless signals via the second antenna **108**, and for outputting the second electrical signal to the one or more acoustic transducers **106** of the second earphone **10**b. The second transceiver circuit **100** may comprise firmware, which when executed by the second transceiver circuit **100**, causes the second transceiver circuit **100** to: (i) receive digital audio wirelessly from the data source **20** via the ad hoc wireless network **24** when the data source **20** is in wireless communication range with the second earphone **10**b via the ad hoc wireless network **24**; and (ii) when the data source **20** is not in wireless communication range with the second earphone **10**b via the ad hoc wireless network **24**, transition automatically to receive digital audio via the infrastructure wireless network **30**.

In addition, according to various embodiments, the first earphone **10**a may comprise a first data port and the second earphone **10**b may comprise a second data port. In addition, the headset may further comprise an adapter or dongle **150** connected to the first data port of the first earphone **10**a and to the second data port of the second earphone **10**b, wherein the adapter **150** comprises an output plug connector **152** for connecting to a remote device.

In addition, according to other embodiments, the present invention is directed to a method that comprises the steps of: (i) receiving, by a wireless earphone, via an ad hoc wireless network, digital audio from a data source when the data source is in wireless communication with the earphone via the ad hoc wireless network; (ii) converting, by the wireless earphone, the digital audio to sound; and (iii) when the data source is not in wireless communication with the earphone, transitioning automatically, by the earphone, to receive digital audio via an infrastructure wireless network.

In various implementations, the step of transitioning automatically by the earphone to receive digital audio via an infrastructure wireless network may comprises transitioning automatically to receive digital audio from the data source via an infrastructure wireless network when the data source is not in wireless communication range with the earphone via the ad hoc wireless network. In addition, the method may further comprise the step of receiving by the wireless earphone from the data source via the ad hoc wireless network data regarding one or more infrastructure wireless networks detected by data source when the earphone and the data source are communicating via the ad hoc wireless network.

In addition, the step of transitioning automatically by the earphone to receive digital audio via an infrastructure wireless network comprises may transitioning automatically to receive digital audio from a host sever via the infrastructure wireless network when the data source is not in wireless communication range with the earphone via the ad hoc wireless network. Additionally, the step of transitioning automatically by the earphone to receive digital audio via an infrastructure wireless network may comprise: (i) receiving, by the wireless earphone via the infrastructure wireless network, from a host server connected to the infrastructure wireless network, a network address for a streaming digital audio content server; and (ii) connecting, by the wireless earphone, to the streaming digital audio content server using the network address received from the host server.

It is to be understood that the figures and descriptions of the embodiments have been simplified to illustrate elements that are relevant for a clear understanding of the embodiments, while eliminating, for purposes of clarity, other elements. For example, certain operating system details for the various computer-related devices and systems are not described herein. Those of ordinary skill in the art will recognize, however, that these and other elements may be desirable in a typical processor or computer system. Because such elements are well known in the art and because they do not facilitate a better understanding of the embodiments, a discussion of such elements is not provided herein.

In general, it will be apparent to one of ordinary skill in the art that at least some of the embodiments described herein may be implemented in many different embodiments of software, firmware and/or hardware. The software and firmware code may be executed by a processor or any other similar computing device. The software code or specialized control hardware that may be used to implement embodiments is not limiting. For example, embodiments described herein may be implemented in computer software using any suitable computer software language type. Such software may be stored on any type of suitable computer-readable medium or media, such as, for example, a magnetic or

17

optical storage medium. The operation and behavior of the embodiments may be described without specific reference to specific software code or specialized hardware components. The absence of such specific references is feasible, because it is clearly understood that artisans of ordinary skill would be able to design software and control hardware to implement the embodiments based on the present description with no more than reasonable effort and without undue experimentation.

Moreover, the processes associated with the present embodiments may be executed by programmable equipment, such as computers or computer systems and/or processors. Software that may cause programmable equipment to execute processes may be stored in any storage device, such as, for example, a computer system (nonvolatile) memory, an optical disk, magnetic tape, or magnetic disk. Furthermore, at least some of the processes may be programmed when the computer system is manufactured or stored on various types of computer-readable media.

A "computer," "computer system," "host," "host server," "server," or "processor" may be, for example and without limitation, a processor, microcomputer, minicomputer, server, mainframe, laptop, personal data assistant (PDA), wireless e-mail device, cellular phone, pager, processor, fax machine, scanner, or any other programmable device configured to transmit and/or receive data over a network. Such components may comprise: one or more processor circuits; and one more memory circuits, including ROM circuits and RAM circuits. Computer systems and computer-based devices disclosed herein may include memory for storing certain software applications used in obtaining, processing, and communicating information. It can be appreciated that such memory may be internal or external with respect to operation of the disclosed embodiments. The memory may also include any means for storing software, including a hard disk, an optical disk, floppy disk, ROM (read only memory), RAM (random access memory), PROM (programmable ROM), EEPROM (electrically erasable PROM) and/or other computer-readable media.

In various embodiments disclosed herein, a single component may be replaced by multiple components and multiple components may be replaced by a single component to perform a given function or functions. Except where such substitution would not be operative, this substitution is within the intended scope of the embodiments. Any servers described herein, such as the host server 40, for example, may be replaced by a "server farm" or other grouping of networked servers (such as server blades) that are located and configured for cooperative functions. It can be appreciated that a server farm may serve to distribute workload between/among individual components of the farm and may expedite computing processes by harnessing the collective and cooperative power of multiple servers. Such server farms may employ load-balancing software that accomplishes tasks such as, for example, tracking demand for processing power from different machines, prioritizing and scheduling tasks based on network demand and/or providing backup contingency in the event of component failure or reduction in operability.

While various embodiments have been described herein, it should be apparent that various modifications, alterations, and adaptations to those embodiments may occur to persons skilled in the art with attainment of at least some of the advantages. The disclosed embodiments are therefore intended to include all such modifications, alterations, and adaptations without departing from the scope of the embodiments as set forth herein.

18

What is claimed is:

**1**. A wireless headphone assembly comprising:

first and second earphones, wherein each of the first and second earphones comprises an acoustic transducer;

an antenna for receiving wireless signals;

a wireless communication circuit connected to the antenna, wherein the wireless communication circuit is for receiving and transmitting wireless signals to and from the wireless headphone assembly;

a processor in communication with the wireless communication circuit; and

a rechargeable battery for powering the wireless headphone assembly,

wherein the headphone assembly is configured, with the processor, to transition automatically from playing digital audio content received wirelessly by the headphone assembly via a first wireless network to playing digital audio content received wirelessly by the headphone assembly via a second wireless network.

**2**. The wireless headphone assembly of claim **1**, wherein the processor is further configured to, upon activation of a user-control of the headphone assembly, initiate transmission of a request to a remote network server.

**3**. The wireless headphone assembly of claim **2**, wherein:

the headphone assembly further comprises a microphone; and

the processor is further configured to:

process audible utterances by a user of the headphone assembly picked up by the microphone in response to activation of the microphone by the user; and

transmit a communication based on the audible utterances via the first or second wireless networks.

**4**. The wireless headphone assembly of claim **1**, wherein:

the first earphone comprises a first earbud; and

the second earphone comprises a second earbud.

**5**. The wireless headphone assembly of claim **4**, wherein each of the first and second earphones comprises:

an antenna;

a wireless communication circuit connected to the at least the antenna;

a processor in communication with the wireless communication circuit; and

a rechargeable battery for powering the wireless headphone assembly.

**6**. The wireless headphone assembly of claim **1**, further comprising a headband connected between the first and second earphones.

**7**. The wireless headphone assembly of claim **6**, wherein the first and second earphones comprise speaker elements housed in on-ear headphones.

**8**. The wireless headphone assembly of claim **6**, wherein the first and second earphones comprise speaker elements housed in over-ear headphones.

**9**. The wireless headphone assembly of claim **1**, wherein each of the first and second earphones comprises:

a hanger bar that sits upon an upper external curvature of a user's ear; and

a body connected to the hanger bar, wherein the acoustic transducer is connected to the body.

**10**. The wireless headphone assembly of claim **1**, further comprising a docking station to charge the rechargeable battery when the first and second earphones are connected to the docking station.

**11**. The wireless headphone assembly of claim **1**, wherein the processor is configured to transition automatically from playing digital audio content received wirelessly by the headphone assembly via the first wireless network to playing

US 10,368,155 B2

19

20

digital audio content received wirelessly by the headphone assembly via the second wireless network based on a signal strength level for the second wireless network.

**12**. The wireless headphone assembly of claim **11**, wherein the processor is configured to transition automatically from playing digital audio content received wirelessly by the headphone assembly via the first wireless network to playing digital audio content received wirelessly by the headphone assembly via the second wireless network based on whether the signal strength level for the second wireless network is above a threshold level.

**13**. The wireless headphone assembly of claim **1**, wherein the processor is further configured to receive firmware updates from a remote computer device.

**14**. The wireless headphone assembly of claim **1**, further comprising a memory unit that stores network identifiers for the first and second wireless networks.

* * * * *

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:**      <u>2022-2090</u>

**Short Case Caption:**    <u>Koss Corp. v. Bose Corp.</u>

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

     ☒      the filing has been prepared using a proportionally-spaced typeface and includes <u>12,102</u> words.

     ☐      the filing has been prepared using a monospaced typeface and includes ___ lines of text.

     ☐      the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No._____).

Date: <u>Nov. 14, 2022</u>        Signature:    <u>*/s/ Mark G. Knedeisen*</u>

                                   Name:      <u>Mark G. Knedeisen</u>